EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier<br><br>Peticionarios<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos<br><br>---<br><br>Carmen Damaris Quiñones Torres<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Demandados<br><br>---<br><br>Carlos Delgado Altieri<br><br>Peticionario<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos<br><br>---<br><br>Wanda Vázquez Garced<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Demandados | 2020 TSPR 82<br><br>204 DPR ____ |

Número del Caso:  CT-2020-11 consolidado con
                  CT-2020-12
                  CT-2020-13
                  CT-2020-14


Fecha:  12 de agosto de 2020

Abogados de la parte peticionaria:

**CT-2020-11**
**Lcdo. Pedro Pierluisi Urrutia**
Lcdo. Carlos J. Sagardía Abreu
Lcda. Vanessa Santo Domingo Cruz
Lcdo. Walter Pierluisi Gonzalezcoya

**Lcdo. Eduardo Bhatia Gautier**
Lcdo. José A. Andréu Fuentes
Lcdo. Roberto L. Pratts Palerm

**CT-2020-12**
**Sra. Carmen Damaris Quiñones Torres**
Lcda. Mayte Bayolo Alonso
Lcdo. Fermín Arraiza Navas

**CT-2020-13**
**Sr. Carlos Delgado Altieri**
Lcdo. José Fco. Chaves Caraballo

**CT-2020-14**
**Hon. Wanda Vázquez Garced**
Lcdo. Edgar R. Vega Pabón

Abogados de la parte recurrida:
**CT-2020-11, CT-2020-12, CT-2020-13 y CT-2020-14**

**Comisión Estatal de Elecciones**
**Lcdo. Juan Ernesto Dávila Rivera, Presidente**
Lcdo. Félix R. Passalacqua Rivera
Lcda. Vickmary Sepúlveda Santiago
Lcdo. Jason R. Caraballo Oquendo
Lcdo. José A. Feliciano Ramos

**Comisionada Electoral del Partido Nuevo Progresista**
**Sra. María D. Santiago Rodríguez**
Lcdo. Hamed G. Santaella Carlo

**Comisionado Electoral del Partido Popular Democrático**
**Lcdo. Lind O. Merle Feliciano**
Lcdo. Jorge Martínez Luciano
Lcdo. Emil Rodríguez Escudero
Lcdo. Gerardo A. Cruz Maldonado
Lcdo. Gerardo De Jesús Annoni

Materia:  Derecho Constitucional y Derecho Electoral - En virtud del deber y responsabilidad constitucional que ostenta el Tribunal Supremo de Puerto Rico de proteger el derecho fundamental al sufragio del electorado y de los candidatos de los partidos políticos, a base de un balance de intereses y tomando en consideración la totalidad de las circunstancias, se decreta la continuación de las primarias estatales suspendidas para una fecha posterior, según las disposiciones del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, según enmendado, y el Reglamento para la celebración de primarias de los partidos políticos, para garantizar el derecho al voto de los electores que lo ejercitaron en el evento primarista suspendido y el de aquellos que esperaban por ejercerlo.  Igualmente, para garantizar la secretividad de los votos ya emitidos, se prohíbe la divulgación de resultados preliminares y oficiales hasta la culminación de todo el proceso de votación.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier<br><br>    Peticionarios<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Recurridos | |
| Carmen Damaris Quiñones Torres<br><br>    Demandante<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Demandados | CT-2020-11<br><br>cons. con<br><br>CT-2020-12<br><br>con<br><br>CT-2020-13<br><br>y con<br><br>CT-2020-14 |
| Carlos Delgado Altieri<br><br>    Peticionario<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Recurridos | |
| Wanda Vázquez Garced<br><br>    Demandante<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Demandados | |

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 12 de agosto de 2020.

A poco más de un (1) año de haber atendido uno de los casos de mayor envergadura en la historia de Puerto Rico y haber devuelto la estabilidad gubernamental y la paz

social, Senado de PR v. Gobierno de PR, 2019 TSPR 138, 203 DPR ___ (2019), este Tribunal se encuentra, una vez más, con la gran encomienda de detener las inobservancias y desviaciones de las normas jurídicas que rigen las primarias que nos ocupan y poner fin a la incertidumbre que arropa los procesos democráticos, brindar sosiego al Pueblo, pero, sobre todo, garantizar que su derecho fundamental al sufragio quede debidamente protegido.

Nos corresponde dilucidar con celeridad y firmeza varias controversias puramente de derecho que se suscitaron a raíz de la suspensión el pasado domingo, 9 de agosto de 2020, de las primarias estatales para seleccionar, entre otros, a los candidatos a la gobernación tanto por el Partido Nuevo Progresista (PNP) como por el Partido Popular Democrático (PPD). En esencia, debemos determinar si el acuerdo alcanzado por las respectivas Comisiones de Primarias de ambos partidos es válido parcial o totalmente; cuál fue el efecto, si alguno, que tuvo la posposición de dichos comicios sobre los votos emitidos ese día; y si corresponde divulgar los resultados oficiales de los precintos en los que los electores lograron ejercitar su derecho al voto. Un ejercicio adjudicativo pragmático, a base de la totalidad de las circunstancias que rodearon esta controversia, nos lleva a ordenar la continuación de las primarias, garantizando así el derecho al voto de los electores que

lo ejercitaron, así como el de los que aún esperan por hacerlo. Veamos:

## I.    Tracto fáctico y procesal

El pasado 4 de junio de 2020, mediante la Resolución Conjunta Núm. 37-2020, la Asamblea Legislativa reprogramó la fecha para celebrar las primarias tanto del PNP como del PPD **del domingo, 7 de junio de 2020 al domingo, 9 de agosto de 2020.** Esto ocurrió como resultado de la situación de emergencia acaecida a consecuencia del brote mundial del Coronavirus (COVID-19).

El 9 de agosto de 2020, a la hora programada, los electores se dirigieron a los centros de votación para ejercer su derecho al voto. No obstante, solo una porción de los centros se encontraba abierta, pues debido a múltiples deficiencias en la distribución correcta y oportuna de las papeletas y material necesario para celebrar las primarias, muchos de los centros no estaban preparados para operar. Causa de lo anterior fueron los atrasos y complicaciones administrativas, producto de la crasa negligencia de los directivos de la Comisión Estatal de Elecciones (CEE) y de las Comisiones Especiales de Primarias. Este atropello del proceso causó que gran parte de los precintos electorales no pudieran dar comienzo a los comicios a la hora que correspondía.

Evidencia del problema salió a relucir, inicialmente, por un comunicado que emitió la propia CEE. En éste, el Presidente de la CEE, anunció que "ante el retraso en

el recibo de papeletas, varios centros de votación de las Primarias Locales del PNP Y PPD no podr[ía]n abrir en el horario establecido".[1] Así, se incumplió con el deber de coordinar, dirigir y gestionar la celebración total de las primarias programadas, en violación a los postulados constitucionales y la normativa electoral que expondremos más adelante. Como remedio a la imposibilidad de abrir puntualmente varios colegios electorales por falta de equipo, la CEE anunció que se ampliaría el horario de votación de manera que se garantizara la apertura de todos los centros de votación durante ocho (8) horas.[2] No obstante, las horas transcurrieron sin que los materiales llegaran a todos los centros de votación.[3]

En reacción a lo anterior y en busca de un remedio para el caos que se suscitó, el Secretario de la CEE, Sr. Ángel L. Rosa Barrios (Secretario), emitió una *Certificación de acuerdo sobre primarias locales del 9 de agosto de 2020*, Núm. CEE-AC-20-224 (Acuerdo). En la misma expresó:

> Las Comisiones de Primarias del PNP y PPD[,] por unanimidad[,] acuerdan que hoy domingo, 9 de agosto de 2020 culminarán su proceso de votación en aquellos precintos

---

[1] *CEE anuncia extensión de horario de votación de Primarias Locales ante el retraso del comienzo de votación*, comunicado de prensa emitido por la Directora de Comunicaciones de la CEE el 9 de agosto de 2020, del cual tomamos conocimiento judicial.

[2] Íd.

[3] En algunos centros de votación las papeletas nunca llegaron, mientras que en otros llegaron horas después de que el evento electoral comenzó.

electorales donde se abrieron maletines electorales.

Se garantizará las ocho (8) horas para que los electores puedan ejercer su derecho al voto. Por el contrario, aquellos precintos electorales donde **no haya comenzado la votación a la 1:45 [p.m.],** se suspenderá la elección hasta el próximo domingo, 16 de agosto de 2020 en el horario de 8:00 [a.m.] a 4:00 [p.m.]

**Queda terminantemente prohibido la divulgación de resultados preliminares de cualquier colegio, unidad o precinto. Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno.**

Las violaciones de las directrices contenidas en este Acuerdo podrán acarear la aplicación de las sanciones penales contenidas en el Código Electoral de Puerto Rico 2020[,] Ley [Núm.] 58-2020.

Así se acuerda.

.   .   .   .   .   .   .   .[4]

(Énfasis en el original).

Inconforme con tal determinación, uno de los precandidatos a la gobernación por el PNP, el Lcdo. Pedro Pierluisi Urrutia (licenciado Pierluisi Urrutia), presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, un *Recurso de revisión electoral* el 9 de agosto de 2020.[5] En éste alegó que la prohibición pactada por la CEE con respecto a no publicar los resultados parciales de las votaciones contravenía el mandato expreso de salvaguardar el derecho al voto, consagrado en la Constitución de Puerto Rico, así como varias disposiciones

---

[4]  *Certificación de acuerdo sobre primarias locales del 9 de agosto de 2020*, Núm. CEE-AC-20-224, Apéndice del recurso urgente de certificación intrajurisdiccional, Caso Núm. CT-2020-0011, pág. 6.

[5]  *Recurso de revisión electoral*, Caso Núm. SJ2020CV04146, Apéndice del recurso urgente de certificación intrajurisdiccional, Caso Núm. CT-2020-0011, págs. 1-5. (El mismo se presentó a las 9:43 p.m., según surge del documento).

legales, entre las cuales se encontraba el Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020 (Código Electoral de 2020).

Similares argumentos presentó uno de los precandidatos a la gobernación por el PPD, el Lcdo. Eduardo Bhatia Gautier (licenciado Bhatia Gautier), quien compareció ante el Tribunal de Primera Instancia mediante otro *Recurso de revisión electoral*.[6] Alegó que el acuerdo habido entre los Comisionados era *ultra vires*, pues no se encontraba avalado por el Código Electoral de 2020, el Reglamento para la celebración de primarias de los partidos políticos, ni los reglamentos particulares del PPD o el PNP. Solicitó también la publicación de los resultados habidos hasta el momento y, además, que se concluyese el proceso electoral primarista a la brevedad posible. Esto es necesario, según afirmó, "para garantizar la validez de dichos votos y el debido proceso de ley de dichos electores, promoviendo de esa manera que el resultado de la elección para dichas unidades permanezca en suspenso y sujeto a la posibilidad de manipulación o fraude […]".[7] Posteriormente, el licenciado Bhatia Gautier presentó una *Solicitud de consolidación e intervención* en el caso iniciado por el licenciado Pierluisi Urrutia por entender que los hechos en cuestión y el derecho aplicable eran de

---

[6]    *Recurso de revisión electoral*, Caso Núm. SJ2020CV04153. (El mismo se presentó el 10 de agosto de 2020, a la 1:23 p.m., según surge del documento).

[7]    Íd., págs. 2 y 5.

naturaleza similar.**8**  Poco después, el Tribunal de Primera Instancia declaró *ha lugar* la solicitud de consolidación e intervención del licenciado Bhatia Gautier.

Mientras se dilucidaban varios asuntos relacionados a las Primarias Electorales ante el Tribunal de Primera Instancia, el licenciado Pierluisi Urrutia compareció ante este Tribunal y presentó un *Recurso urgente de certificación intrajurisdiccional*,**9** por virtud del cual solicitó nuestra inmediata intervención en el asunto, y reiteró los argumentos expuestos ante el foro primario. Añadió que la atención del caso resultaba apremiante por el carácter novel de la controversia, el riesgo de que el asunto se tornase académico, y el daño que podía causarse al proceso electoral primarista.  Mediante *Resolución*, paralizamos los procedimientos ante el Tribunal de Primera Instancia, concedimos a las partes peticionarias un término para evidenciar el diligenciamiento de los correspondientes emplazamientos, y a las partes recurridas la oportunidad de expresar su posición con respecto a la expedición del recurso de certificación.**10**

De igual manera, y mediante otra acción separada, la Sra. Carmen Damaris Quiñones Torres -representada por la

---

**8**  Solicitud de consolidación e intervención (presentado electrónicamente el 10 de agosto de 2020, a la 1:27 p.m.).

**9**  *Recurso urgente de certificación intrajurisdiccional*, presentado el 10 de agosto de 2020, a las 10:50 a.m.

**10**  *Resolución*, CT-2020-0011, emitida el 10 de agosto de 2020 a las 2:47 p.m. (Al momento de emitir esta Resolución tanto el recurso del licenciado Pierluisi Urrutia como el del licenciado Bhatia Gautier se encontraban consolidados en el Tribunal de Primera Instancia).

Unión Americana de Libertades Civiles (ACLU)- presentó ante el Tribunal de Primera Instancia una *Solicitud de entredicho provisional, mandamus, injunction preliminar y permanente*.[11] Ésta expresó que le indicaron en su colegio de votación que no había papeletas. Añadió que posteriormente se enteró de que la Escuela Francisco Prisco Fuentes -lugar donde ejercería su derecho al voto- estaba cerrada y que había un funcionario instruyendo que podría votar para las primarias el 16 de agosto de 2020. La señora Quiñones Torres alegó que ni la CEE ni los Comisionados Electorales tenían potestad legal para posponer ni suspender las elecciones primaristas del 9 de agosto de 2020. Por tanto exigió, entre otros remedios, que se declarase nulo e ilegal el cierre de los colegios el 9 de agosto de 2020; que continuasen las primarias en horario extendido; que se le exigiese a la CEE evidencia certificada y acreditativa de procedimientos, protocolos, bitácoras, entre otros aspectos del proceso eleccionario y su manejo; o que, en la alternativa, el Tribunal custodiase las papeletas y máquinas de escrutinio electrónico utilizadas el 9 de agosto de 2020 hasta tanto se concluyese el proceso el 16 de agosto de 2020. Mediante *Resolución* emitida el 10 de agosto de 2020, expedimos *motu proprio* el auto de certificación en dicho

---

[11] *Solicitud de entredicho provisional, mandamus, injunction preliminar y permanente*, Caso Núm. SJ2020CV04145. (Presentado electrónicamente el 9 de agosto de 2020, a las 8:33 p.m., según surge del documento).

caso y concedimos hasta el día siguiente a las partes para expresar su posición.[12]

Cónsono con los anteriores casos, y mediante una *Solicitud de revisión*, otro precandidato a la gobernación por el PPD, el Sr. Carlos Delgado Altieri (señor Delgado Altieri) impugnó también el Acuerdo de los Comisionados de Primarias y la CEE. Aseveró que estos no tenían autoridad en ley para modificar, suspender o cancelar el evento electoral. Por tanto, solicitó que se continuase el mismo dentro de un periodo de setenta y dos (72) horas, así como la contabilización y publicación de los resultados de los votos ya emitidos. Mediante *Resolución* de 10 de agosto de 2020, expedimos *motu proprio* el auto de certificación en dicho caso y concedimos hasta el día siguiente a las partes para que expresaran su postura al respecto.[13]

El 11 de agosto de 2020, la Gobernadora de Puerto Rico y precandidata a la gobernación por el PNP, Hon. Wanda Vázquez Garced (Gobernadora) también presentó un *Recurso de revisión electoral*.[14] En síntesis, señaló que el curso de acción tomado por la CEE violentó el derecho al sufragio de los ciudadanos de Puerto Rico, dado que cambió el horario de votación a última hora, lo cual a su vez incidió sobre la planificación del elector

---

[12] *Resolución*, CT-2020-0012, del 10 de agosto de 2020.

[13] *Resolución*, CT-2020-0013, del 10 de agosto de 2020.

[14] *Recurso de revisión electoral*, Civil Núm. SJ2020CV04176, de 11 de agosto de 2020 presentado ante el Tribunal de Primera Instancia a las 7:48 a.m.

para ejercer su derecho al voto. Por cuanto solicita que se revoquen todos los acuerdos tomados por los Comisionados Electorales para alterar el horario de las primarias del 9 de agosto de 2020, por contravenir la Resolución Conjunta 37-2020 y se ordene una nueva votación en todos aquellos precintos electorales donde se violó el horario establecido y donde no pudo efectuarse la votación.

Recibidos y atendidos los alegatos de todas las partes, y habiendo consolidado y certificado todos los recursos ante nosotros, procedemos a examinar el derecho aplicable a fin de resolver las controversias de derecho planteadas.

## II. Derecho aplicable

### A. Recurso de certificación intrajurisdiccinal

Como indicamos hace poco más de un año, la certificación *intrajurisdiccional*:

> es un mecanismo procesal discrecional, que podemos expedir por iniciativa propia o a solicitud de parte, para elevar inmediatamente a la consideración de este Tribunal cualquier asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuando, entre otros factores, se plantean **cuestiones de alto interés público que incluyen un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de Estados Unidos. Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V. Esto es de particular importancia cuando la legitimidad de los procesos democráticos y de nuestras instituciones está en disputa.** Senado de PR

v. Gobierno de PR, 2019 TSPR 138, págs. 4-5
(haciendo referencia a Torres Montalvo v.
ELA, 194 DPR 760 (2016)). (Énfasis
nuestro).[15]

Este Tribunal ha utilizado este mecanismo "para
atender asuntos que requieren urgente solución, ya sea
porque se afecta la administración de la justicia o porque
el asunto es de tal importancia que exige una pronta
atención". UPR v. Laborde Torres y otros, 180 DPR 253,
272-273 (2010) (citado en PIP v. ELA, 186 DPR 1, 9
(2012)). Asimismo, establecimos como ejemplo de lo
anterior su utilización en controversias que involucren
asuntos electorales de alto interés público. PIP v. ELA,
supra, pág. 9; Mundo Ríos v. CEE, 187 DPR 200, 206 (2012).
Véase, también, McClintock v. Rivera Schatz, 171 DPR 584
(2007); Suárez v. CEE I, 163 DPR 347 (2004) (Per Curiam).
De igual modo, expresamos que resulta de vital importancia
y utilidad cuando se cuestiona la legitimidad de los
procesos democráticos y nuestras instituciones. Véase
Senado de PR v. Gobierno de PR, supra, pág. 5; y Torres
Montalvo v. Gobernador, supra.

---

[15] Véase además: Art. 3.002s(f) de la Ley Núm. 201-2003, conocida
como la Ley de la Judicatura de 2003, 4 LPRA sec. 24s(f); Artículo
13.1 del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020
(Código Electoral de 2020); Regla 52.2(d) de Procedimiento Civil de
2009, 32 LPRA Ap. V; Regla 24s(e) del Reglamento del Tribunal Supremo,
4 LPRA Ap. XXI-B. Véase, también, R. Hernández Colón, *Práctica
Jurídica de Puerto Rico, Derecho Procesal Civil*, 6ta ed., LexisNexis
Puerto Rico, 2017, Sec. 5623, pág. 574.

## B. Derecho fundamental al sufragio

El derecho fundamental al voto consta consagrado tanto en la Décimo Cuarta enmienda de la Constitución de Estados Unidos de América, como en el Artículo II, Sección 2 de la Constitución de Puerto Rico, LPRA, Tomo 1.  Como hemos establecido anteriormente, éste es una de las garantías fundamentales de nuestro sistema democrático de gobierno, mediante el cual el Pueblo ejerce su poder soberano y expresa su voluntad.  Ramírez de Ferrer v. Mari Brás, 144 DPR 141 (1997); P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 207 (1981).  Véase, además, Rodríguez v. Popular Democratic Party, 457 US 1, 10 (1982); y Reynolds v. Sims, 377 US 533, 561-564 (1964).  Tan es así, que la Carta de Derechos de la Constitución de Puerto Rico impone limitaciones sobre la intervención con tal prerrogativa del Pueblo, al expresar que las leyes aprobadas por la Asamblea Legislativa "garantizarán la expresión de la voluntad del [P]ueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral".  Artículo II, Sección 2, Const. PR, LPRA, Tomo 1.

Como parte del derecho al voto, hemos reconocido como elementos básicos de este proceso a los partidos políticos.  McClintock v. Rivera Schatz, 171 DPR 584, 597 (2007).  Dijimos eso, en tanto y en cuanto los partidos resultan ser "los mecanismos mediante los cuales se

canaliza el ejercicio del sufragio de los ciudadanos, haciendo viable la elección periódica del Gobierno del país". Íd. De igual modo, nuestro andamiaje constitucional delegó en la Asamblea Legislativa no solo la encomienda de promulgar las leyes que habrán de garantizar el derecho al voto, sino también la reglamentación del proceso electoral. McClintock v. Rivera Schatz, *supra*, pág. 597. Cónsono con ello, nos hemos pronunciado a los efectos de que las controversias relacionadas con nuestro ordenamiento electoral se rigen tanto por principios constitucionales como estatutarios. Íd.

De otra parte, en cuanto al proceso de primarias se refiere, el Tribunal Supremo de Estados Unidos expresó que el ejercicio de votación de las primarias cuenta con la misma protección ante el Estado con la que cuenta el derecho al voto en una elección general. Rosario v. Rockefeller, 410 US 752, 768 (1973); Bullock v. Carter, 405 US 134 (1972).

En Puerto Rico, hemos expresado que:

> la democratización del proceso de primarias y el acceso de todo miembro del partido a éste adelanta el interés de que los resultados de este proceso representen las opciones de preferencia del electorado afiliado. Permiten que sea el elector, mediante el voto directo, quien controle lo que será la agenda de gobierno. McClintock v. Rivera Schatz, *supra*, págs. 605-606 (haciendo referencia a R. Dahl, *On Democracy, New Haven*, Yale University Press, 2000, Cap. 8).

De igual modo, establecimos que:

> [l]a imposibilidad de participar en este proceso representa la inhabilidad del electorado afiliado de apoyar un candidato, coartando la expresión de la voluntad del elector. Este daño que sufre el elector no se subsana con la posibilidad de votar en las elecciones generales, pues en ese momento sólo el candidato que resultara victorioso en el proceso de primarias figura en la papeleta. McClintock v. Rivera Schatz, *supra*, pág. 606.

Por tanto, hemos trazado como norte que todo elector afiliado del partido tenga acceso al proceso de primarias, enmarcado en un sistema electoral efectivo, justo y honesto. Íd., págs. 606-607. Empero, también velamos por no intervenir de manera irrazonable, haciéndolo de manera mínima con la autonomía reconocida a los partidos políticos. Íd., pág. 607.

No obstante, estamos llamados a proteger al ciudadano "contra toda coacción en el ejercicio de su prerrogativa electoral". Acevedo Vilá v. C.E.E., 172 DPR 971, 986 (2007). El estado y sus agencias tienen el deber ineludible de salvaguardar el principio de la libre selección del Pueblo. Íd. A esos efectos, toda actuación que tienda a crear una desigualdad indebida o desventaja no justificada entre unos y otros es contrario al mandato constitucional. Íd. Véase, además, P.N.P. v. Hernández, Srio. D.T.O.P., 122 DPR 362, 404 (1988) (*Sentencia*), Opinión concurrente del Juez Asociado señor Rebollo López.

## C. Resolución Conjunta 37-2020

El 4 de junio de 2020, la Asamblea Legislativa aprobó la Resolución Conjunta 37-2020 sobre la R. C. del S. 556 (Conferencia) (Resolución Conjunta 37-2020), la cual entró en vigor inmediatamente después de su aprobación. Sección 12, Resolución Conjunta 37-2020. Entre otras razones, especificó que, dado a que la preparación para el evento de primarias se había atrasado cerca de dos (2) meses a consecuencia del estado de emergencia de salud pública que enfrenta Puerto Rico, declarado en la Orden Ejecutiva Núm. 2020-0020 debido a la pandemia del Coronavirus (COVID-19), era prudente aprobar la referida resolución con el propósito primordial de posponer la fecha de celebración de las primarias de los partidos políticos, según establecida entonces en el Artículo 8.009 del derogado Código Electoral de Puerto Rico para el Siglo XXI, Ley Núm. 78-2011 (Código Electoral anterior). Por lo cual, ordenó la posposición de las primarias señaladas para el 7 de junio de 2020, hasta el domingo, 9 de agosto de 2020, en horario de 8:00 a.m. a 4:00 p.m. Secciones 1 y 5, Resolución Conjunta 37-2020. De igual forma, dispone que, a los fines de dicha resolución conjunta, "cualquier referencia al Código Electoral significará el 'Código Electoral de Puerto Rico para el Siglo XXI', Ley [Núm.] 78-2011, según enmendada, **o cualquier ley análoga que lo sustituya**". (Énfasis suplido). Sección 11, Resolución Conjunta 37-2020.

## D. Código Electoral de Puerto Rico de 2020

El Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, según enmendada (Código Electoral de 2020), entró en vigor inmediatamente después de su aprobación el 20 de junio de 2020, derogando, a su vez, entre otras disposiciones, el Código Electoral anterior.

La Exposición de Motivos del Código Electoral de 2020 consignó que éste persigue como algunos de sus principales propósitos el "[e]mpoderar a los electores facilitando su acceso a los procesos relacionados con el ejercicio de su derecho al voto". Esto se debe a que, en lo pertinente, el "elector es el eje y protagonista del sistema electoral y debe serlo sin limitaciones ni condiciones procesales que, irrazonablemente menoscaben, limiten o compliquen el ejercicio del voto […]". De igual manera, establece que tiene como uno de sus propósitos "[p]roveer a los partidos políticos y a los candidatos un marco legal que garantice sus derechos federales y estatales en razonable balance con los derechos individuales de los electores".

Por su parte, entre las disposiciones pertinentes al presente caso, se encuentra el Artículo 2.3(92) que define primarias como un "[p]roceso de [v]otación a través del cual se seleccionan los Candidatos a cargos públicos electivos con arreglo a esta Ley y a las reglas que adopte la Comisión y el organismo directivo del Partido Político concerniente". Además, el inciso 109 del mismo articulado incluye las primarias estatales como uno de los eventos

electorales contemplados dentro del significado de una votación. Íd.

Cónsono con lo anterior, el Artículo 5.1 reafirma el derecho fundamental al voto como "la más clara expresión e intención de la voluntad del Pueblo". Además, reconoce como derechos y prerrogativas adicionales del elector, la "más amplia accesibilidad de [éste], sin barreras y sin condiciones procesales onerosas, a toda transacción o servicio electoral, incluyendo el ejercicio de su derecho al voto"; a que "el sistema y los procedimientos electorales estén fundamentados en su más amplia participación y accesibilidad"; así como su derecho fundamental a la libertad de asociación mediante la inscripción de Partidos Políticos para, entre otros asuntos, "endosar las candidaturas de aspirantes apelantes a cargos electivos de su Partido"; y a que las primarias se realicen conforme a las garantías, los derechos y los procedimientos establecidos en la ley. Artículos 5.1 (4), (5), (11), (15), Código Electoral de 2020.

Por otra parte, el Código Electoral de 2020 considera a los Partidos Políticos de Puerto Rico como "entidades privadas, pero revestidas con amplio interés público y con reconocimiento constitucional" que tienen como propósito "promover la participación libremente asociada de los ciudadanos en los procesos electorales de acuerdo con los programas, principios e ideas que postulan; **y mediante el sufragio universal, libre, secreto y directo**". (Negrillas

añadidas). Artículos 2.3(85), 6.1, Código Electoral de 2020.

De otro lado, el Capítulo 7 del Código Electoral de 2020 regula el proceso de las primarias. Específicamente, el Artículo 7.1 provee para la creación de una Comisión de Primarias para cada Partido Político, compuesta por el Presidente de la Comisión Estatal de Elecciones y el Comisionado Electoral de cada Partido Político que deba realizar primarias. Estas Comisiones de Primarias se activarán automáticamente en todo su rigor una vez el partido deba realizar primarias para la nominación de los candidatos a uno o más cargos públicos electivos y "hasta que se certifiquen los resultados finales de las primarias en escrutinio general o recuento". Las decisiones de las Comisiones de Primarias se tomarán por unanimidad del Presidente de la Comisión y el Comisionado Electoral del Partido Político, pero, de no haberla, prevalecerá la decisión del Presidente. Íd. Para estos fines, la CEE aprobará reglamentación uniforme para todos los partidos. Íd.

En lo concerniente a la fecha dispuesta en el Código Electoral de 2020 para la celebración de las primarias, el Artículo 7.12 indica que "tendrán lugar el primer domingo del mes de junio del año de la Elección General".

A su vez, el Artículo 7.20 atiende la contabilización de votos y escrutinio para las primarias. Éste establece:

> La Junta Local de Primarias será responsable del escrutinio de primarias de su precinto y deberá presentar a la Comisión un acta con los resultados. **El acta se presentará dentro de las veinticuatro (24) horas siguientes a la celebración de la primaria**. La Comisión de Primarias reglamentará los procedimientos y los formularios a ser utilizados por esta Junta. (Énfasis suplido). Íd.

Como vemos, la contabilización y presentación de las correspondientes actas se presentan luego de celebrada la primaria. Hasta tanto no culmine la votación, la primaria no ha culminado.

Por otra parte, el Artículo 10.5(2) especifica que:

> La Comisión tendrá la obligación de establecer un sistema de divulgación pública de los resultados en progreso de todo evento electoral, según sean recibidos. **Este sistema deberá estar disponible para acceso del público en general desde la hora de cierre de los colegios de votación.** (Énfasis suplido). Íd.

Nótese que no se refiere al cierre de algunos colegios. Se presume que la alusión al cierre de colegios se refiere al que se da cuando ya más ningún elector puede emitir su voto.

Asimismo, el Artículo 10.6 (1) añade que:

> La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el primer anuncio público de resultado parcial de una elección, no más tarde de las diez de la noche (10:00 pm) **del día en que se realizó la votación.** […] (Énfasis suplido). Íd.

Esto presume que la votación concluyó, como de ordinario sucede, en un mismo día. Ciertamente el

Legislador no contempló la divulgación de resultados parciales o mientras aún sea posible votar. No existe base legal alguna para la divulgación parcial de los resultados antes de que culmine el proceso de primarias.

En cuanto a la revisión judicial de las decisiones alcanzadas por la CEE, el Artículo 13.1 consigna como obligaciones de la Rama Judicial, las siguientes:

(2) Obligación de la Rama Judicial

(a) En todo recurso legal, asunto, caso o controversia que se presente en un Tribunal de Justicia, este deberá dar prioridad a la deferencia que debe demostrar a las decisiones tomadas por la Comisión a nivel administrativo, siendo esta la institución pública con mayor experti[s]e en asuntos electorales y la responsable legal de implementar los procesos que garanticen el derecho fundamental de los electores a ejercer su voto en asuntos de interés público.

(b) Ese derecho fundamental a votar del pueblo soberano en nuestro sistema democrático tiene supremacía sobre cualquier otro derecho o interés particular que pretenda impedirle votar. Ningún recurso legal, asunto, caso o controversia bajo la jurisdicción interna de la Comisión; y ningún proceso, orden, sentencia o decisión judicial podrán tener el efecto directo o indirecto de impedir, paralizar, interrumpir o posponer la realización de una votación según legislada y según el horario y día específicos dispuestos por ley; a menos que el Tribunal Supremo de Puerto Rico determine la violación de algún derecho civil que, con excepción de una Elección General, posponga la votación o la clasifique como inconstitucional.

Finalmente, el Artículo 13.3, en lo pertinente, reconoce la facultad legal de certificar recursos de este Tribunal, entre otras circunstancias, expidiéndolos discrecionalmente y *motu proprio*. Así lo dispone específicamente:

.   .   .   .   .   .   .   .

> (4) Mediante auto de certificación, a ser expedido discrecionalmente, motu[] prop[r]io o a solicitud de parte, el Tribunal Supremo podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto electoral pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones, cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico y/o la Constitución de Estados Unidos de América.

### E. Reglamento de Primarias

A tenor con el Código Electoral de 2020, se aprobó y promulgó el *Reglamento para la celebración de primarias de los partidos políticos* (aprobado el 16 de marzo de 2020 y revisado el 23 de junio de 2020) (Reglamento de Primarias). Al igual que las disposiciones previamente mencionadas, el Reglamento de Primarias dispuso para la celebración de dichos comicios el domingo, 9 de agosto de 2020, de 8:00 a.m. a 4:00 p.m. Sección 2.1, Reglamento de Primarias. Consignó, además, que dicho proceso garantizaría el derecho al voto igual, libre, directo y secreto. Sección 2.2, Reglamento de Primarias.

A propósito de la creación y funciones de la Comisión de Primarias, el Reglamento de Primarias lee de manera similar al Artículo 7.1 del Código Electoral de 2020, previamente discutido. Además, considera a la Comisión de Primarias como el último nivel jerárquico para resolver desacuerdos sobre decisiones que se tomen en la mesa de escrutinio entre funcionarios que representen a los aspirantes. Sección 5.11(5), Reglamento de Primarias.

Asimismo, en cuanto a los procedimientos **posteriores** a la votación de primarias, el Reglamento de Primarias dispone para que la CEE combine "los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos" de forma tal que le permita realizar un primer anuncio público del resultado parcial de una elección, "no más tarde de las diez de la noche (10:00 [p.m.]) del día en que se realizó la votación […] tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer [el] anuncio". Sección 5.4(1), Reglamento de Primarias. Posteriormente, la CEE podrá hacer un segundo anuncio de resultados parcial "no más tarde de las seis de la mañana (6:00 [a.m.]) del día siguiente en que se realizó la votación", bajo los mismos términos que el primer anuncio. Sección 5.4(2), Reglamento de Primarias. El resultado del escrutinio general deberá ser informado "no más tarde de las 72 horas siguientes al día de las primarias" y se hará "a base de

la combinación de los resultados de todos los colegios de votación de cada Unidad Electoral". Sección 5.6, Reglamento de Primarias.

## III. Análisis

La controversia planteada ante este Tribunal cumple claramente con todos los requisitos estatutarios y jurisprudenciales que ameritan nuestra pronta intervención, sin dilación. Mundo Ríos v. CEE, *supra*, pág. 206. Primeramente, estamos frente a un evento electoral de primarias suspendido el pasado domingo, 9 de agosto de 2020, y programado para continuar el próximo domingo, 16 de agosto de 2020. Segundo, ante un evento de primarias estatales, pende ante nosotros garantizar el derecho al sufragio de dos grupos de puertorriqueños: los que ejercieron su derecho al voto y aquellos que vieron pospuesto el ejercicio de éste en las urnas en igualdad de condiciones. No hallamos mayor grado de interés público en el Puerto Rico de hoy, que el de imprimir certeza y legitimidad a los procesos democráticos.

Es de conocimiento general la situación de emergencia que atraviesa Puerto Rico debido a la pandemia del coronavirus y las múltiples dificultades que ha traído a la vida diaria de los ciudadanos, al igual que en las operaciones de entidades públicas como privadas. Ante este cuadro fáctico, mediante la Resolución Conjunta 37-2020, la Asamblea Legislativa pospuso las primarias estatales para el pasado domingo, 9 de agosto de 2020.

Como agravante, una administración deficiente del evento electoral programado dejó a miles de electores sin la oportunidad de expresar su voluntad respecto a las primarias en las urnas. La situación para aquellas unidades electorales se tornó insostenible cuando pasado el mediodía aún no habían recibido las papeletas y otros materiales de votación. Ante este grave incumplimiento con el andamiaje electoral de nuestro ordenamiento, las Comisiones de Primarias del PNP y PPD, integradas, según dispone el derecho arriba citado, por el Presidente de la CEE y los Comisionados Electorales de cada partido, acordaron culminar las votaciones en aquellos precintos electorales donde se abrieron los maletines electorales y se comenzó el proceso de votación y suspender las primarias para el próximo domingo para aquellos precintos donde los electores no tuvieron oportunidad de votar. Al mismo tiempo, prohibieron tajantemente la divulgación de resultados preliminares y ordenaron apagar las máquinas de escrutinio.

Tras la emisión del Acuerdo, en lo pertinente, algunos de los peticionarios cuestionaron ante el Tribunal de Primera Instancia y este Tribunal la validez de la determinación alcanzada por la Comisión de Primarias y solicitaron la divulgación de los resultados habidos hasta entonces. Otros, a su vez, solicitaron la reanudación de

las primarias estatales a la brevedad posible,[16] que se le requiriera evidencia acreditativa de los protocolos, entre otros documentos, del proceso eleccionario a la CEE, así como se ordenara la incautación de las papeletas y máquinas utilizadas. Así las cosas, certificamos y consolidamos los casos.

Ante la realidad de lo ocurrido en las primarias celebradas el pasado domingo, no cabe duda de que quien sale mayormente perjudicado por ser la parte más vulnerable y sin inherencia directa en los procedimientos que rigen dichos eventos, es el elector. El Acuerdo alcanzado, es un reconocimiento de lo anterior. Sin embargo, es innegable que la administración y celebración de este evento electoral, el cual está revestido con amplio interés público, no fue cónsono con los postulados constitucionales y estatutarios que exigen el derecho al sufragio universal, libre, secreto y directo.

---

[16] Al respecto, el licenciado Bhatia Gautier argumentó a favor de que se concluyera el proceso electoral lo antes posible, entre otras razones, para evitar "la posibilidad de manipulaciones o fraude [...]". *Recurso de revisión electoral*, Civil Núm. SJ2020CV04153, págs. 2 y 5. En el presente recurso, las alegaciones de fraude no encuentran base alguna en el expediente ante nuestra consideración. Como hemos reiterado en múltiples ocasiones, las alegaciones de ese tipo deben probarse con hechos, mediante prueba clara, robusta y convincente, y no por inferencias o deducciones. Véase González v. Rivera, 42 DPR 313, 318 (1931); Sucesión Cayere v. Monell, 40 DPR 936, 940 (1930); Sabalier v. Iglesias, 34 DPR 352, 374-375 (1925); Ana María Sugar Co. v. Castro, 28 DPR 241, 257 (1920). Véase también, por ejemplo, Casals v. Sancho Bonet, Tesorero, 53 DPR 640 (1938). Véase, sin embargo, Arruza v. Laugier *et al.*, 14 DPR 25, 33 (1908) y Gómez v. American Colonial Bank, 34 DPR 148, 154 (1925) (los cuales establecían un estándar de preponderancia de la prueba). Asimismo, es meritorio resaltar que en nuestro ordenamiento opera una presunción contra el fraude. Ortiz v. Clausells, 34 DPR 536, 540 (1925); Sabalier v. Iglesias, *supra*, pág. 374.

Es obligación de la Rama Judicial proteger el derecho fundamental al voto de los electores, el cual goza de supremacía sobre cualquier otro interés que pretenda de forma irrazonable limitar su ejercicio pleno.

El Acuerdo alcanzado de manera unánime, dentro del contexto histórico vivido el pasado domingo, tiene el efecto con respecto a los electores que ya ejercitaron su voto, de preservar su naturaleza secreta, sin adelantos de tendencias que coloquen a los otros electores que aún no han votado en ventaja o desventaja sobre los que ya votaron. Revelar resultados en estos momentos podría claramente influenciar y tener un efecto en las personas que aún no han votado, en perjuicio de los electores que ya emitieron su voto y que no contaban con dicha información cuando lo hicieron. O, por el contrario, puede tener el efecto de disuadir la participación de los electores que aún no han votado pues se da la impresión de que su voto ya no cuenta o no haría diferencia. No se estaría realizando la votación en igualdad de condiciones, lo que sería injusto e irrazonable, consistiendo a todas luces en una ventaja indebida en los procesos eleccionarios.

Por su parte, la estipulación para continuar el evento electoral el próximo domingo en los precintos donde los electores no pudieron votar, es cónsona al principio rector de las disposiciones electorales de garantizar el derecho al sufragio igual, secreto y, particularmente para

este grupo, directo. Los contratiempos de los organismos oficiales no pueden ser un escollo que anule el ejercicio del derecho al voto con igual peso que el del resto de los electores. En ese contexto, la divulgación prematura de resultados electorales sin que haya culminado todo el proceso de votación sería contraria a esos postulados.

Ahora bien, es innegable la situación que atraviesa Puerto Rico actualmente. Ante la ausencia de un precedente que dispusiera de este asunto previamente o que interpretara esta disposición del Código Electoral, el proceso de Primarias se suspendió en aquellos precintos en que la votación no había comenzado a la 1:45 p.m.

En virtud del deber y responsabilidad constitucional que ostenta este Tribunal, en el balance de intereses y la evaluación de la totalidad de las circunstancias, nos vemos obligados a disponer un remedio que garantice y proteja el derecho del electorado y los candidatos de los partidos políticos. Por lo tanto, se decreta la continuación del evento electoral por disposición de este Tribunal. En específico, ordenamos la continuación del proceso primarista el próximo domingo, 16 de agosto de 2020. El proceso primarista se mantendrá suspendido hasta su reanudación en los precintos que no comenzaron la votación y aquellos donde no se proveyó el periodo de ocho (8) horas que brinda el Código Electoral y el Reglamento de Primarias. La continuación de las Primarias en los comicios correspondientes deberá llevarse a cabo en el

horario de 8:00 a.m. a 4:00 p.m., según establece el Reglamento de Primarias. Asimismo, para proteger y garantizar el derecho constitucional de los electores, en vista de que las Primarias no han culminado, se prohíbe la divulgación de resultados preliminares y oficiales de la votación que se llevó a cabo el 9 de agosto de 2020. La CEE deberá tomar las medidas necesarias para comenzar puntualmente las votaciones en los colegios restantes y proceder igualmente a divulgar prontamente los resultados de todos los votos emitidos <u>posterior a que culmine la votación</u>, para la tranquilidad y sosiego de todas las partes y el Pueblo de Puerto Rico. Esperemos que, a nombre de la democracia, no haya más fallos, ineficiencia, errores ni dilaciones. Cualquier otro resultado o desviación a lo aquí intimado sería claramente inaceptable.

### IV. Conclusión

Por los fundamentos expuestos en esta Opinión, en el balance de intereses y en el ejercicio de nuestra facultad constitucional ordenamos la continuación del evento primarista pautado para <u>el próximo domingo</u>, 16 de agosto de 2020, en los precintos que no recibieron los materiales electorales o aquellos que recibiéndolos no comenzaron el proceso de votación. Ello se hará según el plan de trabajo de las respectivas Comisiones de Primarias y en el marco de las garantías de secretividad instruidas en la

Certificación de la CEE que provee para garantizar la no divulgación prematura de los votos previa y válidamente emitidos hasta tanto culmine todo el proceso de votación. Por último, y en cuanto a la Sra. Carmen Damaris Quiñones Torres, tomamos conocimiento judicial de que la Escuela Francisco Prisco Fuentes ubica en el Precinto 106 de la Región de Carolina, donde deberán efectuarse las votaciones el próximo domingo, por lo cual su derecho al voto no se verá afectado.

Se dictará Sentencia de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier<br><br>    Peticionario<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Recurridos | |
| Carmen Damaris Quiñones Torres<br><br>    Demandante<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Demandados | CT-2020-11<br><br>cons. con<br><br>CT-2020-12<br><br>con<br><br>CT-2020-13<br><br>y con<br><br>CT-2020-14 |
| Carlos Delgado Altieri<br><br>    Peticionario<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Recurridos | |
| Wanda Vázquez Garced<br><br>    Demandante<br><br>    v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>    Demandados | |

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de agosto de 2020.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se ordena la continuación del evento primarista pautado para el próximo domingo, 16 de agosto de

2020, en los precintos que no recibieron los materiales electorales o aquellos que recibiéndolos no comenzaron el proceso de votación. Ello se hará según el plan de trabajo de las respectivas Comisiones de Primarias y en el marco de las garantías de secretividad instruidas en la Certificación de la Comisión Estatal de Elecciones de Puerto Rico que provee para garantizar la no divulgación prematura de los votos previa y válidamente emitidos hasta tanto culmine todo el proceso de votación.

Por último, y en cuanto a la Sra. Carmen Damaris Quiñones Torres, tomamos conocimiento judicial de que la Escuela Francisco Prisco Fuentes ubica en el Precinto 106 de la Región de Carolina, donde deberán efectuarse las votaciones el próximo domingo, por lo cual su derecho al voto no se verá afectado.

**Notifíquese de inmediato por teléfono y correo electrónico.**

Lo acordó el Tribunal y certifica el Secretario del Tribunal. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión de Conformidad. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de Conformidad en parte y Disidente en parte. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad. El Juez Asociado señor Estrella Martínez emitió una Opinión de Conformidad. El Juez Asociado señor Colón Pérez emitió una Opinión de Conformidad. La Jueza Asociada señora Pabón Charneco emitió una Opinión Concurrente en parte y Disidente en parte.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier

    Peticionario

          v.

Comisión Estatal de Elecciones, y otros

    Recurridos

_____

Carmen Damaris Quiñones Torres

    Demandante

          v.

Comisión Estatal de Elecciones, y otros

    Demandados

_____

Carlos Delgado Altieri

    Peticionario

          v.

Comisión Estatal de Elecciones, y otros

    Recurridos

_____

Wanda Vázquez Garced

    Demandante

          v.

Comisión Estatal de Elecciones, y otros

    Demandados

CT-2020-11 cons. con CT-2020-12 con CT-2020-13 y con CT-2020-14

La Jueza Presidenta ORONOZ RODRIGUEZ emitió una Opinión de conformidad.


En San Juan, Puerto Rico, a 12 de agosto de 2020.

> [T]he right to vote is precious – almost sacred. Countless people marched and protested for this right. Some gave a little blood, and far too many lost their lives." John Lewis (en una de sus últimas declaraciones públicas, el 25 de junio de 2020, en el séptimo aniversario de la decisión de Shelby County v. Holder)

Otra vez Puerto Rico vive una encrucijada histórica. Hace apenas un año el Poder Judicial -como guardián de nuestra Constitución- guió al País ante una crisis de gobernanza sin precedentes. Proveyó la certeza y la estabilidad que exigía el momento. Un año después, precisa tomar acción decidida para proteger la voluntad del soberano: el Pueblo de Puerto Rico, cuyo derecho fundamental al voto se laceró irremediablemente.

Por décadas, los puertorriqueños y puertorriqueñas nos preciábamos de la eficiencia de nuestros comicios. Personas de otros países los observaban para emularlos. La alta participación de nuestra gente en los eventos electorales generales, si bien ha disminuido en los años recientes, evidencia nuestra fe y convicción de que las elecciones son la base de la democracia. Y es que votar es el ejercicio volitivo más fundamental pues le da voz a cada ciudadano con respecto a quienes le gobernarán. Por ello, los eventos del 9 de agosto de 2020, la fecha en que por mandato de ley se celebrarían las primarias, consternaron al País quien observó, impotente, el desenlace trágico del evento electoral. Si bien la función de este Tribunal es resolver

las controversias de Derecho que se traban en el foro judicial, a las

cosas hay que llamarlas por su nombre, máxime cuando las ejecutorias de unos pocos pisotearon uno de los derechos sagrados de los ciudadanos. Lo que ocurrió el 9 de agosto es una vergüenza, pero es mucho más. Es una alerta dura del peligro de adoptar prácticas que se asemejan más a un régimen autoritario, que a la democracia que nos distingue como Pueblo.

La presentación de recursos múltiples y cuestionamientos variados en los foros judiciales refleja el fracaso del organismo cuyo deber ministerial es garantizar el derecho al voto --en igualdad de condiciones-- de **toda** persona que quiera ejercerlo. Miles de puertorriqueños invirtieron su tiempo, arriesgaron sus vidas ante el contagio potencial del COVID-19, hicieron arreglos en sus trabajos o en sus hogares, esperaron en filas bajo el sol, pagaron transportación o se movilizaron a pie -más de una vez- para ejercer su derecho al voto. Muchos, incluso, fungieron como voluntarios en los colegios para garantizar la pureza de los procesos **y la Comisión Estatal de Elecciones les falló abismalmente.**

Tras el desasosiego que creó el desastre del proceso electoral primarista, es imperativo que el Poder Judicial pondere los remedios que devuelvan al Pueblo la confianza en nuestra capacidad de llevar a cabo estos ejercicios electorales sin mácula sobre sus resultados. Todos los Jueces y Juezas que integramos este Foro coincidimos en esto.

También sabemos que, por encima de todo, vamos a salvaguardar el derecho fundamental al voto de cada puertorriqueño y puertorriqueña. Ahora bien, no hay un remedio

perfecto que abarque el universo de situaciones que se dieron en los precintos y colegios de Puerto Rico. Lo que sí podemos hacer, y lo que estamos haciendo, es garantizar los derechos de aquellos que emitieron sus votos con el mismo celo con el que hoy protegemos a los que se le privó de la oportunidad. **Con ello, esperamos devolverle al País un proceso electoral que le permita al que triunfe reclamar su victoria con legitimidad y al que pierda, acatarlo sin reservas.**

De cara a las elecciones generales y ante un proceso primarista nefasto bajo un estatuto legal nuevo, las instituciones responsables de facilitar y proteger el derecho al voto de la ciudadanía aún pueden llevar a cabo un proceso de primarias ordenado y confiable. Uno que facilite el ejercicio libre e igual de todos los puertorriqueños y puertorriqueñas que deseen ejercer su deber cívico de escoger las personas que les representarán en los comicios generales.

Por ello, estoy conforme con la opinión mayoritaria pues da prelación al rasgo más distintivo del carácter universal del derecho al voto: el sufragio igualitario. Al determinar que se contarán todos los votos que se emitieron el domingo, respetamos la igualdad del voto y decretamos que todos los votos tendrán el mismo peso, no importa cuándo se emitieron. Hoy, este Tribunal realza el valor del derecho al voto y de

la participación ciudadana en los procesos electorales. Más aun, envía un mensaje claro de que cualquier acción que lacere este derecho fundamental es una afrenta a la democracia, a la Constitución y a una de las libertades más importantes del ser humano.

Con esto en mente, y aunque de un tiempo a esta parte no existe pausa para las tragedias que enfrentamos como Pueblo, como una optimista eterna, sé que también superaremos este día.

## I.

El 9 de agosto de 2020 cargará con la marca del día en que, ante la mirada internacional, millones de puertorriqueñas y puertorriqueños fuimos testigos de una debacle que postra una sombra sobre nuestro proceso electoral. La incompetencia administrativa de la Comisión Estatal de Elecciones (CEE) y de sus oficiales principales negó a los electores el derecho fundamental al voto. Fracasó con su obligación legal principal: "[g]arantizar que los servicios, procesos y eventos electorales se planifiquen, organicen y realicen con pureza, transparencia, seguridad, certeza, rapidez, accesibilidad y facilidad para los electores de manera costo-eficiente, libre de fraude y coacción […]". Art. 3.1(1), Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020 (Código Electoral).

Según reseñó la Opinión mayoritaria, el domingo, 9 de agosto de 2020, las Comisiones de Primarias del Partido Nuevo Progresista (PNP) y el Partido Popular Democrático (PPD)

suscribieron un Acuerdo que la CEE certificó.[17] En lo pertinente, el Acuerdo lee como sigue:

Las Comisiones de Primarias del PNP y PPD por unanimidad acuerdan que hoy domingo, 9 de agosto de 2020 culminarán su proceso de votación en aquellos precintos electorales donde se abrieron maletines electorales.
Se garantizará las ocho (8) horas para que los electores puedan ejercer su derecho al voto. Por el contrario, aquellos precintos electorales donde **no haya comenzado la votación a la 1:45 pm**, se suspenderá la elección hasta el próximo domingo, 16 de agosto de 2020 en el horario de 8:00 am a 4:00 pm.
**Queda terminantemente prohibido la divulgación de resultados preliminares de cualquier colegio, unidad o precinto. Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno.**
[…].[18]
De esta manera, se trabó una de las controversias que planteó este recurso: si la CEE y las Comisiones de Primarias del PNP y el PPD tenían la autoridad para posponer una votación en curso. La respuesta, hay que decirlo enseguida, es que no.

El legislador invistió en la CEE la autoridad para *motu proprio* resolver "cualquier asunto o controversia de naturaleza específicamente electoral, **excepto que otra cosa se disponga en esta ley**". Art. 3.5 del Código Electoral (Énfasis suplido). Más adelante, ese mismo artículo fija un límite importante al ejercicio de esa autoridad y jurisdicción. Dispone que ningún **"asunto"**, **"controversia"**, **"proceso" u "orden"** – incluyendo aquellos que de ordinario estarían bajo la jurisdicción de la CEE- "podrá tener el efecto <u>directo o indirecto de impedir, paralizar, interrumpir o dilatar la realización de una Votación</u> **a menos que el Tribunal Supremo de Puerto Rico determine**

---

[17] *Certificación de Acuerdo sobre Primarias Locales del 9 de agosto de 2020*, CEE-AC-20-224.
[18] <u>Íd.</u> (Énfasis en el original).

**inconstitucionalidad o violación de algún derecho civil que**, con excepción de una Elección General, **convierta la votación en ilegal**". Art. 3.5(3) del Código Electoral, supra (Énfasis suplido).[19] En este caso, no medió determinación alguna de este Tribunal que autorizara a la CEE --y a nadie-- a paralizar el proceso electoral. Por ende, obliga la conclusión de que la CEE actuó sin jurisdicción y de manera *ultra vires* al certificar un Acuerdo entre las Comisiones de Primarias del PNP y PPD. Tal curso de acción interrumpió el ejercicio de una votación en curso. Esto es grave.

No obstante, por dos razones principales, la primacía del derecho constitucional al voto prohíbe que tal actuación *ultra vires* anule los votos que se emitieron previo a la suspensión de las primarias. Primero, una orden que se emite sin autoridad no puede relevar a la CEE de su responsabilidad de asegurar que se cuente cada voto que se emitió válidamente. Al contrario, el hecho de que su incapacidad ocasionara el caos que hoy nos tiene aquí acentúa aún más la responsabilidad de la CEE de garantizar que cada voto se cuente. Segundo, independientemente de que la CEE actuó sin autoridad, este Tribunal es responsable de mitigar el daño que la CEE causó y garantizar que todo ciudadano que no pudo votar pueda hacerlo. Este Tribunal no se prestará para legitimar que tres personas se pongan de acuerdo para interrumpir el proceso que asegura que cientos de miles de

---

[19] *Véase también* Art. 13.1(b)(2) (reafirmando, mediante lenguaje casi idéntico, ese límite a la autoridad de la CEE).

puertorriqueñas y puertorriqueños ejerzan su prerrogativa constitucional.

En consecuencia hizo bien este Tribunal al ofrecer un remedio en equidad que garantice el principio de la igualdad del voto entre aquellos que lo pudieron ejercer válidamente y los que, vergonzosamente, no pudieron.

Ante este cuadro inaudito, no existe una solución perfecta. No obstante, como bien expone el profesor Héctor L. Acevedo, "ver los derechos individuales sin aquilatar sus repercusiones acumulativas es una invitación al desastre". H.L. Acevedo, *La democracia puertorriqueña y su sistema electoral*, Puerto Rico y su gobierno: estructura, retos y dinámicas, Puerto Rico, Ed. SM, 2016, pág. 321. Tales consideraciones informan el remedio que --en derecho y en términos pragmáticos-- ofrecemos para salvaguar las garantías constitucionales de los electores que ejercieron su derecho y aquellos a quienes la negligencia de la CEE se lo impidió. Hoy, este Tribunal hace valer cada uno de los votos que se emitió el 9 de agosto de 2020 y permite a la ciudadanía que no pudo votar ejercer tal derecho en una fecha posterior con **las garantías de confiabilidad que requiere el ejercicio efectivo de ese voto**. Al hacerlo, sostenemos hasta donde sea posible, "el clima de seguridad, todavía frágil, en la igualdad del voto y en el principio de que el poder político emana del pueblo". PSP, PPD, PIP v. Romero Barceló, 110 DPR 248, 282 (1980).

II.

Al adoptar nuestra Consitución hace más de 68 años, el pueblo puertorriqueño decidió "organizarse políticamente sobre una base plenamente democrática, promover el bienestar general" y asegurarse para el presente y el futuro el "goce cabal de los derechos humanos". De esta manera se declaró inequívocamente en el Preámbulo de nuestra ley máxima "[q]ue el sistema democrático es fundamental para la vida de la comunidad puertorriqueña" y que "entendemos por sistema democrático aquel donde **la voluntad del pueblo es la fuente del poder público**, donde el orden político está subordinado a los derechos del hombre [y de la mujer] y donde **se asegura la libre participación del ciudadano en las decisiones colectivas**". Const. ELA, Preámbulo, LPRA, Tomo 1. Así, el diseño de nuestro sistema de gobierno republicano descansa en el principio constitucional de que su poder político "emana del pueblo" y "se ejercerá con arreglo a su voluntad". Const. ELA, Art. I, Sec. 1, LPRA, Tomo 1.

Cónsono con esos enunciados, el derecho al voto compone la zapata de nuestra sociedad democrática. Ante ello, la Constitución de Puerto Rico garantiza a cada ciudadana y ciudadano el derecho a elegir a sus representantes y gobernantes, conforme a la expresión de su voluntad, por medio del **sufragio universal, igual, directo y secreto.** Const. ELA, Art. II, Sec. 2, LPRA, Tomo 1. Al ejercer su derecho al voto en un proceso íntegro la ciudadanía legitima el andamiaje que la gobierna. Por ello, el derecho al sufragio constituye "la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su

poder soberano y expresa su voluntad". PPD v. Admor. Gen. De Elecciones, 111 DPR 199, 207 (1981). De ahí que afirmáramos que "[n]uestra democracia representativa es la piedra angular de nuestra vida colectiva como pueblo". McClintock v. Rivera Schatz, 171 DPR 584, 597 (2007).

Estos principios no solo encuentran apoyo en nuestra Carta Magna, sino que además son cónsonos con las protecciones que garantiza la Constitución de los Estados Unidos. Conforme a ello, el Tribunal Supremo federal ha reconocido desde antaño la condición fundamental y preeminente de este derecho, así como su centralidad en los sistemas democráticos de primer orden. Así, en Yick Wo v. Hopkins, 118 US 356, 370 (1886), el Máximo Foro federal expuso que el voto se considera un derecho político fundamental debido a que preserva todos los demás derechos. De igual forma, en Wesberry v. Sanders, 376 US 1, 17 (1964), se dispuso: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined". Igualmente, en Reynolds v. Sims, 377 US 533, 555 (1964), ese foro dispuso: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government". Finalmente, en Harper v. Virginia St. Bd. of Elections, 383 US 663, 667 (1969), el Tribunal Supremo federal expresó: "[S]ince the right to excercise the franchise in a free and unimpaired

manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized" (citando a Reynolds v. Sims, supra, pág. 562).

Asimismo, la salvaguarda del sufragio como garante de la sociedad democrática encuentra eco a nivel internacional. A esos efectos, la Declaración Universal de Derechos Humanos reconoce el derecho al voto como fundamental e indispensable para la organización de una sociedad democrática. Res. A.G. 217 (III) A, Declaración Universal de Derechos Humanos, art. 21 (10 de diciembre de 1948). En su artículo 21, la Declaración dispone que el derecho de toda persona a "participar en el gobierno de su país […] por medio de representantes directamente escogidos", asegurando que "[l]a voluntad del pueblo es la base de la autoridad del poder público" y que esa "voluntad se expresará mediante elecciones auténticas […] por sufragio universal e igual y por voto secreto u otro procedimiento equivalente que garantice la libertad del voto". Íd.

### III.

Con base en lo anterior, podemos precisar que el elector es quien le confiere legitimidad a nuestra sociedad democrática. Después de todo, es "el sujeto principal de la arquitectura moderna constitucional-electoral". PSP v. Com. Estatal de Elecciones, 110 DPR 400 (1980). Por ello, en el ejercicio de su prerrogativa electoral, además de garantizársele el derecho al sufragio universal, igualitario, directo y secreto, la Constitución exige que se le proteja

contra toda coacción en el ejercicio de su derecho. Const. ELA, Art. II, Sec. 2, LPRA, Tomo 1. También, exige que se le garantice el acceso a que pueda ejercer su derecho pese a su estatus de analfabetismo o al no poseer propiedad. Const. ELA, Art. VI, Sec. 4, LPRA, Tomo 1.

Al amparo de esas garantías mínimas, la primacía del derecho al voto obliga a las instituciones llamadas a preservarlo a "hacerlo observar y respetar". PPD v. Admor. Gen. de Elecciones, 111 DPR 199, 221 (1981). Cuando el elector ha emitido su voto válidamente, corresponde a las instituciones públicas pertinentes hacerlo valer. Íd. Esa garantía fundamental "[n]o se observaría ni respetaría si permitiésemos que el voto emitido pudiera ser anulado o que su valor pudiera ser mermado por cualquier ataque". Íd. Según hemos reiterado, **no debemos anular un voto "ni menguarse su validez, por fallas de las que no puede responsabilizarse al elector"**. Íd., pág. 208. (Énfasis suplido).

IV.

Al amparo de los principios antes esbozados, corresponde al sistema gubernamental estructurar el marco normativo legal y administrativo que "propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro". PSP v. Com. Estatal de Elecciones, 110 DPR 400, 405-406 (1980); véase también Const. ELA, Art VI, Sec. 4, LPRA, Tomo 1. Esto pues, según el profesor Héctor L. Acevedo, el Derecho Electoral "concierne los derechos básicos de una democracia y la legitimidad de sus elecciones, lo cual requiere un especial celo en actuar con el mayor cuidado y

estudio". H.L. Acevedo, op. cit., pág. 297. Ante estos principios inherentes al derecho al voto del electorado, se requiere que quienes estén llamados a administrar el proceso que viabiliza el ejercicio de ese derecho garanticen además su integridad en un marco de total transparencia. Tan importante como facilitarle a la ciudadanía la oportunidad de ejercer su derecho al voto es asegurar la integridad del proceso en sí. Lo anterior, pues el sistema democrático de gobierno solo puede legitimarse ante un proceso justo, íntegro y puro. Por ello, me reafirmo en las expresiones que emití en mi Opinión disidente en Com. PNP v. CEE III, 196 DPR 706 (2016), cuando indiqué que:

[L]a integridad del proceso [electoral] en sí […] es un elemento indispensable en un sistema de gobierno democrático, ya que cualquier sombra que se arroje sobre la pureza del proceso indudablemente lacera la confianza requerida para preservar la esencia misma del sistema democrático.

Un pueblo cuya ciudadanía no confía en que el resultado electoral es fiel a su voluntad, se ve marginado, no solo por el proceso electoral en sí mismo, sino por su gobierno. La verdadera prueba de un sistema democrático auténtico consiste en la legitimación del mandato mayoritario. […] La destrucción de la confianza debida al proceso representa la ruptura del pacto social —tan necesario para una sana convicencia— y la supremacía de la Ley. (Jueza Presidenta Oronoz Rodríguez, Opinión disidente, págs. 720-721).

Ahora bien, no toda irregularidad en el proceso electoral puede dar lugar a que tomemos determinaciones que conlleven la confiscación del voto. PPD v. Admor. Gen. de Elecciones, supra, pág. 241. Para tomar el remedio drástico de anular una votación, la irregularidad debe ser de tal naturaleza que afecte la justedad e igualdad del proceso electoral. Íd. Esto último no significa que no podamos

proveer un remedio justo en aquellos casos donde las acciones u omisiones de las entidades responsables del proceso eleccionario afectaron el derecho al voto. Por lo tanto, le corresponde a los tribunales conceder un remedio que tome en cuenta los derechos constitucionales de **todas** las partes afectadas.

V.

El domingo el País supo qua la totalidad de las papeletas no estaban impresas, que no estaban en los maletines y por ende, tampoco en los camiones que debían salir a los precintos antes del amanecer. Los organizadores del evento lo sabían desde antes. Ello exigía que la CEE tuviera un plan de contingencia para salvaguardar el derecho contitucional de los ciudadanos a ejercer su voto. La ausencia de guías mínimas para atender este caos, previsible por demás, refleja una falta profunda de conciencia sobre el valor del voto y la necesidad apremiante de salvaguardar nuestro sistema democrático. Esto, evidentemente, no pasó.

La magnitud de la confusión e intranquilidad en el País fue tal, que **era imperativo ordenarle a las partes presentar información precisa y detallada sobre lo que ocurrió en los colegios de votación el pasado domingo, 9 de agosto de 2020.**[20]

---

[20] Véase Com. PNP v. CEE III, 196 DPR 706 (2016) (donde este Tribunal, en un caso electoral certificado, nombró una Comisionada Especial para recibir prueba y rendir un informe). Consistente con ese precedente, el Art. 13.3(4) de la Ley Núm. 58-2020, conocida como el Código Electoral de Puerto Rico de 2020, autoriza ese proceder al disponer que este Tribunal podrá certificar *motu proprio* "**cualquier** asunto electoral pendiente ante el Tribunal de Primera Instancia […] cuando se planteen […] cuestiones noveles de alto interés público que incluyan cualquier cuestión constitucional sustancial […]" (Énfasis suplido). Nada en el texto del Art. 13.3(4), supra, impide que –en circunstancias que lo ameriten– este Tribunal reciba prueba o emita órdenes para solicitar información o comparecencias adicionales en casos electorales

Esto nos hubiese dado datos necesarios para proveer un remdio más completo.

En específico, necesitábamos que la CEE nos detallara:

(1) Una lista de los colegios de votación a los que no llegaron las papeletas;

(2) Una lista de los colegios que recibieron las papeletas y la hora en que se entregaron;

(3) Un desglose de la hora de apertura y cierre de cada colegio;

(4) Una lista de los colegios de votación en donde no hubo papeletas suficientes para que todos los electores emitieran su voto;

(5) Una lista de los colegios de votación sonde se prepararon actas, incluyendo actas de escrutinio y cualquier informe sobre resultados en progreso.

Igualmente, era importante solicitarle a la CEE que:

(1) Acreditara la cadena de custodia de las papeletas y los sistemas electrónicos que contienen los votos;

(2) Precisara cuál fue el proceso que se siguió una vez cerraron los colegios de votación. Esto último también debía incluir información sobre los funcionarios y el personal a cargo de estas papeletas y sistemas electrónicos;

(3) Acreditara la localización actual de todas las papeletas y los sistemas electrónicos, así como las medidas de seguridad que se tomaron para asegurarlas.

---

certificados. Aunque no prevalecí en mi recomendación de solicitar a las partes información sobre asuntos neurálgicos a la controversia, las incluyo en esta Opinión pues estimo, como menciono arriba, que nos hubiese dado un cuadro fáctico mayor para proveer un remdio más completo.

Sostengo que nuestra responsabilidad adjudicativa requería que fuéramos más allá de lo que resuelve la Opinión del Tribunal. No podíamos descansar en la presunción de que la CEE y los partidos políticos estarán listos para completar el proceso el domingo, 16 de agosto de 2020. **No nos consta si existen los recursos de papeletas, funcionarios, personal de apoyo necesario, transportación, entre otros, para realizar un evento que tendrá una participación mayor que la del domingo 9 de agosto.** Esta información era neurálgica para salvaguardar los efectos de la decisión que hoy tomamos.

Asimismo, debimos precisar qué pasa con los electores de aquellos colegios que comenzaron el proceso de votación **después de la 1:45 p.m.**, y no pudieron votar, a pesar de que se cumplió con el periodo de ocho (8) horas ininterrumpidas para que los electores votaran.

Esta incertidumbre abona a la crisis democrática que provocó la CEE por lo que debimos establecer lineamientos **específicos** que garanticen la estabilidad y certeza del proceso que ordenamos continuar.

Además, albergo serias dudas sobre si la CEE, su Presidente o las Comisiones de Primarias podían pautar una fecha distinta a la que dispuso la ley para celebrar los comicios primaristas. Como parte de nuestro análisis debimos resolver esta controversia.

VI.

La Opinión mayoritaria resuelve —correctamente— que: (a) no procede divulgar los resultados <u>preliminares</u> de unas primarias que no han culminado; y (b) no procede anular los

votos de las personas que ya votaron o privar a las personas que no han votado de su oportunidad de ejercer ese derecho. Ese era el único resultado constitucionalmente permisible.

Ahora bien, la ley electoral vigente prohíbe terminantemente que un puñado de funcionarios públicos paralicen unilateralmente una votación. Los Arts. 3.5(3) y 13.1(2)(b) del Código Electoral, supra, establecen --sin margen a duda-- que el Pueblo delegó la facultad de legitimar tal actuación en este Tribunal. **A ese mandato popular es que había que atenerse.** No obstante, reitero, aunque la CEE y las Comisiones de Primarias de los partidos no podían posponer unilateralmente una votación, la primacía del derecho al voto que consagra nuestra Constitución obliga a este Tribunal a diseñar un remedio que salvaguarde los derechos de todos los electores. En virtud de este derecho, y no del Acuerdo *ultra vires* de unos pocos, autorizamos la continuación de la votación en las primarias en una fecha posterior. Claro está, con el respeto a los derechos de los electores que ya emitieron su voto válidamente el pasado domingo, 9 de agosto de 2020.

Finalmente, si bien logramos un resultado balanceado que honra el derecho fundamental al voto, hago constar mi más profunda desaprobación e indignación ante la manera en que la CEE y los funcionarios de los partidos a cargo del evento manejaron una crisis de su autoría. Actuar al margen de la ley para intervenir con la expresión de la voluntad popular es, como indiqué, una característica inherente a los regímenes autoritarios que aún dirigen los destinos de

demasiados pueblos en el mundo. Es una conducta indigna de la democracia robusta y vibrante que nos distingue como Pueblo. A los funcionarios públicos concernidos: los invito a que hagan un ejercicio autorreflexivo en el que repasen sus acciones durante estos días y aunen esfuerzos que mitiguen los daños que su negligencia ocasionó a la integridad democrática de nuestro sistema de gobierno. Solo así se podrá comenzar a sanar este golpe más reciente a la democracia puertorriqueña y restaurar la confianza del Pueblo en los procesos e instituciones mediante los que se traza el curso de su futuro colectivo. El momento lo exige.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier<br>     Peticionarios<br><br>     v.<br><br>Comisión Estatal de Elecciones, *et al.*<br>     Recurridos | |
| Carmen Damaris Quiñones Torres<br>     Demandante<br><br>     v.<br><br>Comisión Estatal de Elecciones, *et al.*<br>     Demandados | CT-2020-11<br><br>cons. con<br><br>CT-2020-12<br><br>con<br><br>CT-2020-13<br><br>y con<br><br>CT-2020-14 |
| Carlos Delgado Altieri<br>     Peticionario<br><br>     v.<br><br>Comisión Estatal de Elecciones, *et al.*<br>     Recurridos | |
| Wanda Vázquez Garced<br>     Demandante<br><br>     v.<br><br>Comisión Estatal de Elecciones, *et al.*<br>     Demandados | |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 12 de agosto de 2020.

¡Qué vergüenza! ¡Qué desgracia! ¡Cuánta indignación!

Observamos el pasado domingo con asombro, aunque no con total sorpresa, la debacle electoral del proceso de primarias celebrado a semanas de una elección general. Se

veía venir, pues el deterioro de la administración pública y la gestión de gobierno es innegable y ha pasado a ser un elemento inherente de nuestra cotidianidad como País.

Era de esperarse. Ante una sucesión de eventos dirigidos a debilitar nuestro sistema electoral y atentar contra una rediviva participación ciudadana, el elenco fue estelar y su utilería la más perfecta: un nuevo Código Electoral que cambia sustancialmente las reglas de la contienda eleccionaria a última hora, aprobado de manera atropellada por la Asamblea Legislativa; una Rama Ejecutiva que lo refrenda con beneplácito no obstante los serios señalamientos que se hacen en contra del proyecto; una Comisión Estatal de Elecciones (CEE) presidida por un neófito, el licenciado Juan Ernesto Dávila Rivera, quien le demostró al País su patente incapacidad para desempeñar con un mínimo de eficacia el cargo al cual fue designado por el exgobernador Ricardo Rosselló Nevares[21]; unos comisionados electorales que no advirtieron de antemano al País de lo que ocurría en el seno de la CEE y que por el contrario aseguraron al elector que estaban listos para celebrar con éxito el evento; unos presidentes de partido -candidatos, a su vez, a puestos electivos- quienes, en una conferencia de prensa desafortunada, se arrogaron las prerrogativas de la CEE

---

[21] El licenciado Dávila Rivera juramentó a su cargo en septiembre de 2018 sustituyendo a Rafael Ramos Sáenz, quien había sido nombrado Presidente de la CEE en enero de 2018 y tuvo que renunciar al cargo.

sobre el proceso electoral. Y lo que es peor, ninguno de estos actores está dispuesto a asumir su responsabilidad, sino que, como niños, recurren a la cantaleta trillada: "La culpa no es mía, es tuya". Y es que cuando la incompetencia y la desfachatez se combinan en la trama, el desenlace es siempre infausto.

Decía Henri Cartier-Bresson, el afamado fotógrafo francés y padre del fotoperiodismo, que en todo proceso, situación o acción siempre hay un "momento decisivo". Desde el punto de vista institucional, que reconoce el valor del voto en una democracia, "no hay dudas por nuestra parte a la hora de señalar el acto de votación y, más en concreto, al momento de confección del voto, de introducción de la papeleta en el sobre de votación, como el auténtico momento decisivo de las elecciones. En él toma forma el sentido y valor de la democracia". Luis Gálvez Muñoz, *La Confección del Voto*, Madrid, 2009, pág. 20. Y es ese momento decisivo el que se vulneró el pasado domingo. Toca ahora subsanar ese quebrantamiento.

I.

Los distintos recursos ante la consideración de este Tribunal versan justamente sobre la tragedia para la democracia que resultó de la interrupción, posposición y bifurcación ilegal de un evento electoral predestinado al fracaso. Todos los recursos y comparecencias recuentan la crónica de una incompetencia sabida y avalada por un gobierno incapaz de garantizarle a sus ciudadanos el ejercicio del derecho en el que se cimenta toda

democracia: el voto. Lo ocurrido en el proceso de primarias socava la legitimidad de la CEE y crea un estado de excepción que más que garantizar el derecho al voto para preservar el estado de Derecho, lo revoca. En ese sentido, Giorgio Agamben señala que "[e]l Estado de excepción no es un derecho especial (como el derecho de guerra) sino que, en cuanto a suspensión del propio orden jurídico, define el umbral o el concepto límite". Giorgio Agamben, *Estado de Excepción*, pág. 28. Todo indica que nos encontramos ante otro momento de excepción como resultado de los eventos del domingo. El dictamen del Tribunal representa un intento de paliar ese estado de excepción producto de negligencia, la ineficiencia y la incapacidad exhibida por los funcionarios cuyo deber principal es garantizar el ejercicio cabal de este derecho a nuestra ciudadanía.

El remedio que hoy dispone este Tribunal para atajar esta crisis electoral es, dentro de las circunstancias, el que menos violenta un sistema representativo fundamentado en el derecho al sufragio y en la confianza que deben tener los ciudadanos en los procesos electorales mediante los cuales ejercitan ese derecho. Ante una situación sin precedente jurídico alguno, correspondía a este Tribunal tomar una decisión que sopesara los derechos e intereses de todas las partes involucradas. Como últimos garantes de los derechos consagrados en nuestra Constitución, sin embargo, esa decisión ha de estar imperiosamente guiada por el

principio de igualdad de acceso a los procesos electorales que encarna la Sección 2 de nuestra Carta de Derechos. Esta sección mandata que en nuestro ordenamiento legal se garantice "la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto". Asimismo, la sección 2 provee para que se proteja, "al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Const. PR Art. II, Sec. 2.

Los hechos que originan los recursos ante nuestra consideración evidencian una transgresión incuestionable a ese derecho al sufragio universal, igual, directo y secreto que garantiza nuestra Constitución. La incertidumbre y falta de legitimidad de un proceso electoral mancillado por la fragmentación indebida de un evento de primarias se presenta como una amenaza peligrosa a la democracia y a la igualdad de acceso al derecho al voto. Contrario a lo que arguyen algunos de los candidatos peticionarios, divulgar a destiempo los resultados de un proceso electoral malogrado incide directamente en el ejercicio del derecho al voto de miles de puertorriqueños que fueron privados de participar en los comicios el pasado domingo. La garantía constitucional del derecho al voto en igualdad de condiciones se vería irremediablemente abatida con la concesión del remedio solicitado. Lejos de dotar de confianza y legitimidad el proceso, una divulgación parcial podría ser tanto un disuasivo como un aliciente

para el electorado que aún no ha ejercido su derecho al voto, constituyendo así una coacción indebida en ese ejercicio.

En definitiva, un elector que conoce de antemano el resultado parcial de un proceso electoral no está en igualdad de condiciones que el elector que vota con la expectativa de conocer el resultado final al cierre del evento. Así, la divulgación parcial -en estas circunstancias- supone una fragmentación injustificada e indebida de lo que debió ser un evento electoral único. Bajo este escenario, resulta improcedente -y hasta irresponsable- aplicar irreflexivamente una disposición contenida en la recién aprobada ley electoral que fue concebida para adelantar resultados parciales de forma coetánea a la realización del evento electoral en sí. A esos efectos, una lectura del Articulo 10.6 de la ley electoral demuestra que la divulgación parcial de resultados se fundamenta en la proximidad o inminencia de la conclusión del evento electoral cuyos resultados se anuncian.

Es por esta razón que el Articulo 10.6 ordena a la Comisión "combinar los resultados de los colegios de votación de cada unidad electoral de los precintos **a medida que se reciban los mismos** y, en forma tal, que le permita hacer el primer anuncio público de resultado parcial de una elección, no más tarde de las diez de la noche (10:00 pm) del día en que se realizó la votación. Este primer anuncio se hará tomando en consideración los

resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio". Art. 10.6, Ley Núm. 58 de 2020. La simultaneidad y continuidad como elementos temporales son, sin lugar a duda, esenciales en la divulgación parcial de los resultados de cualquier evento electoral. De ahí que se permita anunciarlos "a medida que se reciban", según dispone la propia ley.

En este caso, la divulgación parcial de los resultados, según solicitada, se llevaría a cabo días antes de la segunda parte de un evento electoral que fue interrumpido y pospuesto indebidamente por la CEE. Tal proceder, como dijimos, socavaría el principio fundamental de igualdad de condiciones al ejercer el derecho al voto contenido en la Sección 2 de nuestra Carta de Derechos y coaccionaría en el ejercicio de ese derecho a los electores que aún no han votado en las primarias. Consiguientemente, estoy conteste con denegar la divulgación de los resultados de los comicios del pasado domingo hasta tanto culmine el evento de primarias pautado para continuar el 16 de agosto de 2020. Únicamente de esta manera protegeremos íntegramente el ejercicio del derecho constitucional al voto de todos los que participen en un proceso electoral que no ha terminado. Empero, es indispensable que, en aras de evitar la vulneración del derecho al voto de los electores que pudieron ejercer el mismo el pasado domingo, los maletines electorales que los resguardan deben ser custodiados con el máximo recelo.

Ahora bien, es imperativo señalar que permitir que continúe el proceso primarista el próximo domingo impropiamente fragmentado es un remedio excepcional que sólo se valida ante la imposibilidad de celebrar una nueva elección. Para esto último, es muy tarde ya. Este escenario extraordinario se da de cara a una elección general que, para todos los efectos, comienza en un término aproximado de 55 días y que exige que, para la semana que viene, los partidos políticos certifiquen sus candidatos. Como es de público conocimiento, la celebración de los comicios generales es contingente a los resultados de este evento primarista. De ahí subyace su importancia.

Nuestra acción, sin embargo, no debe verse como una aquiescencia a la manera irresponsable en la que se llevaron a cabo los procesos electorales de las primarias y la forma impropia e ilegal de fragmentación. Mucho menos ha de verse como un reconocimiento de que las actuaciones del Presidente de la CEE y los Comisionados Electorales están dentro del marco de la ley. Es, más bien, un reconocimiento a que ésta es la determinación menos onerosa que logra proteger el derecho constitucional lacerado a los electores el pasado domingo. No podemos perder de vista que la posposición de las primarias y la crisis electoral que resultó de tal determinación es únicamente atribuible al desempeño mediocre de los comisionados y presidentes de partido y a la incapacidad del organismo a cargo de la coordinación y

realización de eventos electorales en nuestro País -y su Presidente- de llevar a cabo una primaria en la que, como mínimo, se le garantizara a todo elector acceso a una papeleta.

Ante esta situación excepcional, es imperativo -no solamente que las primarias culminen este domingo, 16 de agosto de 2020- sino que los procedimientos se lleven a cabo implementando todas las medidas necesarias para asegurar un proceso ordenado, en el que se le garantice al electorado el ejercicio pleno de su derecho al voto. Así, sirva lo dictaminado por este Tribunal como advertencia a la CEE, y a todos sus componentes llamados a resguardar el ejercicio del derecho al voto, de que sólo cuentan con una oportunidad para la continuación de unas primarias a la altura de lo esperado por nuestros constituyentes. Concluido este proceso, y en atención a la realidad de que quienes lo dirigieron no están capacitados para llevar a cabo las funciones inherentes a sus puestos, resulta indispensable que éstos no presidan los procesos en una elección general. La confianza se ha perdido. El país no aguanta más incertidumbre ni otra afrenta a la democracia.

Ciertamente, lo acontecido representa una crisis democrática sin precedentes que ha sido reseñada ampliamente en medios locales e internacionales y que ha generado aun más suspicacia entre la ciudadanía sobre la legitimidad de nuestras instituciones y la capacidad de aquellos funcionarios que las dirigen. Lo que es peor,

estamos ante una situación que cuestiona la validez misma de un gobierno basado en el republicanismo y la representatividad que de él deriva. Se trata de una **crisis** infligida por el mal gobierno, la mala administración, la mediocridad, la incapacidad y la falta de transparencia, y sobre todas las cosas, la incompetencia. No hay que ser Albert Einstein para concluir que "la verdadera crisis es la incompetencia".[22] Desafortunadamente, la decisión que antecede no suprime esa crisis. Corresponderá a la ciudadanía, mediante el ejercicio pleno del derecho al voto, resguardar y enaltecer una democracia que actualmente se encuentra en jaque.

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[22] "Incompetence is the true crisis." Albert Einstein.

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bathia Gautier<br><br>Peticionarios<br><br>v.<br><br>Comisión Estatal de Elecciones, Et Al<br><br>Recurridos | |
| Carmen Damaris Quiñones Torres<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, Et Al<br><br>Demandados | **CT-2020-0011 Consolidado con CT-2020-0012 CT-2020-0013 CT-2020-0014** |
| Carlos Delgado Altieri<br><br>Peticionario<br><br>v.<br><br>Comisión Estatal de Elecciones, Et Al<br><br>Recurridos | |
| Wanda Vázquez Garced<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, Et Al<br><br>Demandados | |

Opinión de conformidad en parte y disidente en parte emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 12 de agosto de 2020.

Lo excelente no es necesariamente enemigo de lo bueno, así como lo bueno no lo es de aquello que, dentro de las circunstancias, es lo único realmente posible. Tal regla de lógica o pensamiento racional aplica también a nuestros sistemas democráticos. Hace apenas un año, advertí que tal axioma es incluso parte de nuestra realidad constitucional. Por ejemplo, de las expresiones del delegado Víctor Gutiérrez Franqui, autor del texto de la Sección 7 del Art. IV de la Constitución que autoriza la sustitución de un gobernante que no termina su término, así como del debate en torno a esa sección, emerge claramente la preocupación de los delegados constituyentes por el déficit democrático que produce la sustitución de un gobernante electo por uno que no lo es. Advertidos de la deficiencia en el remedio diseñado para tan particular eventualidad, aun así, la Asamblea Constituyente aprobó esa importante sección de nuestra Constitución. Como vemos, esto es un claro ejemplo de que nuestros delegados constituyentes estaban conscientes de la realidad de que irremediablemente en ocasiones será necesario, por distintas circunstancias, aceptar deficiencias incluso en el diseño de nuestros procesos políticos y democráticos.

Increíblemente, hoy volvemos a estar en el mismo dilema. Ante la situación provocada por el incorrecto

manejo de las primarias de ley -sin adjudicar quién o quiénes son finalmente el o los responsables, pues eso no está ante nuestra consideración- nos vemos obligados en varios aspectos a hacer uso del llamado pragmatismo, y aceptar lo bueno en lugar de lo excelente o lo que realmente se puede en lugar de lo que es lo mejor.

Lo mejor sería que todo hubiera acontecido el pasado domingo con una relativa normalidad que nos permitiera enterarnos temprano en la noche de quiénes serían finalmente los candidatos de los partidos principales que aspirarán -junto a los demás candidatos al mismo puesto- a ser electos democráticamente para ocupar la silla de la gobernación por los próximos cuatro años, y acabar con este déficit democrático, aunque constitucional. Sin embargo, eso ya no es posible y nos confrontamos entonces con la tarea de decidir cuáles son aquellas alternativas que, atendiendo el sagrado derecho al voto del elector, son realmente posibles dentro de las circunstancias.

Es precisamente por el análisis y elección de esas alternativas que hoy, lamentablemente, me veo obligado muy respetuosamente a disentir, solo en parte, de la determinación de la Mayoría del Tribunal. Aunque estoy conforme con la mayoría de las determinaciones tomadas, se desatiende un importante reclamo presentado tanto por el Lcdo. Pedro Pierluisi Urrutia, como por el Lcdo. Eduardo Bhatia Gautier. Esto es, la solicitud de ambos candidatos de que se revoque la determinación de la Comisión Estatal

de Elecciones (CEE) que tuvo el efecto de **no cerrar la votación** en las máquinas de escrutinio electrónico, evitando así la transmisión y correcta preservación, conforme a los reglamentos de ambos partidos principales, de los resultados de los votos emitidos.

En otras palabras, distinto a la Mayoría, no puedo ratificar en su totalidad el acuerdo alcanzado por las respectivas Comisiones de Primarias de ambos partidos. Esto, porque parte de ese acuerdo puso y mantiene en riesgo el manejo y la transparencia del sagrado voto del elector depositado en las urnas. Aunque reconozco la necesidad de una gran dosis de pragmatismo que nos permita obviar las múltiples imperfecciones del referido acuerdo, eso no nos debe mover a avalar aquello para lo que ciertamente existe un mejor remedio posible.

Los hechos que entiendo pertinentes se esbozan a continuación.

### I.

Ante el estado de emergencia que enfrenta el País como consecuencia del coronavirus (COVID-19) y en virtud de la Resolución Conjunta 37-2020 sobre la R. C. del S. 556 (Resolución Conjunta), el proceso de las primarias fue pospuesto para el 9 de agosto de 2020.[23] En esa misma fecha y durante el transcurso de las primarias, las Comisión Estatal de Elecciones (CEE) emitió una

---

[23] El Art. 7.12 de la Ley 78-2011, según enmendada, conocida como el Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral) lee de la manera siguiente:

Las primarias que deban realizarse bajo las disposiciones de esta Ley tendrán lugar el primer domingo del mes de junio del año de la Elección General.

Certificación del Acuerdo sobre Primarias Locales del 9 de agosto de 2020, CEE-ACC-20-224. Este acuerdo fue pactado entre las Comisiones de Primarias del Partido Nuevo Progresista (PNP) y del Partido Popular Democrático (PPD).[24]

Mediante el referido acuerdo, se estableció lo siguiente:

Las Comisiones de Primarias del PNP y PPD por unanimidad acuerdan que hoy domingo, 9 de agosto de 2020 culminarán su proceso de votación en aquellos precintos electorales donde se abrieron maletines electorales.

Se garantizará las ocho (8) horas para que los electores puedan ejercer su derecho al voto. Por el contrario, aquellos precintos electorales donde **no haya comenzado la votación a la 1:45 pm,** se suspenderá la elección hasta el próximo domingo, 16 de agosto de 2020 en el horario de 8:00 am a 4:00 pm.

**Queda terminantemente prohibido la divulgación de resultados preliminares de cualquier colegio, unidad o precinto. Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno.**

Las violaciones de las directrices contenidas en este Acuerdo podrán acarear la aplicación de las sanciones penales contenidas en el Código Electoral de Puerto Rico 2020 Ley-58-2020.

**Así se acuerda.** (Énfasis suplido).

Inconforme con lo anterior, el aspirante a candidato a la gobernación por el PNP, Lcdo. Pedro Pierluisi Urrutia, presentó ante el Tribunal Primera Instancia un *Recurso de revisión electoral* con la finalidad de que se dejara sin efecto el acuerdo. En específico, el licenciado Pierluisi Urrutia reclamó la necesidad de la intervención del tribunal para evitar

---

[24] La suspensión notificada por la Comisión Estatal de Elecciones fue por acuerdo de los presidentes de los partidos políticos que celebraban primarias el 9 de agosto de 2020.

"el secuestro de un proceso electoral **y la posposición del conteo de votos como dispone la regulación aplicable".[25]** Posteriormente, el licenciado Pierluisi Urrutia compareció ante este Foro mediante un *Recurso urgente de certificación intrajurisdiccional* y nos solicita que dejemos sin efecto el acuerdo y que, en consecuencia, ordenemos el conteo de los votos y la divulgación de los resultados electorales de los colegios que celebraron el proceso de votación el 9 de agosto de 2020.

En resumen, para sustentar su solicitud el licenciado Pierluisi Urrutia alega que la CEE tiene la obligación de establecer un sistema de divulgación pública de los resultados en progreso del evento electoral. También aduce que la CEE está obligada a combinar los resultados de los colegios de votación de cada unidad electoral de los precintos, según se reciban, viabilizando el anuncio público del resultado parcial no más tarde de las 10:00 p.m. del día en que se realizó la votación.[26] En particular, en cuanto al conteo de los votos el licenciado Pierluisi Urrutia alega que el Reglamento de las Primarias del PNP requiere que -una vez se termine de atender a los electores con derecho a votar- los funcionarios tendrán que proceder a cerrar la elección en la máquina de escrutinio electrónico y

---

[25] *Recurso de revisión electoral* presentado por el Lcdo. Pedro Pierluisi Urrutia.

[26] En específico, el Lcdo. Pedro Pierluisi Urrutia sustenta su argumento al amparo de los Arts. 10.5 y 10.6 del Código Electoral.

seguir los pasos establecidos en el propio Reglamento, los cuales incluyen la impresión del acta de escrutinio de colegio y la transmisión de los resultados.

Por otro lado, el aspirante a candidato a la gobernación por el PPD, el Lcdo. Eduardo Bhatia Gautier, presentó ante el Tribunal de Primera Instancia un *Recurso de revisión electoral* con el propósito de que dicho foro dejara sin efecto el acuerdo aludido y, en consecuencia, que se divulgaran los resultados. Además, solicitó que se ordenara la continuación del proceso primarista para la fecha más cercana posible. Para sustentar su solicitud, argumentó que la CEE está obligada a establecer un sistema de divulgación pública de los resultados en progreso y, además, combinar los resultados y hacer el anuncio de éstos no más tardar de las 10:00 p.m.[27]

Posteriormente, el licenciado Bhatia Gautier presentó una *Moción en torno a consolidación y uniéndonos a solicitud de certificación intrajurisdiccional.*[28]

En cumplimiento con nuestra orden, el 11 de agosto de 2020 la CEE presentó su posición sobre los recursos de revisión consolidados en certificación ante este foro. En cuanto al conteo de votos en las primarias, alegó que este es regido por el artículo 7.20 del Código

---

[27] Lo anterior, al amparo de los Arts. 10.5 y 10.6 del Código Electoral y del Reglamento del PPD.

[28] El Lcdo. Eduardo Bathia Gautier solicitó que su recurso fuese consolidado con el del Lcdo. Pedro Pierluisi Urrutia. Se proveyó de conformidad.

Electoral. Al amparo de esta disposición, cada junta local debe presentar a la CEE el acta de los resultados de las primarias dentro de las 24 horas siguientes a la celebración de la primaria. Interpreta que, mientras no se haya culminado la votación, la primaria no ha culminado y que por ello las juntas locales no deben producir el acta de los resultados. Argumentó que los artículos 10.5 y 10.6 citados por la parte peticionaria son aplicables al proceso de escrutinio de las elecciones generales, no al de las primarias, y que estos no contemplan la posposición de una votación en circunstancias apremiantes. Adujo que acogió el acuerdo de los partidos de no tramitar los resultados de los colegios votados hasta la finalización de las votaciones en todos los colegios bajo el entendido de que era la mejor forma de evitar que los resultados preliminares influenciaran en el ánimo de quienes no habían ejercido su derecho al voto el día establecido.

Ante la petición de los aspirantes a candidatos a la gobernación por los dos partidos principales para cerrar la votación en las máquinas y preservar los resultados de los votos emitidos, la CEE expuso su preocupación en cuanto a la identificación de los funcionarios de colegio con los candidatos y su interés en informarle los resultados que pudieran imprimirse. Invitó a este foro tomar conocimiento judicial de cómo, a pesar de la prohibición, los aparentes resultados

preliminares de las primarias han circulado en Puerto Rico.

## II.

Comenzaré por lo último. Como señalamos, el día del evento primarista los miembros de la Comisión de Primarias del PNP y del PPD emitieron en conjunto una determinación en la que señalaron lo siguiente: "Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno". Con relación a esta determinación, el licenciado Pierluisi Urrutia argumentó que el acuerdo emitido por la CEE y los Comisionados resulta nulo y ultra vires, en la medida en que, en síntesis, pospuso el conteo de votos que regula el Reglamento de Primarias del PNP, en la Parte H-5. Esto, según el licenciado Pierluisi Urrutia, "impide que los funcionarios puedan constatar el voto de los electores sujetando a que permanezcan dichos resultados abiertos y escondidos en cuartos oscuros lo que no es permitido por la regulación aplicable ni abona a la transparencia y confianza del proceso". Le asiste la razón al licenciado Pierluisi Urrutia.

La Parte H-5 del Reglamento de Primarias del PNP establece cinco pasos que van claramente dirigidos a conservar la pureza del voto del elector una vez se ha concluido la votación en un colegio. Estos son:

a. Ejecutarán el proceso de cierre de la máquina de escrutinio electrónico siguiendo el procedimiento para este propósito de manera que la máquina no aceptará ninguna otra papeleta.

b. Imprimirán una (1) copia del acta de escrutinio de colegio y el Director y el Secretario firmarán la misma y la colocarán en un sobre dentro del maletín del material electoral del colegio. Esta copia incluirá en el mismo papel y de forma continua el Acta de Escrutinio en cero que se imprimió antes de la apertura del colegio.

c. Procederán a transmitir los resultados electorales del colegio a la Comisión, siguiendo los procedimientos de operación de la máquina de escrutinio electrónico.

d. Imprimirán una copia adicional del Acta de Escrutinio de Colegio, para entregar la misma a la Junta de Unidad e imprimirán una copia para cada uno de los funcionarios de colegio. La impresión se realizará siguiendo los procedimientos de operación de la máquina de escrutinio electrónico.

e. Procederán a remover una de las dos tarjetas tarjeta de memoria de la máquina de escrutinio electrónico la cual entregarán a la mano a la Junta de Unidad dentro del sobre del enviado por la Comisión.

Después de un concienzudo análisis de todo lo anterior, no encuentro razón que justifique la acción de la CEE y sus comisionados de impedir con su orden este procedimiento. Ello, pone en riesgo la transparencia del proceso electoral y, como corolario, contradice su propia misión de garantizar a todos los electores un proceso transparente y eficiente que reafirme la credibilidad de nuestro pueblo.

Ahora bien, la CEE justifica esta acción señalando que cada funcionario de colegio está identificado con algún candidato y que cuando los resultados se imprimen por éstos, al finalizar la contabilización, se procede a

informar los resultados al respectivo candidato que se representa. Entonces, la CEE nos invita a que tomemos conocimiento judicial de "los aparentes resultados preliminares que han estado circulando en el país sobre los resultados preliminares de las primarias que causan la controversia de epígrafe".[29] Así, concluye que

la única forma de prevenir dicha divulgación es que se abstuvieran de transmitir e imprimir resultados hasta luego de finalizada la totalidad de las votaciones. Esta medida preventiva se toma entendiendo que la prematura divulgación de los resultados preliminares puede tener el efecto de influenciar a parte del electorado que interesa participar en las primarias.[30]

En primer lugar, la CEE nos invita a que tomemos conocimiento judicial de unos resultados que ella misma describe como "aparentes". El que suscribe ciertamente está dispuesto a tomar conocimiento judicial de la divulgación por las redes sociales de, como señala la CEE, supuestas actas electorales que reflejan aparentes resultados de la competencia electoral primarista en controversia. Sin embargo, estoy igualmente obligado a, *motu proprio*, tomar conocimiento judicial de la cantidad de aplicaciones y programas de computadoras capaces en la actualidad no solo de producir o modificar falsamente un acta electoral en una fotografía, sino de representar falsamente que el edificio de la CEE ubica en el

---

[29] Véase, Escrito sobre oposición, Petición de *certiorari* de la Comisión Estatal de Elecciones, pág. 8.

[30] Íd.

estacionamiento del Estadio Hiram Bithorn. Lo cierto es que hoy en día en las redes sociales, el Internet y en los distintos medios de comunicación, el ciudadano, y en este caso el elector, está indefectiblemente expuesto a una cantidad de información que no necesariamente es cierta y **que el elector está consciente de la probabilidad de su falsedad o al menos la examina con mucho recelo.** No hay duda de que estos son tiempos distintos con una sociedad y, por ende, un elector más sagaz y sofisticado.

Ahora bien, no ignoro que la intención de la CEE fue lidiar con un problema real que no tomó como pequeño o insignificante. Sin embargo, y como impliqué, lo cierto es que el efecto negativo que pueda causar en el candidato que no sale favorecido con la divulgación de una alegada o aparente acta electoral, siempre puede ser en gran medida neutralizado con expresiones públicas que desmientan la veracidad de esta o la advertencia de que solo nos dejemos llevar por resultados de los organismos oficiales.

Sin embargo, lo que realmente me parece preocupante en la argumentación de la CEE es el hecho de que, en el balance de intereses, ésta parece darle más peso a lo que podría ser una indebida influencia en el ánimo futuro de un posible elector, que el riesgo en que se puso y se encuentra al momento la seguridad y transparencia en el conteo de los votos emitidos válidamente. Este parece ser entonces un claro caso en

el que el remedio podría terminar siendo peor que la enfermedad. No me queda dudas de que, el sentido común, de justicia y el correcto balance de intereses nos debe llevar a concluir en este caso que el remedio contra la presunta o incluso probada en su día acción indebida de algún funcionario de colegio en la divulgación de algún resultado electoral, de ninguna manera puede derivar en la eliminación de procedimientos precisos, diseñados para proteger lo más sagrado: la expresión de un elector depositada en la urna. Este es un derecho que, por lo menos a criterio del que suscribe, es uno más concreto que trasciende en importancia la protección contra la indebida alegada influencia al elector.

Considero que entre las alternativas que tenía esta honrosa Curia, estaba el ordenar a la CEE que inmediatamente implementara el cierre de las máquinas de escrutinio electrónicos que todavía estén abiertas, y se ordenara la transmisión de los resultados correspondientes, conforme lo establecen los reglamentos de ambos partidos principales.

**III.**

Finalmente, me es menester expresarme con relación a un punto adicional. Me refiero a la propuesta o pretensión de una elección nueva que anule todo lo acontecido partiendo de cero. Esto, fundamentado no en una alegación de fraude general o serias irregularidades en el conteo de los votos, sino en el alegado derecho de todos los electores a una elección en igualdad de

condiciones, entiéndase a un "voto igual". Creo que esta no solo no es necesariamente la mejor alternativa, sino que también es poco probable, sino imposible. Me explico.

En primer lugar, es menester definir el contenido del derecho a un sufragio "igual" consagrado en la Sección 2 del Art. II de nuestra Constitución. El que esta sección garantice que la expresión de la voluntad del pueblo mediante un sufragio tenga que ser "igual" para todos los electores, a lo que se refiere es a que el voto de cada ciudadano debe tener el mismo peso e importancia electoral. Que mi voto cuenta igual que el de todos los demás; sea rico o pobre, mujer u hombre, blanco o negro. El voto "igual" simplemente implica que mi voto vale y cuenta como el de todos los demás, cuando finalmente se haga la contabilidad. Ahora bien, también se ha señalado que ese derecho a un voto "igual" comprende o se extiende hacia un aspecto bastante más abstracto. Esto es, la teoría de que también incluye igualdad en la información que tengan los electores al depositar la papeleta. Así, se ha establecido que ese derecho se vulnera si al fraccionarse un evento electoral los que ya votaron no contaban con una información que surgió *a posteriori* y con la que sí cuentan aquellos que votarán posteriormente en el mismo evento.

Puedo coincidir con que tal aspecto de este derecho tiene algún peso racional y de justicia. Sin embargo,

creo que mientras el aspecto del peso que tiene mi voto al momento de contabilizarse no puede de ninguna manera ceder o disminuirse sin constituir una violación a la garantía constitucional, no ocurre de la misma forma con el aspecto de la "igual información" al momento de ejercer el voto que comprende este derecho. Tome, por ejemplo, el caso de los miles de ciudadanos que solicitaron "voto adelantado" en estas primarias. Estas personas votaron con una semana de anticipación al evento electoral del pasado domingo, 9 de agosto. Tales ciudadanos implícitamente renunciaron a su derecho a un voto igual con relación a toda la información que en la última semana de la campaña primarista recibimos el resto de los ciudadanos previos al día de la elección. ¿Cuántas cosas pueden ocurrir que descarrilen o catapulten a un candidato en la semana previa al evento electoral?  Pues no sabemos, pero para los que ejercieron su derecho al voto adelantado no tiene ninguna importancia. Esto, porque en esa semana y porque así lo solicitaron, ellos ya no son parte de ese derecho a al voto "igual" en su aspecto del derecho a recibir la misma información que todos los demás votantes. Lo mismo ocurre, aunque con menos riesgo pues estos votan más cercano al evento electoral, con el llamado "voto encamado" o el "voto ausente".

Ciertamente, se pudiera argumentar que los electores que voten el próximo domingo pudieran tener una información -habría que evaluar su veracidad- que

pone en desventaja a aquellos que votaron este pasado domingo, 9 de agosto. Pudiera ser. Sin embargo, lo mismo ocurre con el "voto adelantado", el "encamado" y el "ausente" y no por eso se declara nula una elección.

Ahora bien, veamos si anular la primaria es una buena alternativa. Para eso, basta un ejemplo sencillo. Qué tal si de los votantes que sí pudieron ejercer su voto el pasado 9 de agosto, miles de ellos le dieron gracias a Dios porque el próximo domingo 16, por distintas razones todas razonablemente válidas no hubieran podido ir a votar. ¿Qué justicia le hacemos si le eliminamos su voto válidamente emitido para finalmente dejarlo sin la oportunidad de ejercerlo? Como vemos, ninguna solución es perfecta; lo importante es determinar las mejores posibles, dentro de las peculiares circunstancias en que nos encontramos.

Por último, y como se desprende de lo argumentado por la CEE en su comparecencia, una elección a nivel de toda la Isla que es de por sí muy complicada, lo es mucho más en estos tiempos de COVID-19. A eso le sumamos que la elección general que por mandato constitucional tiene que celebrarse en el mes de noviembre de este año se acerca a toda prisa y con aparente desdén de los múltiples problemas que enfrentamos como pueblo. Por eso, concluyo que la pretensión de eliminar la primaria en controversia para iniciar una desde cero no solo no es necesariamente la alternativa más justa y razonable,

sino que, en el marco de tiempo que queda, es muy poco probable o sencillamente imposible.

IV

Por todo lo anteriormente expuesto, estoy conforme con la Opinión de este Tribunal en todas sus partes, excepto en lo relacionado a no contabilizar los votos y, como tal, la incorrecta protección de la voluntad del elector expresada en las urnas. En ese contexto, ordenaría a la CEE a que de inmediato implemente el cierre de las máquinas de escrutinio electrónicos que todavía estén abiertas, y ordene la transmisión de los resultados correspondientes, conforme lo establecen los reglamentos de ambos partidos principales.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro Pierluisi-Urrutia y
Eduardo Bathia Gautier

Peticionarios

v.

Comisión Estatal de
Elecciones, *et al.*

Recurridos
_____

Carmen Damaris Quiñones
Torres

Demandante

v.

Comisión Estatal de
Elecciones, *et al.*

Demandados
_____

Carlos Delgado Altieri

Peticionario

v.

Comisión Estatal de
Elecciones, *et al.*

Recurridos
_____

Wanda Vázquez Garced

Demandante

v.

Comisión Estatal de
Elecciones, *et al.*

Demandados

CT-2020-11

cons. con

CT-2020-12,
CT-2020-13 y
CT-2020-14

**Opinión de Conformidad emitida por el Juez Asociado señor RIVERA GARCÍA.**

En San Juan, Puerto Rico, a 12 de agosto de 2020.

En este momento histórico y ante el clima de desasosiego que estamos viviendo, el Pueblo de Puerto Rico exige tener certeza y confianza en que ejerció, y podrá ejercer, su derecho al voto con la convicción de que los candidatos que sean certificados para figurar en las papeletas de las Elecciones Generales en noviembre fueron seleccionados al amparo de los principios democráticos que protege la Constitución de Puerto Rico y el andamiaje estatutario que rige estos procesos.

Precisamente, una de las funciones de este Tribunal es brindar un remedio que garantice que los derechos fundamentales de cada ciudadano y ciudadana no se vulneren luego de su ejercicio legítimo. Cada uno de los miembros de este Foro ——en virtud de nuestro deber de respetar y hacer respetar la Constitución de Estados Unidos de América y Puerto Rico——, al juramentar como Jueces o Juezas del Tribunal Supremo, asumimos la obligación de asegurar que el voto de cada una de las personas que ejercieron su derecho fundamental en el evento electoral primarista que comenzó el domingo, 9 de agosto de 2020, sea respetado. Así pues, invalidar el ejercicio que desplegó parte de la ciudadanía por eventos ajenos a su voluntad quebrantaría, en efecto, el

llamado que tenemos como miembros de este Tribunal. En ese sentido, nuestra responsabilidad se cumple al encontrar la alternativa que permite que cada una de las personas que no tuvieron la oportunidad de ejercer su derecho constitucional y sagrado al sufragio en las Primarias puedan tener la oportunidad de expresar su voluntad de forma libre, secreta y directa como exige la Carta Magna.[31]

A esos efectos, resulta importante destacar que ninguno de los candidatos en las Primarias que recurrieron ante el Tribunal luego de lo ocurrido el 9 de agosto de 2020, impugna la validez de los votos emitidos en los colegios y precintos que estuvieron hábiles para desplegar este derecho. Se limitaron a cuestionar el Acuerdo CEE-AC-20-224 entre las Comisiones de Primarias.[32] Esto es, un convenio entre el Presidente de la Comisión Estatal de Elecciones (CEE) y los representantes de los propios partidos políticos en la CEE —los Comisionados Electorales— que tenían Primarias pautadas para el 9 de agosto de 2020.[33] De ese modo

---

[31] Véase Const. PR, Art. II, Sec. 2, LPRA, Tomo 1 ("Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral").

[32] Véase *Certificación de acuerdo sobre primarias locales del 9 de agosto de 2020*, *Comisiones de Primarias PNP y PPD* (Acuerdo CEE-AC-20-224), CEE-AC-20-224, pág. 2, disponible en: ww2.ceepur.org/sites/ComisionEE/es-pr/Secretaria/Acuerdos/Acuerdo%20sobre%20las%20Primarias%20Locales%202020.pdf.

[33] Véase Sec. 2.12 del Reglamento para la Celebración de Primarias de los Partidos Políticos (Reglamento de Primarias)*,* CEE, 16 de marzo de 2020, rev. 23 de julio de 2020.

reconocen implícitamente la legitimidad de los votos emitidos por los electores y las electoras que acudieron a las urnas y ejercieron su derecho fundamental al sufragio. Solo uno de los peticionarios, la Sra. Carmen Damaris Quiñones Torres, solicitó, en la alternativa, que las Primarias se comenzaran *de novo*.

De conformidad con ese panorama, no es correcto ni razonable aventurarnos a declarar nulo todo un proceso en el que numerosos electores y electoras ejercieron su voto, y en donde falta una cantidad sustancial por ejercitar su derecho a favor de los candidatos de su predilección en distintas posiciones en la contienda electoral. Así las cosas, me rehúso a faltar al Juramento que presté como Juez Asociado del Tribunal Supremo, por lo que estoy conforme con la Opinión que, como Cuerpo Colegiado, emitimos en el día de hoy. No albergo reserva alguna de que esta es la alternativa viable, que, dentro de las circunstancias extraordinarias, excepcionales y únicas que tenemos ante nuestra consideración, garantiza que los ciudadanos y las ciudadanas que se vieron impedidos e impedidas de ejercer uno de los derechos de mayor transcendencia puedan rescatar la democracia al elegir a las personas que aspirarán en las Elecciones Generales a dirigir a Puerto Rico desde distintos cargos electivos.

Debido a que los elementos fácticos están detallados en la Opinión de este Tribunal, nos

limitaremos a esbozar el marco jurídico que sostiene nuestra postura.

## I

Nuestro ordenamiento jurídico le concede jurisdicción a este Tribunal para, a través de un auto de certificación intrajurisdiccional, intervenir en casos pendientes ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones. Se trata de un recurso de revisión que puede ser expedido *motu proprio* o a solicitud de parte.

En lo que respecta a los asuntos electorales, el Art. 13.3 del Código Electoral, *infra*, regula las revisiones judiciales de las decisiones de la CEE. En lo pertinente, y de forma muy similar a la *Ley de la Judicatura de Puerto Rico de 2003*, Ley Núm. 201-2003, según enmendada, esta disposición instituye que

> [m]ediante auto de certificación, a ser expedido discrecionalmente, motus propio [sic] o a solicitud de parte, el Tribunal Supremo podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto electoral pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones, cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, se planteen cuestiones noveles de derecho o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico y/o la Constitución de Estados Unidos de América.[34]

---

[34] Véanse, además: Art. 3.002 de la *Ley de la Judicatura de Puerto Rico de 2003*, Ley Núm. 201-2003, según enmendada, 4 LPRA sec.

En ese sentido, la certificación intrajurisdiccional es un recurso discrecional que solo procede utilizarse en casos realmente meritorios donde no es aconsejable ni necesario esperar que los foros inferiores adjudiquen las controversias de un caso.[35] Para hacer esa determinación, este Tribunal ausculta rigurosamente la urgencia, la etapa en que se encuentran los procedimientos, la necesidad que puede presentarse de recibir prueba y la complejidad de la controversia.[36] Por su carácter excepcional, y ante la regla preferida de que los casos maduren durante el trámite ordinario, en la medida que estos factores no aconsejen la expedición del recurso, debe denegarse.

Enmarcado en estos parámetros jurídicos que imperan a nivel revisor, se expidieron varias certificaciones intrajurisdiccionales para atender esencialmente la impugnación que hacen todos los peticionarios del Acuerdo CEE-AC-20-224 entre las Comisiones de Primarias el pasado domingo, 9 de agosto de 2020. Ello, en medio del evento electoral de las Primarias de numerosos candidatos del Partido Nuevo Progresista (PNP) y el Partido Popular Democrático (PPD).

---

24s(e); Regla 23 del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI.

[35] Véase *UPR v. Laborde Torres*, 180 DPR 253, 272 (2010), donde se reiteró la excepcionalidad del recurso de certificación intrajurisdiccional.

[36] *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 849 (2014).

En particular, el mismo día del evento electoral, dada la imposibilidad que se enfrentaba en varios colegios, unidades y precintos electorales por la ausencia de papeletas de votación, las Comisiones de Primarias llegaron al Acuerdo CEE-AC-20-224 que dispuso lo siguiente:

**CERTIFICACIÓN DE ACUERDO SOBRE PRIMARIAS LOCALES DEL 9 DE AGOSTO DE 2020**

**COMISIÓN DE PRIMARIAS PNP Y PPD**

Las Comisiones de Primarias del PNP y PPD por unanimidad acuerdan que hoy domingo, 9 de agosto de 2020 culminarán su proceso de votación en aquellos precintos electorales donde se abrieron maletines electorales.

Se garantizará[n] las ocho (8) horas para que los electores puedan ejercer su derecho al voto. Por el contrario, aquellos precintos electorales donde **no haya comenzado la votación a las 1:45 pm,** se suspenderá la elección hasta el próximo domingo, 16 de agosto de 2020 en el horario de 8:00 am a 4:00 pm.

**Queda terminantemente prohibid[a] la divulgación de resultados preliminares de cualquier colegio, unidad o precinto. Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno.**

Las violaciones de las directrices contenidas en este Acuerdo podrán acarear la aplicación de las sanciones penales contenidas en el Código Electoral de Puerto Rico 2020[,] Ley-58-2020.

Así se **acuerda.**

[*Fdo.*]

Ángel R. Rosa Barrios

Secretario

De esa forma, dieron por suspendido el proceso de las Primarias en aquellos colegios, precintos o unidades en donde no había comenzado la votación previo a la 1:45 p.m. El Acuerdo CEE-AC-20-224 estableció, además, que la

continuación del proceso electoral se reanudaría el próximo domingo, 16 de agosto de 2020, en el horario de 8:00 a.m. a 4:00 p.m. De igual manera, se prohibió la divulgación de resultados preliminares de colegio, unidad o precinto alguno.

Ante esta determinación, varios candidatos de ambos partidos políticos, así como una electora, presentaron sus respectivas reclamaciones judiciales ante el Tribunal de Primera Instancia. En consecuencia, este Tribunal decidió expedir los recursos de certificación intrajurisdiccional tomando en consideración la urgencia, la etapa procesal, la irrelevancia de prueba alguna más allá del Acuerdo CEE-AC-20-224 de la CEE y las controversias definidas que presentaban los casos. Es decir, reconocimos que lo único que se cuestionaba era los términos del referido Acuerdo CEE-AC-20-224 y la validez de los votos de los electores que ejercieron su derecho constitucional el día en que estaban pautadas las Primarias. De hecho, estos factores nos llevaron a interrumpir las vistas que había pautado el juez del Tribunal de Primera Instancia y a consolidar los recursos para su adjudicación conjunta en el día de hoy.

En vista de lo anterior, la decisión que emite este Tribunal está enmarcada en aspectos estrictamente de derecho, constitucionales y estatutarios, según concebidos en los recursos de certificación intrajurisdiccional. Estas controversias se han

adjudicado luego de un riguroso análisis, y de conformidad con la atención y la urgencia que merecen los recursos consolidados ante nuestra consideración. Ello, al brindar relevancia únicamente a los elementos de juicio para resolver el caso de autos y en absoluto rechazo de adentrarnos en aspectos impertinentes y ajenos a las cuestiones jurídicas planteadas.

## II

### A.

El derecho al sufragio es un derecho de carácter constitucional que emana de la Décimo Cuarta Enmienda de la Constitución de los Estados Unidos de América y la Sec. 2 del Art. II de la Constitución de Puerto Rico.[37] Esta disposición de nuestra Carta de Derechos dispone expresamente que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral".[38]

Según hemos reconocido, el derecho al sufragio reviste de un valor "consustancial con la existencia de

---

[37] *P.N.P. v. De Castro Font II*, 172 DPR 883, 893 (2007). La primacía del derecho al sufragio junto al carácter fundamental y preeminente de este derecho ha sido reconocido a cabalidad. J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos,* Bogotá, Ed. Temis, 2009, pág. 941-942.

[38] Const. PR, *supra*, Art. II, Sec. 2, pág. 283.

una democracia política".[39] Esto es, en su ejercicio, este derecho sagrado se considera como la "piedra angular del sistema democrático".[40]

Precisamente, la democracia, como doctrina política y modelo de organización social, es el fundamento en el cual se sustentan los principios que rigen nuestra Constitución. Por ello esta define el sistema democrático con palmaria claridad y "establece una forma republicana de gobierno compuesta por el Poder Ejecutivo, el Poder Legislativo y el Poder Judicial".[41] Asimismo, el Preámbulo de la Constitución de Puerto Rico establece

> **[q]ue el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;**
>
> **Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público,** donde el orden político está subordinado a los derechos del hombre y **donde se asegura la libre participación del ciudadano en las decisiones colectivas.** (Énfasis suplido).[42]

Cimentados en estos principios, hemos sido enfáticos y firmes en que la Constitución de Puerto Rico "persigue, como principio fundamental, establecer mayores garantías democráticas para la vida de la

---

[39] *Giménez v. JEE*, 96 DPR 943, 947 (1968). Véanse, además: *P.N.P. v. De Castro Font II, supra,* pág. 946 (Rivera Pérez, J., Opinión disidente); *Santini Guadier v. CEE*, 185 DPR 522, 550 (2012) (Sentencia) (Rodríguez Rodríguez, J., Opinión disidente).

[40] *Ramírez de Ferrer v. Mari Bras*, 144 DPR 141, 203 (1997); Granados v. Rodríguez Estrada V, 127 DPR 1, 81-82 (1990). Véanse, además: *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 975 (2011).

[41] Const. PR, *supra,* Art. I, Sec. 2, pág., 273; *Senado de PR v. Gob. de PR*, supra, (Rivera García, J., Opinión de conformidad).

[42] Preámbulo de la Const. PR, *supra*, pág. 269.

comunidad puertorriqueña".[43] Como ejemplo ilustrativo, la democracia existe cuando el Pueblo selecciona a sus líderes en los procesos electorales mediante el sufragio.[44] Así pues, nuestra Carta Magna dispone que el poder político "emana del pueblo y se ejercerá con arreglo a su voluntad".[45] Los debates en la Convención Constituyente también destacan la naturaleza esencial del voto.[46]

Según emerge con claridad, el derecho al voto es la prerrogativa de los electores y las electoras para ejercer su poder soberano y expresar su voluntad.[47] Es decir, el carácter fundamental del derecho al voto "se ejerce con arreglo a la voluntad manifiesta en las urnas".[48]

Al establecerse este como un derecho fundamental y de supremacía superior en la Constitución de Puerto Rico, hemos establecido que esta "le impone al Gobierno una responsabilidad dual: la de abstenerse, por un lado, de interferir con el ejercicio del sufragio universal, igual, directo y secreto".[49] Asimismo, instituye "un

---

[43] *Senado de PR v. Gob. de PR*, supra, (Rivera García, J., Opinión de conformidad).

[44] Íd.

[45] Const. PR, *supra*, Sec. 1, pág. 273.

[46] Véase, e.g., 2 Diario de Sesiones de la Convención Constituyente 1103-1104 (1961). Véase, además, 4 Diario de Sesiones, *supra,* pág. 2563.

[47] *Ramírez de Ferrer v. Mari Bras*, 144 DPR 141, 173 (1997) (citando a *P.P.D. v. Admor. Gen. de Elecciones*, 111 DPR 199, 207 (1981).

[48] *Ortiz Angleró v. Barreto Pérez*, 110 DPR 84, 92 (1980). Véase, además, *McClintock v. Rivera Schatz*, 171 DPR 584, 597 (2007).

[49] Véase *Sánchez y Colón v. E.L.A. I*, 134 DPR 445, 449-450 (1993).

deber afirmativo al Estado de proteger a la ciudadanía contra toda coacción en el ejercicio de la prerrogativa electoral".[50]

Por lo tanto, el derecho al voto "ocupa un sitial de primerísimo orden que **obliga a los tribunales a conferirle la máxima protección**". (Énfasis suplido).[51] Es decir, resulta imperativo ejercer nuestro poder de revisión contra actuaciones del Estado que interfieran con los procesos democráticos, ya que "es nuestra obligación hacerlo observar y respetar".[52] En esa dirección, hemos reafirmado que el elector individual es el sujeto principal de la estructura moderna constitucional-electoral.[53] Este se convierte en acreedor de "que su voto sea protegido por el Estado de distintas formas y con distinto vigor en una multiplicidad de situaciones".[54] De hecho, el derecho al sufragio no se limita al voto en las elecciones, al igual que la libertad de asociación, también contempla el derecho a formar y a afiliarse a agrupaciones políticas con intención de participar en el proceso electoral. Al amparo de estas responsabilidades es que estamos obligados a actuar.

---

[50] Const. PR, *supra,* Art. II, Sec. 2. Véanse, además: *Suárez v. C.E.E. I*, 163 DPR 347, 355-356 (2004); *Ramírez de Ferrer v. Mari Brás*, 144 DPR 141, 203 (1997).

[51] *Suárez v. C.E.E. I, supra*, pág. 355.

[52] *P.P.D. v. Comisión Local*, 174 DPR 940, 948 (2004) (Rodríguez Rodríguez, J., Opinión disidente).

[53] *P.P.D. v. Gobernador I*, 139 DPR 643, 670 (1999).

[54] Íd.

Ciertamente, la Constitución de Puerto Rico no dispone expresamente sobre la realización de Primarias para elegir los candidatos que aparecerán en las papeletas de las Elecciones Generales. Sin embargo, se trata de un evento electoral que emana del derecho al sufragio universal, igual y directo de los ciudadanos y las ciudadanas.[55] Es decir, más allá de lo que pueda disponer un estatuto, la validez de un evento electoral está supeditado al parámetro constitucional que exige que se garantice el derecho al sufragio universal, igual, directo y secreto.

Como expresión democrática del derecho de asociación, las Primarias son el trámite procesal idóneo que reivindica el derecho al voto.[56] Las Primarias son el mecanismo adecuado para resolver diferencias políticas que "garantiza la participación directa de los electores afiliados para la designación de los candidatos que los representaran en las elecciones generales.[57] En resumen, el proceso de las Primarias tiene diversas funciones, a saber: resolver disputas políticas internas de los partidos; fomentar la exposición de nuevas ideas en el foro público; adelantar el debate político y asegurar la igualdad del elector, y la competencia dentro de un partido puede exponer su posición ante los afiliados del

---

[55] Véase *McClintock v. Rivera Schatz*, supra, págs. 605-606. Véase, además, *Rosario v. Rockefeller,* 410 US 752, 768 (1973).

[56] Álvarez González, *op. cit.*, pág. 963.

[57] Íd., pág. 962-963.

partido para que resuelvan con su voto.[58] A modo ilustrativo, y cónsono con el concepto de las primarias, en *Rosario v. Rockefeller*, 410 US 752, 768 (1973), el Tribunal Supremo federal reconoció que el Estado tiene un interés apremiante en preservar la integridad del proceso electoral.[59] También estableció que el Estado puede implantar restricciones que protejan la integridad electoral del proceso primarista.

Ahora bien, en vista de que nuestra Constitución establece únicamente el parámetro amplio de protección y no dispone los detalles en que se debe garantizar este derecho, por mandato constitucional se delega la facultad para regular el proceso electoral, así como los partidos a la Asamblea Legislativa.[60] La dimensión constitucional insoslayable erige que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas".[61] En virtud de este

---

[58] Véase íd. El proceso de primarias es una institución con origen en Estados Unidos que fue responsable de la democratización al hacer más transparente la toma de decisiones colectivas que afectaran a un país. Íd., pág. 963.

[59] Véase *P.N.P. v. De Castro Font II, supra,* pág. 905 esc. 13.

[60] *McClintock v. Rivera Schatz*, supra, pág. 598.

[61] Const. PR, *supra*, Art. VI, Sec. 4, pág. 425 ("Las elecciones generales se celebrarán cada cuatro años en el día del mes de noviembre que determine la Asamblea Legislativa. En dichas elecciones serán elegidos el Gobernador, los miembros de la Asamblea Legislativa y los demás funcionarios cuya elección en esa fecha se disponga por ley.

Será elector toda persona que haya cumplido dieciocho años de edad, y reúna los demás requisitos que se determine por ley. Nadie será privado del derecho al voto por no saber leer o escribir o por no poseer propiedad.

precepto constitucional, durante décadas se han promulgado una serie de leyes y reglamentos, incluyendo reglamentación por parte de los partidos políticos, para garantizar el disfrute de este derecho.

El último estatuto que se promulgó con esos objetivos fue el *Código Electoral de 2020* (Código Electoral), Ley Núm. 58-2020. Entre otras cosas, esta legislación reiteró la creación de CEE con la "[m]isión de garantizar que los servicios, procesos y eventos electorales se planifiquen, organicen y realicen con pureza, transparencia, seguridad, certeza, rapidez, accesibilidad y facilidad para los electores de manera costo-eficiente, libre de fraude y coacción; y sin inclinación a ningún grupo o sector ni tendencia ideológica o partidista".[62] A esos fines, el Art. 3.2 de la *Código Electoral de 2020*, Ley Núm. 58-2020, impuso a la CEE las obligaciones siguientes:

> (1) Cumplir y hacer cumplir las disposiciones y los propósitos de esta Ley
>
> .    .    .    .    .    .    .    .
>
> (9) Estudiar los problemas de naturaleza electoral y diseñar un plan integral dirigido a una mayor eficiencia, rapidez y resolución de los asuntos y procedimientos electorales a través de la reestructuración institucional y la adopción de sistemas tecnológicos seguros y automatizados que

---

**Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas.**

Todo funcionario de elección popular será elegido por voto directo y se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo"). (Énfasis suplido).

[62] Art. 3.1 del Código Electoral de 2020 (Código Electoral), Ley Núm. 58-2020.

faciliten los procesos y los servicios administrativos y electorales con mayor accesibilidad a los electores a distancia y en tiempo real.

(10) Cumplir rigurosamente con las fechas dispuestas en esta Ley, para su reestructuración institucional y la adopción de los nuevos procedimientos y sistemas informáticos, incluyendo aquellos que serán transitoriamente utilizados en la Elección General de 2020 y los que deberán adoptarse para los eventos electorales posteriores a esta.

(11) Requerir la cesión gratuita y temporera de toda estructura pública, construida u operada con auspicio de fondos públicos -aunque sea administrada por una entidad privada- para el uso estrictamente electoral de la Comisión. En los casos que en que se utilice una estructura administrada por el sector privado, la Comisión deberá tener una póliza global de responsabilidad pública. En los casos de estructuras administradas por el gobierno, se aplicará de manera automática a la Comisión la póliza de responsabilidad pública de la agencia u organismo público que administra la estructura.

(12) Reclamar, a su única discreción y durante los Ciclos Electorales definidos en esta Ley, a personal en destaque de otras entidades públicas de las ramas Ejecutiva, Legislativa y Judicial, incluyendo municipios y corporaciones públicas. Ese personal podrá ser de todo tipo, rango o clasificación cuando surja la necesidad de servicios electorales. Esta facultad unilateral de reclamo discrecional de la Comisión durante los Ciclos Electorales, será legalmente obligatoria para todo funcionario que se le requiera un destaque. En circunstancias distintas a los Ciclos Electorales y los destaques en las oficinas propias de los Comisionados Electorales definidos en esta Ley, los demás destaques de personal solo se realizarán por virtud de legislación o por solicitud de la Comisión y con el consentimiento discrecional de la agencia que aportaría cada destaque.

.    .    .    .    .    .    .    .

(18) Desarrollar un plan de acción afirmativa y aprobar los reglamentos para el cumplimiento de las leyes y las guías estatales y federales que garanticen el acceso al ejercicio del derecho al voto de las personas con impedimentos, encamadas,

población envejeciente y otros electores con barreras.

.    .    .    .    .    .    .    .

(22) Interponer cualesquiera remedios y recursos legales que estime necesarios para hacer cumplir los propósitos de esta Ley y, principalmente, proteger los derechos de los electores.

(23) Definir por reglamento la distribución equitativa de los materiales electorales, así como fijar el precio de venta de estos, tomando en consideración los costos de producción, manejo electrónico o impresión. [...].

Por su parte, el Presidente de la CEE, como máxima autoridad ejecutiva y administrativa, entre otras cosas, tiene asignadas las facultades y deberes siguientes:

(1) Cumplir y hacer cumplir las disposiciones y los propósitos de esta Ley, la Constitución de Puerto Rico y de Estados Unidos de América, de las leyes que ordenen o instrumenten cualquier tipo de proceso electoral o Votación y de los reglamentos electorales que, por virtud de ley, sean aprobados por la Comisión y los acuerdos unánimes de los Comisionados Electorales.

(2) Representar a la Comisión ante cualquier foro o entidad pública y privada; y ser su principal portavoz institucional.

(3) Aprobar las reglas, los reglamentos y los planes que sean necesarios para la administración y las oficinas administrativas de la Comisión. Estos reglamentos administrativos deberán publicarse en la página cibernética de la Comisión.

.    .    .    .    .    .    .    .

(17) Presentar a la consideración y aprobación de la Comisión todos los proyectos o borradores de las reglas, los reglamentos y los planes de naturaleza específicamente electoral que fueren necesarios para cumplir con esta Ley. Las reglas, reglamentos y planes de naturaleza administrativa, serán de la jurisdicción del Presidente, aunque podrá discutirlos y buscar las recomendaciones de los miembros propietarios de la Comisión previo a su aprobación o enmienda.

(18) Realizar todos aquellos otros actos necesarios y convenientes para el cumplimiento de esta Ley.

.   .   .   .   .   .   .   .

[...].[63]

Asimismo, el Art. 3.10 del Código Electoral, *supra,* dispone que "**[l]os Comisionados Electorales propietarios compartirán con el Presidente la responsabilidad de dirigir y supervisar los trabajos de naturaleza específicamente electoral para garantizar el máximo cumplimiento de la política pública y la Misión de la Comisión**". (Énfasis suplido).[64] Con ese objetivo, el estatuto establece la facultad de los Comisionados Electorales de "hacer recomendaciones administrativas al Presidente o requerirle información sobre las operaciones de las Oficinas Administrativas".[65] Cabe recordar que, según estatuye el Código Electoral, "[l]os Comisionados Electorales propietarios y los adicionales

---

[63] Art. 3.8 del Código Electoral, *supra*.

[64] En lo que respecta a las Comisiones de Primarias, la Sec. 3.7 del Reglamento de Primarias, *supra,* dispone lo siguiente:

"La Comisión de Primarias será responsable de:

1.    Reglamentar, dirigir e inspeccionar todo lo referente a la celebración de los procesos de primarias.
2.    Conseguir y habilitar un local apropiado, para que cada partido político lleve a cabo los procesos de radicación de candidaturas y validación de endosos, donde los haya.
3.    Diseñar, producir y distribuir todos los formularios, papeletas y documentos necesarios para la celebración de las primarias.
4.    Poner en vigor los reglamentos de los partidos políticos, que no conflijan con las disposiciones del Código Electoral y con este Reglamento.
5.    Gestionar los centros de votación necesarios para la celebración de las primarias […].
6.    Asignar el personal, material y equipo necesario para la celebración de las primarias.
7.    Dirigir el proceso de escrutinio general o recuento, según sea el caso".

[65] Art. 3.10 del Código Electoral, *supra*.

serán designados por el Presidente de su Partido Político".[66]

Al amparo del derecho constitucional al sufragio universal, igual, directo, libre y secreto, el Código Electoral reconoce una serie de derechos y prerrogativas de los electores y las electoras que deben garantizarse en todo evento electoral.[67] Entre estas prerrogativas del electorado, el Art. 5.1 del Código Electoral, *supra*, dispone que tienen el derecho "a la libre emisión del voto y a **que este se cuente y se adjudique conforme a la intención del Elector al emitirlo, y según se dispone en esta Ley**". (Énfasis suplido). Además, la comunidad electoral tiene derecho a que la administración de los organismos electorales de Puerto Rico se desarrolle dentro de un marco de estricta imparcialidad, uniformidad, pureza, transparencia y justicia.[68] De igual manera, el Código Electoral reconoce la obligación de proveer "[l]a más amplia accesibilidad del Elector, sin barreras y sin condiciones procesales onerosas, a toda transacción y servicio electoral, incluyendo el

---

[66] Íd.

[67] El Art. 5.2 del Código Electoral, *supra*, define electora o elector como "todo ciudadano que haya cumplido con todos los requisitos de inscripción y la actualización de sus datos en el Registro General de Electores. Todo Elector activo, y que cumpla con los requisitos de esta Ley, ejercerá su derecho al voto en la totalidad de las papeletas de votación que correspondan al Precinto electoral al que pertenece el último domicilio que informó en su registro electoral. Si el Elector activo y debidamente calificado vota fuera del Precinto de su domicilio, durante el Escrutinio General solamente se le adjudicará el voto emitido para el Partido Político, Candidato, Candidato Independiente, Aspirante, nominación directa, opción o alternativa que hayan figurado en la o las papeletas de su Precinto de inscripción".

[68] Art. 5.1 del Código Electoral, *supra*.

ejercicio de su derecho al voto".[69] Cónsono con lo anterior, los electores y las electoras tiene el derecho "a que el sistema y los procedimientos electorales estén fundamentados en su más amplia participación y accesibilidad, tomando en consideración su dignidad y su credibilidad personal, y no en la desconfianza de los Partidos Políticos u otros electores".[70] Asimismo, el Código Electoral, *supra,* expone diáfanamente "[e]l derecho fundamental del Elector a la libertad de asociación mediante la inscripción de Partidos Políticos, así como el derecho de afiliarse al Partido de su preferencia y a endosar las candidaturas de aspirantes apelantes a cargos electivos por su Partido, conforme se define en esta Ley".[71] Coetáneamente, se reconoce "[e]l derecho del Elector afiliado aspirante a una candidatura a solicitar primarias en su Partido Político y la realización de estas conforme a las garantías, los derechos y los procedimientos establecidos en esta Ley".[72]

**B.**

Las Primarias son el proceso de votación mediante el cual se seleccionan los candidatos y las candidatas de cada partido a cargos públicos electivos.[73] El Código

---

[69] Íd.

[70] Íd.

[71] Íd.

[72] Íd.

[73] Art. 2.3 del Código Electoral, *supra.*

Electoral de 2020, *supra,* como parte de los deberes de la CEE de planificar, dirigir y supervisar los procedimientos de naturaleza electoral, establece que la CEE debe celebrar Primarias en aquellos casos en que proceda el primer domingo del mes de junio del año en que se celebran las elecciones generales.[74] El Art. 7.13 del Código Electoral, *supra,* dispone, a su vez, que la CEE debe convocar y anunciar "la realización de primarias con sesenta (60) días de anticipación, en por lo menos dos (2) periódicos de circulación general". El tipo de primarias se decide por el partido político.[75]

Si bien el Código Electoral establece el primer domingo del mes de junio del año en que se celebren las Elecciones Generales como la fecha para celebración de las Primarias, la Resolución Conjunta 37-2020 (Resolución Conjunta), R.C. del S. 556, 18va Asamblea Legislativa, 7ma Sesión Ordinaria, se emitió con el fin de posponer la fecha del evento electoral de Primarias. La modificación de la fecha en que estaba pautada este evento electoral estuvo motivada por el estado de emergencia declarado mediante la Orden Ejecutiva en consideración al COVID-19. Se reconoció que "la situación de emergencia que vivimos y el cierre total de las operaciones gubernamentales, incide directamente en

---

[74] Art. 3.2 del Código Electoral, *supra*.
[75] Véase Art. 7.19 del Código Electoral, *supra*.

el calendario electoral previo a las primarias". La

Resolución Conjunta señaló, precisamente, que

> […] debido a la suspensión de las labores en la Comisión Estatal de Elecciones, no se han podido poner en marcha los preparativos que anteceden dicho evento electoral. Es de suma importancia para la Comisión, la revisión de los reglamentos y manuales de primarias, así como la selección de los centros de votación, reclutamiento y adiestramiento de los funcionarios de colegios, y demás personal que labora antes, durante y después del día de la celebración del evento. Como parte de ese proceso preparatorio, se trabaja con el voto adelantado, el voto ausente y el diseño e impresión de las papeletas, (incluyendo las papeletas modelos) entre otros asuntos.
>
> **La Comisión, no está operando a su máxima capacidad durante la emergencia conforme a las órdenes ejecutivas vigentes, por lo que todas sus operaciones han sido detenidas y en suspenso.** Estos trabajos no se pueden llevar a cabo hasta tanto se levante el toque de queda y se restablezca el funcionamiento ordinario en la Comisión. (Énfasis suplido).

Así pues, la Asamblea Legislativa reconoció las circunstancias en que se encontraba la CEE y la imposibilidad de que las Primarias se celebraran en la fecha que ordinariamente debían llevarse a cabo. Entre otras cosas, ello se debió a que la CEE había suspendido labores y no se habían podido continuar los preparativos para el evento electoral, entre los cuales se incluían los siguientes: la revisión de los reglamentos pertinentes y manuales de Primarias; la preparación de las papeletas, y la selección de los centros de votación y adiestramiento de funcionarios de colegios, entre otros funcionarios y aspectos relacionados al voto adelantado y el voto ausente. Consecuentemente, como

dijimos, la Asamblea Legislativa entendió que ante la situación de emergencia de salud era "imperativo tomar la decisión de posponer la celebración de las primarias de los partidos políticos, señalada para el domingo[,] 7 de junio de 2020". Al considerar que la preparación para el evento de las Primarias se había atrasado por cerca de dos (2) meses, entendió prudente posponer las primarias hasta el domingo, 9 de agosto de 2020.[76] Además, se ordenó que el Presidente de la CEE coordinara con los partidos políticos que tenían candidatos que formarían parte de la primaria electoral el ajuste al calendario electoral, de conformidad con el Código Electoral.[77]

La Legislatura estableció la facultad de la CEE de extender el calendario electoral de cualquier trámite cuya fecha establecida venció durante el periodo comprendido entre el 16 de marzo de 2020 y la fecha la aprobación de la Resolución Conjunta.[78]

Cónsono con lo dispuesto en la Resolución Conjunta citada, la CEE revisó el *Reglamento para la Celebración de Primarias de los Partidos Políticos*, que había sido aprobado el 16 de marzo de 2020.[79] La Sec. 2.1 señaló que las Primarias se celebrarían el 9 de agosto de 2020 y que los colegios electorales abrirían para votación a

---

[76] Véase Sec. 1 de la Resolución Conjunta, *supra.*

[77] Véase, Sec. 2 de la Resolución Conjunta, *supra.*

[78] Íd.

[79] Este reglamento fue revisado el 23 de julio de 2020.

las 8:00 a.m. y permanecerían abiertos con este objetivo hasta las 4:00 p.m. Esto es, harían viable la votación de los electores y las electoras en el horario de 8:00 a.m. a 4:00 p.m.

La Sec. 3 de la Resolución Conjunta, *supra*, establece que,

> [e]n los casos en que no haya acuerdo entre los comisionados electorales sobre alguna situación o decisión conforme a esta Resolución Conjunta, a manera de excepción del procedimiento dispuesto en el Artículo 3.0004 (b) de la Ley 78-2011, según enmendada [derogada], el Presidente de la Comisión, consultará el asunto o determinación únicamente con los comisionados electorales de los partidos que vayan a celebrar primarias para seleccionar a los candidatos a figurar en la papeleta en las elecciones generales. El Presidente, tomando en cuenta la recomendación de los comisionados de los partidos que vayan a celebrar la primaria, tomará la decisión que mejor se ajuste a los propósitos de esta Resolución Conjunta.

Ahora bien, el Art. 3.4 del Código Electoral, *supra*, regula la forma en que se tomarán las decisiones en la CEE. En específico, esta disposición estatutaria establece lo siguiente:

> (1) Las decisiones de la Comisión relacionadas con asuntos de específica naturaleza electoral se tomarán con la unanimidad de los Comisionados Electorales propietarios presentes que la componen y se consignarán mediante Certificación de Acuerdo suscrita por el Secretario.
>
> (2) El voto del Presidente solo será necesario cuando no haya unanimidad entre los Comisionados Electorales, a menos que otra cosa se disponga en esta Ley.
>
> (3) Toda moción que se presente ante la Comisión durante una reunión por cualquiera de los Comisionados Electorales deberá ser considerada de inmediato para discusión y

Votación en la próxima reunión de la Comisión, sin necesidad de que la misma sea secundada. Además, las mociones podrán ser presentadas por escrito ante el Secretario y notificadas a los Comisionados Electorales y el Presidente, en cuyo caso será considerada para discusión y votación, sin necesidad de que las mismas sean secundadas, en la próxima reunión de la Comisión. No podrán ser consideradas mociones cuyo término entre la notificación y la reunión sea menor de cuarenta y ocho (48) horas. La falta de notificación, según requerida en esta Ley, impedirá que la moción sea considerada hasta tanto cumpla con este requisito.

(4) En ausencia de la unanimidad de los Comisionados Electorales presentes, el Presidente deberá decidir a favor o en contra no más tarde de los diez (10) días a partir de la ausencia de unanimidad. En estos casos, la determinación del Presidente se considerará como la decisión de la Comisión y podrá solicitarse su revisión judicial conforme a lo dispuesto en esta Ley.

(5) Toda enmienda al reglamento para una Votación y su escrutinio general, que no sean Primarias internas de los Partidos Políticos estatales o nacionales ni Elecciones Especiales de Afiliados que se proponga dentro de los noventa (90) días antes de la correspondiente Votación, requerirá el voto unánime de los Comisionados Electorales presentes. La ausencia de unanimidad en este caso constituye la no aprobación de la enmienda propuesta y no podrá ser votada ni resuelta por el Presidente.

(6) Cualquier enmienda sobre la inclusión de otra categoría de Voto Adelantado durante los noventa (90) días antes de la correspondiente Elección General, se hará con la unanimidad de los Comisionados Electorales presentes. La ausencia de unanimidad en este caso constituye la no aprobación de la propuesta categoría y no podrá ser votada ni resuelta por el Presidente.

(a) En caso de una declaración oficial de emergencia del Gobierno federal o estatal coincidir con los noventa (90) días previos al día de una Votación, que no sean

Primarias internas de los Partidos Políticos estatales o nacional, y no se cuente con la unanimidad de los Comisionados Electorales presentes para añadir categorías de Voto Adelantado, el Presidente podrá crearlas para garantizar el derecho fundamental al voto de los Electores que, por razón de dicha emergencia, enfrenten la imposibilidad o dificultad para asistir a sus Centros de Votación.

(b) Iguales criterios y procedimientos se utilizarán en los casos de declaración de emergencia que requiera la apertura de Centros de Votación y extender las fechas límites para el envío o recibo de materiales de Votación y papeletas de Voto Ausente y Voto Adelantado. En estos casos, la determinación del Presidente podrá incluir la transmisión electrónica y/o la utilización del USPS.

No obstante, a pesar de que el Código Electoral le provee estos poderes y establece este esquema decisional a la CEE, el Código Electoral también limita la jurisdicción y las facultades de la Comisión en ciertos aspectos. A modo ilustrativo, el Art. 3.5 del Código Electoral, *supra*, instituye que la CEE "tendrá jurisdicción original para motu proprio o a instancia de parte interesada entender, conocer y resolver cualquier asunto o controversia de naturaleza específicamente electoral, **excepto que otra cosa se disponga en esta Ley**". (Énfasis suplido). A esos efectos, en lo que nos concierne, el inciso (3) del Art. 3.5 del Código Electoral, *supra*, reconoce una limitación a la CEE, a saber:

**<u>Ningún</u>** asunto, querella, investigación o controversia bajo la jurisdicción interna de la Comisión y ningún proceso, orden, sentencia o decisión judicial, **podrá tener el efecto**

> **directo o indirecto de impedir, paralizar, interrumpir o dilatar la realización de una Votación, según el horario y día específico dispuesto por ley a menos que el Tribunal Supremo de Puerto Rico determine inconstitucionalidad o violación de algún derecho civil que, con excepción de una Elección General, convierta la votación en ilegal.** (Énfasis suplido).[80]

De esa forma, el Código Electoral estableció diáfanamente que la **facultad de impedir, paralizar, interrumpir o dilatar un proceso de votación sería exclusivo del Tribunal Supremo de Puerto Rico.** De manera muy similar a la disposición estatutaria citada, y en virtud de una garantía adicional para proteger el derecho fundamental a votar de los electores y las electoras, el Art. 13.3 del Código Electoral, *supra*, señala que

> […] [n]ingún recurso legal, asunto, caso o controversia bajo la jurisdicción interna de la Comisión; y ningún proceso, orden, sentencia o decisión judicial podrán tener el efecto directo o indirecto de impedir, paralizar, interrumpir o posponer la realización de una votación según legislada y según el horario y día específicos dispuestos por ley; **a menos que el Tribunal Supremo de Puerto Rico determine la violación de algún derecho civil que, con excepción de una Elección General, posponga la votación o la clasifique como inconstitucional.** (Énfasis suplido).

Así pues, se reitera la norma establecida en el Código Electoral de que, en ausencia de legislación a esos efectos, **este Tribunal es el ente con la autoridad exclusiva de impedir, paralizar, interrumpir o posponer la realización de un evento electoral y, por**

---

[80] Art. 3.5(3) del Código Electoral, *supra*.

**consiguiente, la votación correspondiente, según el horario y día determinados por ley**. De hecho, el Art. 13.4 del Código Electoral, *supra*, establece expresamente que ni siquiera una decisión del Tribunal de Primera Instancia ni del Tribunal de Apelaciones puede tener el alcance de "suspender, paralizar, impedir u obstaculizar la votación, el escrutinio o el escrutinio general de cualquier votación, y tampoco cualquier acto o asunto que deba comenzar o realizarse en un día u hora determinada, conforme a esta Ley o cualquier ley habilitadora que instrumente una votación".

Sin embargo, como vimos, las Comisiones de Primarias del PNP y el PPD decidieron suspender mediante un acuerdo unánime la continuación de las Primarias el 9 de agosto de 2020. En particular, las Comisiones de Primarias de ambos partidos políticos, por unanimidad, convinieron que las Primarias continuarían en los precintos electorales donde no se comenzó la votación.

La CEE hace referencia y cita varias disposiciones del Código Electoral que reconocen la facultad de las Comisiones de Primarias para tomar decisiones por unanimidad. Sostiene que, con el interés público de garantizar igual acceso a los electores y las electoras a ejercer el derecho fundamental al voto directo, secreto y protegido contra toda coacción, acordaron suspender la votación en los precintos en que no había

comenzado y prohibir la divulgación de resultados preliminares.

Aun cuando se trató de una determinación unánime de las Comisiones de Primarias de ambos partidos políticos ——en las cuales forman parte como representantes y guardianes los Comisionados Electorales de los partidos políticos con primarias—— esta actuación es contraria a lo establecido en el Código Electoral. No hay duda que la suspensión del evento electoral de las Primarias que se emitió mediante el Acuerdo CEE-AC-20-224 excede las facultades conferidas a los Comisionados Electorales de los partidos y al Presidente de la CEE. En consecuencia, ese acuerdo contraviene el ordenamiento electoral vigente.

No obstante, es innegable que se trata de un acto acogido por los funcionarios y las funcionarias de los colegios, unidades y precintos electorales que no habían comenzado la votación en ese momento. Como resultado, el proceso de las Primarias se descontinuó y se entendió pospuesto hasta una fecha posterior. Así las cosas, estamos obligados a armonizar la exigencia que establece el Art. 13.4 del Código Electoral, *supra*, con los sucesos extraordinarios y excepcionales que ocurrieron el 9 de agosto de 2020 y el estado actual del proceso de Primarias en Puerto Rico. Ello, siempre teniendo como norte garantizar que el ejercicio del derecho sagrado al

voto se respete y, por lo tanto, que cada expresión de voluntad de los electores y las electoras sea contada.

Precisamente, ante esta coyuntura histórica, y para salvaguardar la voluntad de los electores y las electoras que participaron del evento electoral en cuestión, lo que procede es **ordenar la continuación** de las Primarias el próximo domingo, 16 de agosto de 2020, en los precintos en los cuales las elecciones no pudieron comenzar.

Reitero, especialmente en un caso como el de autos donde el Código Electoral o los reglamentos aplicables no conciben un suceso de esta naturaleza, resulta imperativo conceder un remedio que garantice que los derechos fundamentales de cada ciudadano y ciudadana no se vulneren como consecuencia de elementos ajenos a su voluntad luego de su ejercicio legítimo.[81] Concluir lo contrario sería castigarlos por el incumplimiento de las entidades encargadas de que el evento electoral comenzara y culminara el mismo día. El compromiso que asumimos se consuma al diseñar la vía que permite que cada una de las personas que no pudieron ejercer su derecho constitucional al voto en las Primarias puedan

---

[81] Véase *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 DPR 490, 521 (1988) (Negrón García, Opinión Concurrente), donde se expresó que errores humanos, técnicos o atribuibles a la CEE, no son motivos para negar el derecho al voto. Además, señaló que "[l]a primacía del derecho al sufragio es de tal forma trascendental, véase *Wesbery v. Sanders*, 376 US 1; *Reynolds v. Sims*, 377 US 55, que ni tan siquiera errores de los electores que no tengan su base en intenciones fraudulentas deben dar lugar a la anulación de un voto".

tener la oportunidad de expresar su voluntad de forma libre, secreta y directa como exige la Constitución de Puerto Rico.

## III

**¿Qué efecto tiene nuestra determinación sobre la divulgación de resultados preliminares de las Primarias?**

El Art. 7.20 del Código Electoral, *supra*, establece que "[l]a Junta Local de Primarias será responsable del escrutinio de primarias de su precinto y deberá presentar a la Comisión un acta con los resultados".[82] De conformidad con el estatuto, el acta se debe presentar "dentro de las veinticuatro (24) horas siguientes a la celebración dde la primaria".[83]

Por su parte, el Art. 10.6 del Código Electoral, *supra*, instituye la forma en que se deben anunciar los resultados al electorado. A esos efectos, esta disposición del estatuto establece lo siguiente:

> **(1) Primer Anuncio de Resultado Parcial — La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el primer anuncio público de resultado parcial de una**

---

[82] Véase, además, Sec. 5.1 del Reglamento de Primarias, *supra*. El Reglamento de Primarias, *supra,* expresa que la Junta Local de Primarias es "el organismo electoral a nivel de precinto integrado por un presidente nombrado por el Comisionado Electoral del partido político correspondiente y un representante de cada aspirante, según se establece en este Reglamento. **Será responsable del escrutinio de Primarias de su precinto y deberá presentar a la Comisión un acta con los resultados.** Cada reglamento de primarias de los partidos dispondrá, entre otros asuntos, la creación y los deberes de la Junta Local de Primarias de cada precinto donde se realicen primarias". (Énfasis suplido).

[83] Art. 7.20 del Código Electoral, *supra*. Véase, además, Sec. 5.1 del Reglamento de Primarias, *supra*.

**elección, no más tarde de las diez de la noche (10:00 pm) del día en que se realizó la votación. Este primer anuncio se hará tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio.** Al hacer este anuncio, el Presidente de la Comisión o en quien este delegue, deberá enfatizar que:

"El anuncio de este primer resultado parcial, en este día y a esta hora, responde un mandato del "Código Electoral de Puerto Rico de 2020" para orientar al pueblo de Puerto Rico sobre el estatus del escrutinio hasta este momento. Este resultado parcial no constituye, y tampoco debe interpretarse, como un resultado final o la proyección de un resultado final, pues todavía hay votos en proceso de contabilización o escrutinio. El resultado final y oficial de este evento electoral, solo será y solo se anunciará al finalizar el Escrutinio General y considerarse hasta la última papeleta votada por cada Elector. Ningún Candidato, Aspirante, propuesta o asunto sometido a votación, será certificado por la Comisión hasta tanto se realice y complete el Escrutinio General."

**(2)** Segundo Anuncio de Resultado Parcial — La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el segundo anuncio público de resultado parcial de una elección, no más tarde de las seis de la mañana (6:00 am) del día siguiente en que se realizó la votación. Este segundo anuncio se hará tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio. Al hacer este anuncio, el Presidente de la Comisión o en quien este delegue, deberá enfatizar el mismo mensaje dispuesto para el primer anuncio de resultado parcial.

**(3)** Los anuncios de resultados parciales constituirán una formalidad de interés público y no impedirán que el Presidente y los oficiales de la Comisión pueden discutir públicamente los resultados electorales, según vayan reflejándose en los sistemas de la Comisión. (Énfasis suplido).

Asimismo, al amparo del Art. 10.6, *supra,* la Sec. 5.4 del Reglamento de Primarias, *supra*, promulgado por la CEE, dispone como sigue:

(1) Primer Anuncio de Resultado Parcial – La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el primer anuncio público de resultado parcial de una elección, no más tarde de las diez de la noche (10:00pm) del día en que se realizó la votación. Este primer anuncio se hará tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio. Al hacer este anuncio, el Presidente de la Comisión o en quien este delegue, deberá enfatizar que:

"El anuncio de este primer resultado parcial, en este día y a esta hora, responde [a] un mandato del 'Código Electoral de Puerto Rico de 2020' para orientar al pueblo de Puerto Rico sobre el estatus del escrutinio hasta este momento. Este resultado parcial no constituye, y tampoco debe interpretarse, como un resultado final o la proyección de un resultado final, pues todavía hay votos en proceso de contabilización o escrutinio. El resultado final y oficial de este evento electoral, solo será y solo se anunciará al finalizar el Escrutinio General y considerarse hasta la última papeleta votada por cada Elector. Ningún Candidato, Aspirante, propuesta o asunto sometido a votación, será certificado por la Comisión hasta tanto se realice y complete el Escrutinio General."

(2) Segundo Anuncio de Resultado Parcial – La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el segundo anuncio público de resultado parcial de una elección, no más tarde de las seis de la mañana (6:00 am) del día siguiente en que se realizó la votación. Este segundo anuncio se hará tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio. Al hacer este anuncio, el Presidente de la Comisión o en quien este

delegue, deberá enfatizar el mismo mensaje dispuesto para el primer anuncio de resultado parcial.

(3) Los anuncios de resultados parciales constituirán una formalidad de interés público y no impedirán que el Presidente y los oficiales de la Comisión pued[a]n discutir públicamente los resultados electorales, según vayan reflejándose en el sistema de la Comisión.

Varios de los peticionarios plantean que la votación que se llevó a cabo en varios precintos debe escrutarse y publicarse por la Comisión Estatal de Elecciones. En esencia, sostienen que, dado a que el Código Electoral y el Reglamento de Primarias establecen que debe emitirse una serie de anuncio en un plazo determinado, corresponde publicar los resultados de la votación incompleta que se llevó a cabo el 9 de agosto de 2020.

No obstante, estos pierden de perspectiva que las disposiciones que establecen la obligación de anunciar los resultados están predicadas en el caso ordinario en donde las elecciones en nuestra jurisdicción comienzan y concluyen el mismo día. Así pues, estas disposiciones se activan una vez **termina la Primaria.** Esto es, el requisito de publicar los resultados se produce bajo la premisa de que el proceso de votación culminó y no bajo el escenario que prevalece actualmente en Puerto Rico. En ese sentido, cabe resaltar que todos los candidatos que acudieron ante los foros judiciales y que son parte

en el caso de autos reconocen que el proceso electoral **no ha concluido.**

Sin duda, publicar los resultados de unas elecciones a medias no promueven un mejor ejercicio del derecho al voto. Tampoco constituye una vía justa para la totalidad de los candidatos. Es innegable que su publicación puede tener el efecto de incluir a los electores y las electoras, con la consecuencia de que se obtenga un resultado que no hubiera sido el que se reflejara sin su publicación. De hecho, si bien los peticionarios plantean que esto abonará a recobrar la confianza en el proceso electoral de las Primarias, considero que su efecto es totalmente distinto. La publicación de unos resultados en esta etapa promoverá mayor desconfianza en el resultado de la primaria. La publicación de los resultados luego de que se termine el proceso de votación en todo Puerto Rico, y de conformidad con la Opinión que emitió hoy este Tribunal, constituye una salvaguarda de que los votos que emiten los electores y las electoras estén cimentados en elementos similares a los que hubieran tomado en consideración de haberse completado la Primaria electoral el mismo día, y dentro del mismo horario; no por elementos exógenos o presiones injustificadas por los resultados preliminares —de menos del 50% de los precintos— de una **elección en proceso.**

Los argumentos sobre una posible alteración de los resultados se mantienen en la esfera de la especulación. La CEE está predicada en el **principio de la desconfianza interna**, con el fin de **generar confianza externa** a los ciudadanos y ciudadanas, así como a los candidatos y candidatas a cargos públicos electivos. Precisamente, por esa razón, los estatutos pertinentes establecen un andamiaje que, entre otras cosas, incluye Comisionados Electorales, funcionarios y observadores que están llamados a vigilar por los intereses de su colectividad. Ciertamente, las medidas que se tomen en el proceso de espera para la continuación de la Primaria deben cumplir con los más altos rigores de modo que despejen cualquier percepción que pueda producir desconfianza en la integridad del resultado del evento electoral.

## IV

A la luz de los fundamentos que anteceden, solo resta reafirmar mi conformidad con la Opinión que emite hoy este Tribunal. Tengo la firme convicción que esta decisión judicial le brinda certeza y confianza a los electores y las electoras, así como a los candidatos y las candidatas de la Primaria. De este modo, le imprimimos certidumbre al proceso en el cual el voto de cada elector o electora que ejerció su derecho sea contado y respetado.

Esta es nuestra aspiración y estoy seguro que es la exigencia del pueblo de Puerto Rico.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pedro Pierluisi-Urrutia Y Eduardo Bhatia Gautier<br><br>Peticionario<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos | |
| Carmen Damaris Quiñones Torres<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos | CT-2020-11<br><br>cons. con<br><br>CT-2020-12<br><br>con<br><br>CT-2020-13<br><br>y con<br><br>CT-2020-14 |
| Carlos Delgado Altieri<br><br>Peticionario<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos | |
| Wanda Vázquez Garced<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, et al.<br><br>Recurridos | |

Opinión de conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

San Juan, Puerto Rico, a 12 de agosto de 2020.

Los acontecimientos del pasado, 9 de agosto de 2020, en la celebración de las primarias del Partido Nuevo Progresista y el Partido Popular Democrático, constituyen uno de los fracasos a la justicia electoral y a la democracia más lamentables en la historia de Puerto Rico. La administración y operación de este evento electoral por la Comisión Estatal de Elecciones no solo fue incompetente y seriamente negligente, sino que además fue contraria a su ley orgánica y a sus reglamentos interpretativos. Sin duda alguna, los atrasos y las complicaciones administrativas ocurridas laceraron significativamente el mandato constitucional a favor de un sufragio universal directo, igual y secreto de miles de electores y electoras.

Ante esta nefasta realidad, este Tribunal tiene la difícil, pero importante responsabilidad de analizar los eventos transcurridos a la luz de los diversos intereses en pugna. Lo anterior, en vista de que tenemos el deber de salvaguardar el derecho fundamental al voto que ya fue ejercido por miles de personas, mientras que tenemos la obligación de instrumentar el derecho al sufragio de aquellas personas impedidas de ejercerlo. A esos fines, debemos realizar un balance de intereses para proveer la solución más oportuna, justa y adecuada posible dentro de las circunstancias particulares y atropelladas de esta controversia.

En ese ejercicio, es forzoso concluir que el remedio que mejor mitiga los daños ya causados a nuestro sistema democrático es que este Tribunal avale la continuación del ejercicio del derecho al voto calendarizado para este próximo domingo. De esta manera, salvaguardamos el derecho al voto que ya fue ejercido debidamente por miles de puertorriqueños y puertorriqueñas, mientras que le garantizamos tal derecho a aquellos y aquellas que fueron impedidos de ejercerlo este pasado domingo. De igual modo, mediante este dictamen, protegemos la secretividad de los votos emitidos, en aras de garantizar la pureza y la igualdad de condiciones de este atropellado evento electoral. A esos fines, estoy conforme de que, en ese balance de intereses alcanzado, hoy este Tribunal responsablemente descarte dar más peso a los intereses particulares de las personas aspirantes e instrumente un remedio que da mayor peso al interés colectivo del derecho al voto de los miles de electores y electoras que votaron válidamente y de los que lo harán en la culminación del proceso este próximo domingo.

Adviértase que esta determinación no constituye, de ninguna manera, una validación del proceder de la Comisión Estatal de Elecciones en la celebración de estas primarias. Tales eventos no son cónsonos con la Constitución de Puerto Rico y no tienen cabida en nuestro ordenamiento democrático. Por el contrario, a la luz de lo dictaminado por este Tribunal se tienen que tomar acciones afirmativas y

determinantes para garantizar que ello no volverá a ocurrir. Ciertamente, ante la realidad de lo ocurrido, la decisión tomada por este Tribunal en medio de esta emergencia provee un remedio extraordinario y un mecanismo de mitigación de daños que persigue que no se continúen lacerando los distintos intereses en controversia.

Por estas razones, estoy conforme con el remedio provisto por este Tribunal. Veamos el derecho aplicable a la controversia ante nuestra consideración.

## I.

Como es conocido, en nuestro ordenamiento el "poder político emana del pueblo y se ejercerá con arreglo a su voluntad". Art. I, Sec. 1, Const. PR, LPRA, Tomo 1. En ese sentido, ese poder político de tanta envergadura se manifiesta, entre muchas maneras, a través del siguiente mandato constitucional: "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el **sufragio universal, igual, directo y secreto**, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". (Énfasis suplido). Art. II, Sec. 2, Const. PR, LPRA, Tomo 1. La Convención Constituyente estimó que "[s]iendo los ciudadanos iguales, estando los hombres y mujeres en parangón y tratándose de la máxima responsabilidad política, es natural que el sufragio sea universal, igual y directo". 4 Diario de Sesiones de la Convención Constituyente 3177 (versión digital).

En virtud de ello, repetidamente hemos catalogado el derecho al voto como una garantía fundamental de la Constitución de Puerto Rico. P.I.P. v. C.E.E., 120 DPR 580, 615 (1988); Ortiz Angleró v. Barreto Pérez, 110 DPR 84, 88 (1980). Lo anterior, pues "la Sección 2 de la Carta de Derechos enfatiza el rol protagónico del derecho al voto como ingrediente vital de nuestro sistema democrático". J. Farinacci Fernós, La Carta de Derechos, pág. 49 (manuscrito no publicado). "El derecho al voto es de orden tan fundamental que se estima que el examen de posibles obstrucciones al mismo es uno de los usos básicos del poder de revisión judicial". Ortiz Angleró v. Barreto Pérez, supra.

A la luz de estos postulados, nuestro andamiaje electoral ha sido diseñado para que los electores y las electoras sean el eje central del mismo.[84] Exposición de motivos, Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, http://www.bvirtual.ogp.pr.gov/ogp/Bvirtual/leyes referencia/PDF/58-2020.pdf. Tanto es así, que el referido estatuto establece la supremacía de los derechos electorales individuales de cada persona sobre los derechos y las

---

[84]Los Constituyentes delegaron en la Asamblea Legislativa la facultad de regular todo lo "concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Art. VI, Sec. 4, Const. PR, LPRA, Tomo 1. Tal potestad se debe ejercer dentro de los límites inherentes a una democracia que exigen que se garantice y se respete la voluntad del pueblo. A su vez, la Asamblea Legislativa ha encomendado a la Comisión Estatal de Elecciones a gestionar todo lo relacionado con la organización electoral. Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, http://www.bvirtual.ogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/58-2020.pdf (Código Electoral).

prerrogativas de todos los partidos, candidatos independientes y agrupaciones políticas. Íd., Art. 5.1 (2).

En ese sentido, la Comisión Estatal de Elecciones (CEE) debe de garantizar "la más amplia accesibilidad" de los electores y electoras a toda transacción y servicio electoral, "sin barreras y sin condiciones procesales onerosas". Íd., 5.1 (4-5). Por tanto, en el descargue de sus funciones, la CEE tiene la tarea de "[g]arantizar que los servicios, procesos y eventos electorales se planifiquen, organicen y realicen con **pureza, transparencia, seguridad, certeza, rapidez, accesibilidad y facilidad** para los electores de manera costo-eficiente, libre de fraude y coacción; y sin inclinación a ningún grupo o sector ni tendencia ideológica o partidista". (Énfasis suplido). Íd., Art. 3.1.

Asimismo, los tribunales tenemos la obligación de hacer valer este derecho tan fundamental. Es por ello que el Código Electoral dispone igualmente que no se puede "privar a un Elector calificado de su derecho al voto mediante reglamento, orden, resolución, interpretación o cualquier otra forma que impida lo anterior". Íd., Art. 5.6.

Actualmente, y consistente con esquemas anteriores, el Código Electoral reconoce el derecho de una persona aspirante a una candidatura a solicitar primarias en su partido político. Íd., Art. 5.1 (15). Cuando ello ocurre, se activan ciertas entidades internas de la CEE para garantizar

la realización de unas primarias conforme a las garantías, los derechos y los procedimientos dispuestos en la ley.

Particularmente, se crea una Comisión de Primarias compuesta por el Presidente de la CEE y por el Comisionado Electoral del partido político que interesa realizar primarias. Art. 7.1, Código Electoral, supra. La Comisión de Primarias tiene la importante y amplia facultad de dirigir e inspeccionar todos los asuntos referentes a la celebración de las primarias. Íd.; Sec. 3.7 de Reglamento para la celebración de primarias de los partidos políticos, CEE, 16 de marzo de 2020 (revisado el 23 de julio de 2020).

Así, la Comisión de Primarias tiene la responsabilidad de habilitar locales apropiados, distribuir papeletas, gestionar centros de votación, asignar el personal necesario y dirigir el escrutinio de la votación en todo procedimiento de primarias. Sec. 3.7 de Reglamento para la celebración de primarias de los partidos políticos, supra. De hecho, relevante a la controversia ante nos, la Comisión de Primarias tiene la responsabilidad de hacer "los arreglos necesarios para que, **no más tarde del día antes de la celebración de éstas, el material electoral a ser utilizad[o] sea enviado en un vehículo cerrado y sellado a las oficinas de las [Junta de Inscripción Permanente] o a los lugares que determine**". (Énfasis suplido). Íd., Sec. 4.3.

De igual modo, en esta encomienda, la Comisión de Primarias inevitablemente tiene que tomar decisiones y

determinaciones frecuentemente. A esos fines, tanto el Código Electoral como el Reglamento para la celebración de primarias de los partidos políticos, disponen que: "[l]as decisiones de la Comisión de Primarias se tomarán con la unanimidad del Presidente de la Comisión y el Comisionado Electoral del Partido Político; pero no habiéndola, prevalecerá la decisión del Presidente". Art. 7.1, Código Electoral, _supra_; Sec. 2.12, Reglamento para la celebración de primarias de los partidos políticos, _supra_. Entiéndase, la Comisión de Primarias tiene la facultad de tomar decisiones ante complicaciones o situaciones que afecten de alguna manera la celebración de las primarias.

Por otro lado, el Código Electoral dispone que las primarias se celebrarán el primer domingo del mes de junio en los años en los cuales se celebrará una elección general. Art. 7.12, Código Electoral, _supra_. El horario de votación en unas primarias es de 8:00am a 4:00pm. Sec. 2.2, Reglamento para la celebración de primarias de los partidos políticos, _supra_.

Ahora bien, **una vez terminado el período de votación**, el Código Electoral dispone que la CEE "tendrá la obligación de establecer un sistema de divulgación de los resultados en progreso de todo evento electoral, según sean recibidos".[85]

---

[85]Tanto en el Código Electoral, _supra_, como en el Reglamento para la celebración de primarias de los partidos políticos, Comisión Estatal de Elecciones, 16 de marzo de 2020 (revisado el 23 de julio de 2020), hay ciertas contradicciones sobre el momento exacto en que se activa la obligación de divulgar los resultados de las elecciones. Por un lado, el Código Electoral dispone en su Art. 7.20 que los resultados de unas primarias se deben divulgar a

Íd., Art. 10.5 (2). Sin embargo, la ley específica que "[e]ste sistema deberá estar disponible para acceso del público en general **desde la hora de cierre de los colegios de votación**". (Énfasis suplido). Íd. Entiéndase, el estatuto particulariza que la divulgación de los resultados del escrutinio comenzará al cerrar los centros de votación. Lo anterior, partiendo de la premisa de que los centros de votación se considerarán cerrados una vez el evento electoral haya culminado en su totalidad.

Ello, es cónsono con el tratamiento que se le da a los votos adelantados y votos ausentes. Particularmente, las distintas personas que son elegibles a estos métodos especiales de votación, ejercen su derecho al voto en fechas anteriores al evento electoral. A pesar de ello, los resultados de estas votaciones no son divulgados al público. Al contrario, los votos adelantados y ausentes se introducen en las máquinas de escrutinio electrónico el día del evento electoral a partir de las 8:00am. Sec. 8.1 de Reglamento de voto ausente y voto adelantado de primarias 2020 y elecciones generales 2020, CEE (13 de marzo de 2020).

_____

las veinticuatro (24) horas siguientes a la celebración de la primaria, y su Art. 10.5 reseñado en esta Opinión, el cual hace referencia a "todo evento electoral", dispone que se divulgarán los resultados "desde la hora de cierre de los colegios de votación". Por otro lado, el precitado Reglamento establece en su Sec. 5.6 que la Comisión de Primarias tiene setenta y dos (72) horas para divulgar dichos resultados.

Sin embargo, estas incongruencias son inconsecuentes al análisis de esta Opinión, pues cualquier interpretación parte de la premisa de que la intención legislativa es que toda divulgación de resultados comience una vez el evento electoral haya culminado.

Lo anterior, responde al principio básico de que el derecho al voto se debe ejercer en igualdad de condiciones. Así lo dispone el Código Electoral al reconocer que el derecho de las personas electoras "al voto íntegro, al voto mixto, al voto por candidatura y a la nominación directa de personas a cargos públicos electivos **bajo condiciones de igualdad en cada caso**, conforme se define en esta Ley". (Énfasis suplido). Art. 5.1, Código Electoral, supra. Indudablemente, la divulgación temprana y a destiempo de votaciones electorales laceraría la igualdad de condiciones de los y las aspirantes, pero no menos importante, la igualdad de condiciones de los votantes. En consecuencia, tanto en el contexto del voto regular como en el de votos adelantados y ausentes, es imperante que la divulgación de los resultados se efectúe una vez el evento electoral haya culminado.

Aclarado el derecho aplicable, procedemos a exponer los fundamentos de esta Opinión de Conformidad.

**II.**

Según discutimos, el Código Electoral dispone que las primarias se deben celebrar en el mes de junio de los años electorales. Íd., Art. 7.12. Sin embargo, en esta ocasión, razones de alto interés público justificaron la posposición de tal evento electoral. Así, la pandemia del COVID-19 causó que la Asamblea Legislativa emitiera dos (2) resoluciones con el propósito de postergar las primarias programadas. Inicialmente, la Resolución Conjunta de la Cámara de

Representantes Núm. 681-2020 estableció que las primarias se celebrarían el domingo, 12 de julio de 2020. Posteriormente, la Asamblea Legislativa aprobó la Resolución Conjunta del Senado Núm. 37-2020 mediante la cual recalendarizó las primarias para el domingo, 9 de agosto de 2020.

Desafortunadamente, en tal fecha acontecieron unos eventos que seguramente marcarán negativamente el historial electoral de este País y empañarán el prestigio que goza Puerto Rico como modelo del ejercicio del sufragio universal. En esencia, llegado el día de las primarias, una gran de cantidad de precintos se vieron impedidos de celebrar el evento electoral y de honrar el derecho al voto de los miles de puertorriqueños y puertorriqueñas que se presentaron a ejercerlo. Lo anterior, debido a que atrasos y percances administrativos causaron que el material electoral no llegara a los centros de votación. Mediante tales complicaciones – que aunque serias, eran totalmente previsibles – los componentes encargados de la CEE se alejaron de lo dispuesto en el Código Electoral y sus normas interpretativas. Particularmente, fallaron a su responsabilidad indelegable de supervisar, dirigir y viabilizar la celebración de las primarias, y de garantizar que la misma se realizara conforme a los postulados de nuestro ordenamiento electoral.

Sin embargo, ante tal caos, las Comisiones de Primarias llegaron al acuerdo unánime de que aquellos precintos electorales que habían comenzado el proceso de votación

previo a la 1:45pm, podían continuar con la celebración de las primarias. Por su parte, los centros de votación que aún no habían podido comenzar a esa hora, estarían celebrando las primarias el próximo domingo, 16 de agosto de 2020. De igual modo, las Comisiones de Primarias determinaron que los resultados de las votaciones recibidas no se divulgarían al público, hasta tanto culminara la celebración de las primarias en su totalidad. Véase, Certificación de acuerdo sobre primarias locales del 9 de agosto de 2020, CEE-AC-20-224.

Ante este escenario, me veo forzado a validar la continuación del calendario electoral. Ciertamente, es indiscutible que los eventos del día 9 de agosto de 2020, no fueron en cumplimiento con los rígidos postulados de nuestro ordenamiento electoral, los cuales exigen la mayor accesibilidad de los y las electoras a todo servicio electoral. Este proceder no es cónsono con la garantía constitucional de un derecho al voto igual, directo y secreto. Sin duda alguna, la institucionalidad falló crasa y negligentemente a sus responsabilidades administrativas al permitir un atraso tan significativo y oneroso en las operaciones electorales.

No obstante, ante esta realidad, las Comisiones de Primarias adoptaron un mecanismo de mitigación de daños para garantizar y proteger el derecho al voto de los miles de puertorriqueños y puertorriqueñas que se vieron impedidos de ejercerlo en este pasado fin de semana. Al extender la

celebración de las primarias para el próximo domingo, se promueve precisamente la mayor participación y accesibilidad posible de los electores y las electoras de los precintos en los cuales no hubo un proceso de votación en un día no laborable. Ordenar que el proceso de votación se adelante, como algunos sugieren, no brinda la certeza y garantías de confiabilidad ante la lentitud observada por la dirección de la CEE. A su vez, posponer la votación más allá del próximo domingo sería fomentar la agonía de este proceso anómalo. Ante esos escenarios y dentro de este tortuoso proceso, entiendo que ésta es la alternativa más viable para garantizar que más de la mitad de los precintos que se vieron impedidos de celebrar el procedimiento de las primarias, tengan la capacidad de hacerlo.

Adviértase que en esta lamentable votación atípica, existe un bloque mayormente metropolitano que votó, mientras que muchos sectores, mayormente rurales, de Puerto Rico se vieron impedidos de celebrar la elección ese día. Resulta necesario y urgente que el derecho de todas estas personas se instrumente y se valide lo más pronto posible.

Por otro lado, la medida adoptada hoy respeta la voluntad depositada por los electores y las electoras que sí ejercieron su derecho al voto el pasado domingo, 9 de agosto de 2020. Al no anular la votación de los precintos electorales cuyas operaciones comenzaron previo a la 1:45pm, se salvaguardó el importante ejercicio de votación que realizaron miles de puertorriqueños y puertorriqueñas.

Recordemos que, una vez un elector o electora es <u>bonafide</u>, no se le puede limitar irrazonablemente su derecho al voto, ni mucho menos complicarlo con condiciones onerosas o anularlo sin más.

En ese sentido, un balance de todos los intereses en pugna inevitablemente nos lleva a validar el remedio planificado. De lo contrario, la continuación de las primarias el día originalmente pautado - cuyo proceso de votación de por sí inició con graves traspiés - hubiese provocado mayores inconvenientes a los electores y a las electoras que aquellos causados por la extensión de la votación a este próximo domingo. De haber continuado con los procedimientos, el personal electoral hubiese trabajado continuamente por más de 18 horas y el electorado puertorriqueño se le hubiese forzado a acudir a ejercer su voto a horas del amanecer. Por tales razones, la determinación de continuar el proceso otro día no laborable me parece adecuada y necesaria para mitigar los daños de este lamentable evento primarista.[86]

Ciertamente, el resultado de este balance de intereses no es perfecto, pero es la alternativa menos lesiva para

---

[86]Es de conocimiento público que recientemente la CEE adoptó una decisión de esta naturaleza en un contexto similar, la cual fue instrumentada sin cuestionamientos por parte de aspirantes ni ningún otro componente electoral. En torno al voto de personas encamadas, hubo un atraso en las operaciones de esos votos adelantados y no se pudo administrar su totalidad en el día pautado. Ante ello, la CEE determinó aplazar el período de votación hasta el domingo, 9 de agosto de 2020. Esa medida de continuación de esas votaciones especiales sirvió para honrar los votos previamente emitidos y fomentar que las personas encamadas que no votaron pudieran hacerlo a la semana siguiente.

salvaguardar el derecho al voto de aquellos electores y electoras que fueron impedidos de ejercerlo. La prioridad es que se instrumente, lo más rápido y de la manera más viable posible, el derecho al sufragio de toda persona que no tuvo una papeleta en sus manos.[87]

Ante el cuadro que ha desembocado las acciones y omisiones de los funcionarios electorales concernidos, el remedio otorgado por este Tribunal constituye un reconocimiento a la necesidad de darle preminencia al ejercicio del derecho al voto del ciudadano o la ciudadana que lo pudo realizar y, con igual importancia, reconocer ese derecho fundamental a las personas que lo realizarán el próximo domingo. El balance de intereses de derechos constitucionales no puede hacerse a base de textos estatutarios aislados, más aún cuando la ley pertinente no contempla directamente la situación a resolverse. La Constitución opera en reconocimiento de derechos fundamentales cuyos intereses pueden ser difícil de armonizar e, incluso, desembocar en un remedio imperfecto. Precisamente, ese es el trabajo de este Tribunal Supremo.

Lo anterior, **no se debe interpretar como una carta blanca para que este proceder electoral se reproduzca**. Sin duda alguna, tales acontecimientos no son cónsonos con el mandato constitucional a favor de un voto igual, directo y secreto.

---

[87]Advierto que el remedio concedido por este Tribunal no impide el ejercicio de las prerrogativas de la Comisión de Primarias para atender reclamos que no forman parte de esta controversia, siempre y cuando vaya dirigido a instrumentar el derecho al voto.

**Este capítulo nefasto en la historia electoral de Puerto Rico no se puede repetir.** Al contrario, este dictamen se limita a instrumentar un remedio de emergencia que, en el contexto particular en el cual nos encontramos, es la mejor alternativa para proteger y salvaguardar el derecho al sufragio.

Por otro lado, algunas partes peticionarias impugnan la determinación de las Comisiones de Primarias de no divulgar los resultados de las votaciones recibidas el pasado domingo, 9 de agosto de 2020. Como expusimos anteriormente, el Código Electoral no supone ni contempla la extensión o la posposición de un evento electoral como las primarias. Por tanto, al disponer que se divulgarán los resultados "desde la hora de cierre de los colegios de votación", el estatuto parte de la premisa de que, en efecto, el evento electoral culminó.

Lo anterior, se debe a que la transmisión pública de resultados parciales durante un proceso de votación incompleto no promueve los postulados de protección, secretividad e igualdad que enmarcan el derecho constitucional del ejercicio del sufragio universal. Tal norma responde a la misma lógica que prohíbe la distribución de materiales de propaganda política durante el proceso de votación y la utilización de encuestas a boca de urna dentro de los recintos electorales. Estas medidas tienen como propósito garantizar que los electores y las electoras ejerzan su voto sin coacción o influencia indebida alguna.

Asimismo, estas normas buscan garantizar a los electores y las electoras que votarán por los y las aspirantes en igualdad de condiciones. Precisamente, igual razonamiento opera para no divulgar resultados parciales sin que haya culminado el proceso electoral en su totalidad.

Como bien reconocen varias de las partes comparecientes, la divulgación prematura de resultados preliminares puede tener el efecto de influenciar y hasta desalentar el ejercicio del derecho al voto. La prevención de esta influencia indebida de los aparatos electorales está anclada en los postulados constitucionales que rigen el derecho al voto de forma secreta, igual y libre de toda coacción. Como bien apunta el Dr. Jorge Farinacci Fernós, "nótese el uso de la palabra coacción. Si bien esta palabra típicamente indica la presencia de fuerza o violencia, lo cierto es que debe usarse en su acepción más amplia, entiéndase como sinónimo de presión o intervención indebida que impide el ejercicio pleno de indicar, por vía del voto, la preferencia electoral del ciudadano o ciudadana." Farinacci Fernós, op. cit.

Es en consideración a esa acepción amplia que requiere proteger el sufragio de toda coacción, que los resultados de votos ejercidos previo al día de la conclusión del evento, se mantienen debidamente custodiados, pero en secreto. La transmisión pública o divulgación a terceros sin que se haya completado el proceso de votación no promueve los postulados de protección, secretividad e igualdad que enmarcan el

derecho constitucional del ejercicio del sufragio universal. En ese sentido, bajo la acepción amplia del concepto coacción, está comprendida la vertiente psíquica que conllevaría divulgar resultados sin que hayan culminado el cierre de todos los colegios de votación.

Debido a estos fundamentos, estoy conforme con no divulgar prematuramente los resultados parciales sin que haya culminado la votación en todos los colegios. Adviértase que las disposiciones legales que invocan algunas de las partes están supeditadas a una condición que no ha ocurrido: el cierre de todos los colegios de votación. La norma estatutaria que invocan aisladamente opera bajo el supuesto del cierre de todos los colegios en virtud de una **culminación total** de un evento electoral. Como es conocido, la crisis operacional ocurrida impidió que ese escenario se lograra. Ante esa realidad, resulta improcedente ordenar la divulgación de resultados parciales ante un evento electoral incompleto.

De hecho, tal conclusión es similar al tratamiento que se le da a los votos adelantados y a los votos ausentes. Según expusimos anteriormente, tales votos se ejercen días antes de los eventos electorales. Sin embargo, sus resultados se transmiten y se introducen en la máquina de escrutinio electrónico **el día en que culminan las votaciones**, al igual que el voto de los demás electores y electoras. En ninguna circunstancia, nuestro andamiaje electoral contempla que los resultados de esos votos emitidos previamente se divulguen

antes de la culminación de la totalidad del servicio electoral. Lo anterior, se debe precisamente a que ello laceraría la pureza y la secretividad que debe permear todo proceso electoral.

Debemos tener presente nuevamente que, en esencia, la mitad de los precintos electorales no han podido celebrar las primarias. Por tanto, una divulgación de resultados en esta etapa vulneraría el derecho a votar en igualdad de condiciones. Es decir, es necesario velar no solamente por el contenido cuantitativo del voto sino también por el cualitativo. Esa protección cualitativa es la que también justifica y requiere que no se divulguen resultados oficiales previo al cierre de **todos** los colegios. En virtud de la necesidad de detener esos esquemas contrarios a la preservación de los votos igualitarios y secretos de **todos** los electores y electoras, estoy conforme con prohibir la divulgación de esos votos ya ejercidos.

Además, considero que es improcedente comenzar un proceso de escrutinio y divulgación de votos en esta etapa, donde nos encontramos ante unas primarias incompletas. Ello, redundaría en una duplicidad de procesos en una etapa en que la prioridad debe ser garantizar que la CEE instrumente adecuada, oportuna y diligentemente el derecho al voto de aquellos y aquellas que fueron privadas de ejercerlo. De igual modo, lo anterior causaría una alteración innecesaria a los protocolos de seguridad previamente delineados,

creando una especie de escrutinio en una etapa previa al cierre de colegios.

Claro está, ello no significa que la CEE y las Comisiones de Primarias están relevadas de garantizar la custodia adecuada y sellada del material electoral de los precintos que sí abrieron. Ciertamente eso es un deber innegable e indelegable. Hasta tanto culmine la celebración de las primarias, es su responsabilidad mantener debidamente custodiado el material electoral sellado.

En fin, dentro de todos los males organizativos que enmarcaron tristemente este proceso electoral, la intervención de este Tribunal y el remedio instrumentado aporta una mitigación a los daños que ciertamente ha sufrido la democracia en Puerto Rico. Ante la crisis acontecida el pasado domingo, debemos garantizar la continuación ordenada de la votación. Lo contrario, agravaría aún más el estado de incertidumbre y diluiría aún más el poder del voto de los electores y las electoras que no pudieron ejercerlo.

### III.

Cuando un jarrón cae al suelo y se rompe tenemos dos (2) opciones: botarlo a la basura o intentar restaurarlo, aunque queden imperfecciones. Hoy nos enfrentamos a otro mes de agosto en nuestra historia moderna en que el jarrón de la democracia ha sido golpeado contra el suelo. Con ello, se ha desparramado el derecho al voto de miles de electores y electoras. Echar las papeletas de los miles de electores y electoras que ejercieron su derecho al voto a la basura no

puede ser opción legal y mucho menos constitucional. Todo lo contrario, hoy nos toca nuevamente al Tribunal Supremo de Puerto Rico reconstruir ese jarrón, conscientes de que quedarán imperfecciones y marcas que permitirán recordar a futuras generaciones las acciones y omisiones acontecidas en la CEE en este nefasto capítulo de nuestro sistema electoral. En consecuencia, aunque insatisfecho con el rol de los funcionarios electorales concernidos, imparto mi conformidad para lograr que, en este proceso de mitigación de los daños perpetrados a nuestro sistema electoral, se logre un balance entre garantizar el ejercicio del derecho al voto de los electores que no han votado y honrar los votos ya depositados.

Por los fundamentos expuestos, estoy conforme con el remedio instrumentado por este Tribunal.


Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pedro Pierluisi-Urrutia;
Eduardo Bhatia-Gautier

   Peticionarios

          v.

Comisión Estatal de Elecciones;
Juan Ernesto Dávila Rivera, en su
capacidad de Presidente de la
CEE; *et al.*

   Recurridos

CT-2020-11
cons con.
CT-2020-12
cons. con
CT-2020-13
cons. con
CT-2020-14

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 12 de agosto de 2020.

En el día de hoy -- en nuestra función de ser los últimos intérpretes de la Constitución del Estado Libre Asociado de Puerto Rico -- esta vez en el **verano de 2020**, los miembros de este Tribunal tenemos ante nosotros la delicada tarea de buscar una salida salomónica a la difícil encrucijada en que nos encontrábamos como Pueblo; ello, producto de la ineptitud e incompetencia de aquellos y aquellas que han puesto en riesgo la pureza que históricamente ha reinado en los procesos electorales que se han celebrado en nuestra jurisdicción y que han sido ejemplo para muchos países hermanos. Salida que tuvo como punto de partida el respeto a los miles de puertorriqueños y puertorriqueñas que ya expresaron su voluntad en las urnas de la democracia, así como a los y las que, por razones ajenas a su voluntad, aún no lo han podido hacer.

Lo anterior lo hicimos, claro está, haciendo valer previos pronunciamientos de esta Curia, que reconocen el derecho al voto como uno de los derechos más fundamentales y preciados del pueblo y, como tal, nuestra obligación de hacerlo observar y respetar; incluso en escenarios tan convulsos y complejos como los que hoy vivimos. Éste "[n]o se observaría ni respetaría si permitiésemos que el voto emitido pudiera ser anulado o que su valor pudiera ser mermado [ante] cualquier ataque". *P.P.D v. Barreto Pérez*, 111 DPR 199 (1981).

Establecido lo anterior, y a pesar de que estamos conformes con lo hoy resuelto por esta Curia, los tristes momentos vividos por nuestro país el pasado domingo 9 de agosto de 2020, nos obligan a expresarnos.

Y es que, al momento de tomar ésta decisión, no podemos pasar por alto que ese día, fecha en que **por ley** los puertorriqueños y puertorriqueñas estaban llamados a ejercer su derecho al voto en un evento primarista, -- filtro para el proceso de elecciones generales que se celebrará en nuestro país en noviembre 2020 --, la Comisión Estatal de Elecciones, ente rector de los procesos electorales en nuestro Pueblo, por primera vez en nuestra historia, y en una crasa violación a sus deberes ministeriales, no estuvo preparada para ello. No estuvo preparada para garantizar la expresión de la voluntad del pueblo mediante el sufragio universal, **igual**, directo y secreto, conforme lo exige el Artículo II, Sección

2, de la Constitución del Estado Libre Asociado de Puerto Rico. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1.

En esa dirección, es por todos conocidos que el evento electoral celebrado el pasado 9 de agosto de 2020 estuvo matizado por la falta de materiales en los maletines asignados a los distintos colegios electorales; la falta de papeletas; los cambios drásticos al proceso de votación el mismo día del evento electoral *(como por ejemplo, el establecimiento de distintas horas para votar, después que se había anunciado que la votación sería en determinadas horas)*; cuestionamientos sobre la custodia de las máquinas de escrutinio electrónico y, al final del día, la propuesta de fragmentar el proceso primarista para celebrarlo en dos (2) días distintos, ello sin previo aviso y con el consabido efecto de que el elector o electora que vote en el día que se continúe la primaria tenga una información distinta al elector que votó el 9 de agosto de 2020,[88] entre otras.[89] En

---

[88] De ahí, nuestro llamado en *Resoluciones* previamente emitidas por este Tribunal en relación con la causa de epígrafe para que "como medida que asegurase cualquier dictamen que este Tribunal [emitiese] en su día, [hubiésemos] ordenado la incautación inmediata de todos los maletines electorales en posesión de la Comisión Estatal de Elecciones que contengan las papeletas relacionadas con el proceso primarista celebrado el día de ayer, domingo 9 de agosto de 2020", llamado que fue también propuesto como alternativa por el Presidente de la Comisión Estatal de Elecciones, Lcdo. Juan Ernesto Dávila Rivera, en su alegato a este Tribunal. Véase, *Escrito sobre Posición en Petición de Certificación*, pág. 9.

[89] Además del conocimiento general en el País de tales hechos, los medios en los Estados Unidos reseñaron el desastroso desenlace de este evento electoral. Véanse, por ejemplo, P. Mazzei, *Botched Primary Election Creates New Crisis in Puerto Rico: 'This Is a Travesty'*, The New York Times (10 de agosto de 2020), https://www.nytimes.com/2020/08/10/us/puerto-rico-election.html; D. Coto, *Puerto Rico halts primary voting in centers lacking ballots*, The Washington Post (9 de agosto de 2020), https://www.washingtonpost.com/world/the_americas/puerto-ricos-historic-primaries-marred-by-lack-of-ballots/2020/08/09/7464cbe0-da45-11ea-b4f1-25b762cdbbf4_story.html; *Puerto Rico's primary goes off the rails*, Politico (9 de agosto de 2020), https://www.politico.com/news/2020/08/09/puerto-rico-

fin, un proceso en el cual, si este Tribunal no llegaba a tomar las medidas correctivas a tiempo, su validez podía ser altamente cuestionada, bajo el palio de la igual protección de las leyes.[90]

Flaco servicio el que se le ha dado a la democracia y al país -- uno que históricamente se había caracterizado por la pureza de sus eventos electorales -- por parte de los directivos de la Comisión Estatal de Elecciones de Puerto Rico y su presidente, Lcdo. Juan Ernesto Dávila Rivera.[91]

Tras la imposibilidad de los poderes políticos de reparar el fuerte agravio a la democracia del país, se impone, pues, en nosotros la obligación de analizar -- detenida y desapasionadamente -- los diferentes intereses en conflicto y decidir por los derechos más fundamentales sobre

---

primary-ballots-392958; C. Domonoske, *Puerto Rico's Primary Election On Sunday Was Historic — In A Bad Way*, NPR (10 de Agosto de 2020); https://www.npr.org/2020/08/10/900903297/puerto-ricos-primary-election-on-sunday-was-historic-in-a-bad-way.

[90] Sobre ello, basta con hacer mención de lo sentenciado por el Tribunal Supremo de los Estados Unidos en el normativo caso de *Bush v. Gore*, 531 US 98, 104-105 (2000), el cual establece y citamos:

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. **Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.** See, e.g., Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"). It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555 (1964) (Énfasis nuestro).

[91] Vaya sí nuestro reconocimiento a los funcionarios de colegio del Partido Popular Democrático y del Partido Nuevo Progresista que, a pesar de las adversidades enfrentadas, y en un servicio gratuito al País, en su gran mayoría, permanecieron firmes en sus unidades de trabajo como garantes del derecho al voto de los puertorriqueños y puertorriqueñas.

los grandes inconvenientes del momento. Nuestro País, no se merece menos.

Realizado dicho análisis, a la luz de los hechos y el derecho aplicable, coincidimos con el dictamen que hoy emite una mayoría del Tribunal, el cual, a grandes rasgos, da paso a: (1) respetar la voluntad de los electores y las electoras que el pasado 9 de agosto de 2020 fueron a ejercer válidamente su derecho constitucional al voto, en el día que por ley se había reservado para ello; (2) ordenar la continuación del evento electoral aquí en controversia en la fecha avalada por el Tribunal, en aquellos precintos que no comenzaron la votación y aquellos donde no se proveyó el periodo de ocho (8) horas que brinda el Código Electoral y el Reglamento de Primaria; (3) garantizarle el derecho al voto a la señora Carmen Damaris Quiñones Torres, quien oportunamente tocó a las puertas de este Tribunal; y (4) que no se le dé publicidad a los resultados hasta el final del proceso primarista. Sobre esto último, es menester señalar que acceder a cualquier pedido de publicidad de resultados, en estos momentos, podría dar al traste con los principios constitucionales de igualdad del voto, que, en escenarios como los aquí en controversia, buscan proteger la intención del elector o electora que aún no ha ejercido su voto porque su unidad o colegio electoral nunca abrió.[92]

---

[92] Debemos recordar que es también mandato constitucional "prote[ger] al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2 Const. ELA, LPRA, Tomo 1.

Si bien el dictamen que hoy emite este Tribunal no es el remedio perfecto, pues no puede haber un remedio de tal naturaleza en este momento histórico que vivimos, es el remedio correcto. Máxime, si tomamos en consideración el porciento de electores que ya votó el pasado domingo 9 de agosto de 2020, el alto costo que conllevaría el ordenar la celebración de un nuevo proceso primarista, la cercanía de las elecciones generales de noviembre de 2020, y la salud y seguridad de todo un Pueblo en medio de la penosa crisis de salud que afecta al mundo entero, como consecuencia de la pandemia del COVID-19.

Así pues, el voto que hoy emitimos resulta una excepción ante el complejo escenario en el que nos encontramos y la naturaleza extraordinaria del asunto que nos toca solucionar. En ese sentido, dejamos meridianamente claro que no habremos de consentir una secuela del atropellado proceso electoral que tuvo que presenciar el pueblo puertorriqueño el pasado domingo.

En fin, y a modo de epílogo, recordemos que, en el ordenamiento jurídico puertorriqueño, el sufragio, como expresión individual y colectiva, ocupa un sitial de primerísimo orden que obliga a los tribunales a conferirle la máxima protección. Ante cualquier posible vaguedad o laguna en las disposiciones estatutarias o reglamentarias que regulan el ejercicio del voto, -- y, añadimos nosotros, en los procesos que se llevan acabo para garantizar el mismo -- la interpretación adoptada debe dar primacía a la máxima

protección de la expresión electoral. Véase, *Granados Navedo v. Rodríguez Estrada I*, 124 DPR 1 (1989); *PNP v. Rodríguez Estrada*, 123 DPR 1 (1988); *Santos v. C.E.E.*, 111 DPR 351 (1981); *PPD v. Barreto*, 111 DPR 199 (1981); *PSP v. C.E.E.*, 110 DPR 400 (1980). Hoy, al menos quien suscribe, entiende cumplió con esa función.

**Esperamos, pues, que los actores del proceso electoral puertorriqueño aprovechen esta oportunidad y el remedio concedido para que, el próximo día en que se continúe con el evento electoral que comenzó el pasado 9 de agosto de 2020, se evite, a toda costa, otro "ultraje a la democracia de Puerto Rico".[93]**

Ángel Colón Pérez
Juez Asociado

---

[93] Portada del periódico *El Nuevo Día* de 10 de agosto de 2020.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pedro Pierluisi-Urrutia y Eduardo Bhatia Gautier<br><br>Peticionarios<br><br>v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>Recurridos<br>_____<br><br>Carmen Damaris Quiñones Torres<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>Demandados<br>_____<br><br>Carlos Delgado Altieri<br><br>Peticionario<br><br>v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>Recurridos<br>_____<br><br>Wanda Vázquez Garced<br><br>Demandante<br><br>v.<br><br>Comisión Estatal de Elecciones, *et al.*<br><br>Demandados | CT-2020-11<br><br>cons. con<br><br>CT-2020-12<br><br>con<br><br>CT-2020-13<br><br>y con<br><br>CT-2020-14 | *Certificación* |

Opinión Concurrente en parte y Disidente en parte emitida por la Jueza Asociada Señora Pabón Charneco.

En San Juan, Puerto Rico, a 12 de agosto de 2020.

> "This right to vote is the basic right without which all others are meaningless. It gives people, people as individuals, control over their own destinies."
> Lyndon B. Johnson

En el día de hoy, con el recuerdo aún vivo de intervenir para atender una crisis constitucional que involucraba directamente al principal cargo ejecutivo de la Isla hace apenas un (1) año, nuevamente nos vemos forzados a entrar a considerar una novel crisis constitucional que atenta contra uno de los derechos más fundamentales de nuestro sistema democrático de gobierno: el derecho al voto. Una vez más ejerceremos nuestra facultad constitucional con responsabilidad ante el caos histórico que ocurrió en el evento primarista celebrado el pasado 9 de agosto de 2020.

Puerto Rico atraviesa un momento de fragilidad política, social y económica. En los pasados cuatro (4) años hemos atravesado por el embate de dos (2) poderosos huracanes, un cambio de gobierno, terremotos constantes en el área sur y, más recientemente, la pandemia causada por el COVID-19. A esto se suma el lamentable evento primarista, en donde una gran cantidad de nuestros electores no pudieron ejercer su derecho al voto. Como Máximo Foro Judicial, nos corresponde rescatar la democracia y la transparencia de los procesos

electorales en la Isla de manera que podamos intentar devolverle al Pueblo la confianza en sus organismos gubernamentales. Es por estas razones que concurro con la Mayoría en que debemos asumir la jurisdicción de este caso bajo el recurso de Certificación Intrajurisdiccional, así como examinar la novel controversia ante nos. El derecho al sufragio universal y a elegir a aquellos hombres y mujeres que tomarán las riendas de los destinos de Puerto Rico debe ser defendido a capa y espada, toda vez que este derecho fundamental es piedra angular de nuestro desarrollo como Pueblo.

Sin embargo, no puedo más que disentir de la determinación de validar el Acuerdo impugnado y limitar que el Pueblo de Puerto Rico conozca los resultados parciales de las primarias de 9 de agosto de 2020. Restringir esta información solo tiene el efecto de menoscabar la integridad y confiabilidad del proceso y no se ciñe a las exigencias de la ley. Esto pues, el Código Electoral requiere como formalidad de interés público que se anuncien los resultados parciales desde la hora de cierre de los Colegios de Votación.

Por otro lado, aunque concluyo que la actuación de las Comisiones de Primarias no fue válida, sostengo que aquellos votos que cumplieron con todas las formalidades de nuestro sistema electoral deben ser reconocidos, contabilizados y transmitidos, por lo que el proceso primarista debe continuar a la brevedad posible solamente en aquellos

precintos afectados. De esta forma nos aseguramos de que todo elector afiliado a los partidos políticos en primarias tenga acceso al evento electoral y se proteja su derecho a votar de forma efectiva.

I

El año electoral 2020 se ha perfilado como un año sin precedentes. Afectado Puerto Rico por una pandemia, el 4 de junio de 2020 la Asamblea Legislativa atrasó las primarias dos (2) meses y ordenó su celebración el 9 de agosto de 2020.[94] De conformidad con la Resolución Conjunta del Senado Núm. 37-2020 (Conferencia), aprobada el 4 de junio de 2020, el Partido Nuevo Progresista y el Partido Popular Democrático celebraron sus primarias para la mayoría de los cargos públicos de la Isla, incluyendo el de Gobernador.

La preparación y el inicio del proceso estuvo plagado de errores y concluyó con la posposición del evento en numerosos precintos hasta el próximo domingo, 16 de agosto de 2020. Esto por acuerdo entre el Presidente de la Comisión Estatal de Elecciones (CEE) y los Comisionados Electorales de ambos partidos políticos, recogido en la *Certificación de Acuerdo sobre Primarias Locales del 9 de agosto de 2020*, CEE-AC-20-224 (Acuerdo). Hasta ese momento, solo cuarenta y siete (47) precintos de las primarias del Partido Nuevo

---

[94] Resolución Conjunta del Senado Núm. 37-2020 (Conferencia), aprobada el 4 de junio de 2020; Sec. 2.1 del Reglamento para la Celebración de Primarias de los Partidos Políticos de la Comisión Estatal de Elecciones de 16 de marzo de 2020, revisado el 23 de julio de 2020.

Progresista (PNP) y treinta y ocho (38) precintos de las primarias del Partido Popular Democrático (PPD) de un total de ciento diez (110) habían culminado el proceso de votación. Además, se prohibió la divulgación de los resultados electorales y se ordenó que las máquinas de escrutinio electrónico fueran apagadas sin divulgar resultado alguno.[95] Como consecuencia, varios candidatos afectados impugnaron el Acuerdo mediante recursos de revisión electoral independientes y esbozaron sus preocupaciones sobre la integridad del proceso primarista.[96] Así, Pedro Pierluisi Urrutia, candidato a la Gobernación por el PNP, señaló que con el Acuerdo:

> "se impide que los funcionarios puedan constatar el voto de los electores sujetando a que permanezcan dichos **resultados abiertos y escondidos en cuartos oscuros** lo que no es permitido por la regulación aplicable ni abona a la transparencia y confianza del proceso". (Énfasis suplido). *Recurso Urgente de Certificación Intrajurisdiccional*, CT-2020-11, pág. 3.

Por su parte, Eduardo Bhatia Gautier, candidato a la Gobernación por el PPD, sostuvo que:

> "los votos emitidos durante la primaria, además de ser tabulados y preservados para su validez, tienen

---

[95] El Acuerdo disponía específicamente que "[q]ueda terminante prohibido la divulgación de resultados preliminares de cualquier colegio, unidad o precinto. Las máquinas de escrutinio electrónico serán apagadas sin divulgar resultado alguno". *Certificación de Acuerdo sobre Primarias Locales del 9 de agosto de 2020*, CEE-AC-20-224.

[96] Los candidatos Pedro Pierluisi Urrutia, Eduardo Bhatia Gautier, Carlos Delgado Altieri, y los presidentes y alta jerarquía de ambos partidos políticos que participaron en la primaria, favorecen el conteo de los votos ya emitidos, según los remedios solicitados por éstos. Véase además, Certificación del Secretario General del Partido Popular Democrático, José Ariel Nazario Álvarez, de 11 de agosto de 2020 en la que certifica que la Junta de Gobierno del partido ordenó al Comisionado Electoral a solicitar que se transmita el resultado de todos los votos emitidos y que estos sean divulgados de inmediato.

que ser divulgados públicamente para que el proceso acontecido pueda gozar de la transparencia y confiabilidad que caracterizan a las sociedades democráticas como Puerto Rico. **Lamentablemente, ya ha comenzado una campaña de divulgación extraoficial de votos no validados por la CEE y que pretenden manipular la opinión pública en detrimento del proceso electoral todavía en proceso. Tal situación únicamente se corrige con la más amplia y cristalina transparencia en la transmisión de los resultados para que nuestra ciudadanía pueda confiar en que su voto fue contado, validado y que ha de tener eficacia".** (Énfasis suplido), Recurso de revisión electoral, *Bhatia Gautier v. CEE y otros*, SJ2020CV04153, pág. 2.

Las observaciones de los candidatos no pueden ser despachadas ligeramente, por lo que ante la necesidad de dar pronta directriz para la continuación de los procesos electorales, los recursos fueron acogidos y consolidados por este Tribunal mediante el recurso de certificación intrajurisdiccional.

Con el beneficio de la comparecencia de todas las partes, examinemos las disposiciones aplicables.

II

Nuestra Carta de Derechos, requiere que las leyes garanticen la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. Tal como hemos expresado, el "derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones [generales], sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas

contemporáneas". *McClintock v. Rivera Schatz*, 171 DPR 584 (2007), citando a *PAC v. ELA I*, 150 DPR 359, 372 (2000); *PNP v. De Castro Font II*, 172 DPR 883 (2007). Esto se cumple mediante el proceso primarista. *McClintock v. Rivera Schatz*, supra.

El ordenamiento constitucional también exige que "se dispon[ga] por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1. A tenor con el mandato constitucional y para salvaguardar el derecho al voto mediante legislación, la Asamblea Legislativa aprobó la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico 2020.

Para viabilizar el derecho al voto, el Código Electoral reconoce de forma expresa ciertos derechos y prerrogativas de los electores. De particular importancia para la controversia que examinamos, reconoce "[e]l derecho a la libre emisión del voto y a que se cuente y se adjudique conforme a la intención del Elector al emitirlo, y según se dispone en la Ley". Art. 5.1(1) de la Ley Núm. 58-2020.

Por otro lado, el Código Electoral mantiene en los partidos políticos "la responsabilidad de estructurar e inspeccionar todos los procedimientos de naturaleza electoral".[97] *McClintock v. Rivera Schatz*, supra, pág. 598;

---

[97] El Código Electoral facultó a la Comisión a aprobar un Reglamento de Primarias y Métodos Alternos de Nominación, así como a las Comisión de Primarias de cada Partido Político para aprobar los reglamentos para sus primarias internas, los cuales no pueden menoscabar ni vulnerar las

*Granados v. Rodríguez Estrada I*, 124 DPR 1 (1989). Asimismo, elabora sobre las funciones y responsabilidades de la CEE y los partidos políticos en las primarias. Sin embargo, estas facultades no dan carta blanca a la CEE ni a los partidos políticos, los cuales deben ceñirse a las facultades que le concede la ley para salvaguardar la integridad del proceso eleccionario.

Así, durante un evento primarista y culminada la votación en cada precinto, el Código establece que la Junta Local será responsable del escrutinio de primarias de su precinto y deberá presentar a la Comisión un acta con los resultados dentro de las veinticuatro (24) horas siguientes a la celebración de la primaria. Art. 7.20 de la Ley Núm. 58-2020. Esta obligación y procedimiento es separada y previa al escrutinio general de las primarias para la que se requiere que la CEE haya recibido todas las papeletas y materiales de votación. Arts. 7.23 y 10.7(1) de la Ley Núm. 58-2020. Paralelamente, del Reglamento para la Celebración de Primarias de los Partidos Políticos de la CEE, así como de las reglas afines adoptadas por ambos partidos políticos basadas en las disposiciones del Código Electoral, *supra*, se puede apreciar que los funcionarios de colegio tienen la obligación de transmitir los resultados de sus colegios a la CEE.[98]

_____

garantías, reglas y normas protegidas por el Código. Art. 7.1 de la Ley Núm. 58-2020.

[98] Secs. 5.4, 5.5 y 5.6 del Reglamento para la Celebración de Primarias de los Partidos Políticos de la CEE, *supra*, págs. 45-48; Sec. H-5 del

Cabe señalar que el Artículo 7.23 del Código Electoral, *supra*, reconoce que el proceso de votación y escrutinio de las primarias se rige por las disposiciones del Código en lo que no sea incompatible con el Capítulo VII. Así, los Artículos 10.5 y 10.6 también son aplicables a las primarias. Específicamente el Art. 10.5 del Código Electoral le requiere a la Comisión "establecer un sistema de divulgación pública de los resultados en progreso de todo evento electoral, según sean recibidos. **Este sistema deberá estar disponible para acceso del público general <u>desde la hora de cierre de los colegios de votación</u>**". (Énfasis suplido). Art. 10.5 de la Ley Núm. 58-2020.

El Código también provee para anuncios de resultados parciales. Concretamente requiere a la Comisión lo siguiente:

> (1) Primer Anuncio de Resultado Parcial - **La Comisión deberá combinar los resultados de los colegios de votación de cada unidad electoral de los precintos a medida que se reciban los mismos y, en forma tal, que le permita hacer el primer anuncio público de resultado parcial de una elección, no más tarde de las diez de la noche (10:00 pm) del día en que se realizó la votación.** Este primer anuncio se hará tomando en consideración los resultados de los colegios de votación contabilizados y recibidos al momento de hacer este anuncio. Al hacer este anuncio, el Presidente de la Comisión o en quien este delegue, deberá enfatizar que:
>
>> "El anuncio de este primer resultado parcial, en este día y a esta hora, responde **un mandato del "Código Electoral de Puerto Rico de 2020" para orientar al pueblo de Puerto Rico sobre el estatus del escrutinio hasta este momento.** Este resultado

---

Manual de Procedimientos para las Primarias del Partido Nuevo Progresista 2020, págs. 62-65; Sec. X(E), Manual de Primarias del Partido Popular Democrático 2020, págs. 42-47.

parcial no constituye, y tampoco debe interpretarse, como un resultado final o la proyección de un resultado final, pues todavía hay votos en proceso de contabilización o escrutinio. **El resultado final y oficial de este evento electoral, solo será y solo se anunciará al finalizar el Escrutinio General y considerarse hasta la última papeleta votada por cada Elector.** Ningún Candidato, Aspirante, propuesta o asunto sometido a votación, será certificado por la Comisión hasta tanto se realice y complete el Escrutinio General".

.   .   .   .   .   .   .   .

(3) **Los anuncios de resultados parciales constituirán una formalidad de interés público** y no impedirán que el Presidente y los oficiales de la Comisión pueden discutir públicamente los resultados electorales, según vayan reflejándose en los sistemas de la Comisión. (Énfasis suplido). Art. 10.6(1)y(3) de la Ley Núm. 58-2020.

De esta forma, el Código Electoral precisa la manera en la que deben recibirse, contabilizarse, transmitirse y divulgarse los resultados como una formalidad de interés público. En cuanto a la difusión de los resultados, deberá hacerse un anuncio inicial a medida que se reciban los votos transmitidos por los precintos. Posteriormente, la CEE divulgará la votación definitiva. En estricto derecho, a no más tarde de las 10:00pm del día en que se realiza la votación deben difundirse los resultados parciales de los precintos que hubieran culminado la votación en ese momento.

III

Con este andamiaje en mente, reconocemos que estamos ante la situación más difícil que ha ocurrido en un evento electoral en Puerto Rico. Por primera vez en nuestra

historia, se ha paralizado una primaria comenzada. Aunque el Código Electoral no previó la bifurcación de eventos electorales como la que enfrentamos, sí reconoció como una formalidad de interés público el que el Pueblo de Puerto Rico tenga acceso a los resultados en progreso de todo evento electoral desde el cierre de los colegios de votación.

Las partes reconocen que cientos de electores pudieron emitir sus votos sin contratiempos mayores y en conformidad con nuestro ordenamiento electoral. ¿Por qué debemos entonces descartar el ejercicio válido de su derecho? Asimismo, cabe preguntarnos si debemos retrasar la democracia y no permitir se sepan los resultados de aquellos precintos donde sí se pudo votar.

Ante un proceso tan irregular y atropellado, tenemos la obligación de brindarle a los electores certeza de que sus votos serán contados y registrados debidamente previo a que se reanude el evento electoral. Al reconocer los votos que cumplieron con todas las formalidades de nuestro sistema electoral y requerir que el resultado parcial del pasado domingo se publique, compelimos a la CEE a cumplir con el proceso de divulgación establecido en los Artículos 10.5 y 10.6 del Código Electoral de Puerto Rico, así como la reglamentación aplicable. Este ha sido el proceso que se ha seguido en todos los eventos electorales de los pasados años.

Por otro lado, el argumento de proteger a los electores que no han votado al restringir la información no es más que una visión paternalista y condescendiente del electorado.

Mayor incertidumbre y desconfianza en el evento primarista se crea al ocultar esta información. A su vez, avalaríamos el incumplimiento con un requerimiento expreso de la ley electoral.

Por último, debo hacer unos comentarios sobre los argumentos orientados a que la Comisión y las Comisiones de Primarias tienen la facultad de llegar a los acuerdos necesarios para cumplir con sus obligaciones legales y electorales bajo el Código Electoral, incluyendo el acuerdo impugnado. Estos no me convencen. Ciertamente la CEE es responsable de planificar, organizar, dirigir y supervisar los procedimientos de naturaleza electoral en cualquier votación que se realice en Puerto Rico, así como, gestionar los acuerdos necesarios para cumplir con sus obligaciones legales y electorales, entre otras facultades. Art. 3.2(8) de la Ley Núm. 58-2020. Sin embargo, sus actos y decisiones deben cumplir en todo momento con las disposiciones y los propósitos de la ley electoral. De igual forma, debe "garantizar que los servicios, procesos y eventos electorales se planifiquen, organicen y realicen con pureza, transparencia, seguridad, certeza, rapidez, accesibilidad y facilidad para los electores de manera costo-eficiente, libre de fraude y coacción; y sin inclinación a ningún grupo o sector ni tendencia ideológica o partidista". Arts. 3.2(1) y 3.1(1) del Código Electoral. Por otro lado, aunque los partidos políticos gozan de funciones y poderes gubernamentales de la más alta jerarquía, queda en la

Asamblea Legislativa el regularlos en aquello que incida directamente sobre el proceso electoral y el derecho de los electores. Por lo tanto, no puede quedar al arbitrio de los recurridos bifurcar un evento electoral ya pautado por la Asamblea Legislativa debido a errores administrativos y atrasos que ellos mismos causaron. Esto sobrepasa sus facultades en las primarias. La prohibición acordada no se sostiene en el texto del Código Electoral, la Resolución Conjunta 37-2020, el Reglamento de Primarias de la Comisión ni los reglamentos de los partidos políticos para la contienda primarista.

Al estar en riesgo el derecho fundamental al voto, la determinación de paralizar, interrumpir o posponer una votación correspondía a la Asamblea Legislativa. Asimismo, ante cualquier afectación de este Derecho, le corresponde intervenir a la Rama Judicial por mandato constitucional y legal. Véase, Art. 13.1(2)(b) de la Ley Núm. 58-2020. Para ello, los recurridos tenían a su disposición cualquier recurso legal necesario para hacer cumplir los propósitos de la Ley y, principalmente, proteger los derechos de los electores. Art. 3.2(22) de la Ley Núm. 58-2020.

El Pueblo de Puerto Rico tiene derecho a un proceso electoral justo, ordenado, democrático, libre de fraude, certero y accesible. Esto solo se logra si los resultados de los precintos que pudieron celebrar las primarias el 9 de agosto de 2020 son escrutados, registrados en actas de las Juntas Locales de Primaria y publicados tal y como exige el

Código Electoral. De esta forma se reconoce el derecho de los electores que válidamente emitieron su voto, así como la supremacía de su derecho sobre el de los partidos y otras figuras o agrupaciones políticas sin imponerle condiciones procesales onerosas a estos votantes. Art. 5.1(2) y (4) de la Ley Núm. 58-2020.

Como consecuencia de la intervención de este Tribunal en la controversia de autos, despejamos toda duda respecto a que el proceso primarista debe continuar a la brevedad posible en aquellos precintos afectados. Si bien no debió validarse el Acuerdo impugnado, bajo nuestro poder inherente de proveer remedios a quienes acuden ante nos, la solución correcta conllevaba el mismo resultado. El remedio adecuado a concederse era una orden dirigida a la CEE para que continuara con las primarias sin mayor dilación. De esta forma nos aseguramos de que todo elector afiliado a los partidos políticos en primarias, el que ya votó y el que aún falta, tenga acceso al evento electoral y pueda hacer valer efectivamente su derecho al voto.

En consideración de todas las razones que anteceden, concurro con la decisión de este Tribunal de acoger los recursos de certificación intrajurisdiccional presentados y reconocer los votos emitidos. Sin embargo, sostengo que para salvaguardar la integridad y confianza en el proceso electoral, no se deben apagar las máquinas de escrutinio electrónico; se debe proceder con el conteo de los votos emitidos, y se debe ordenar que los mismos sean transmitidos

a la CEE de conformidad con el Código Electoral y la reglamentación aplicable. También publicaría estos resultados previo a la continuación de las primarias. Por consiguiente, disiento de la decisión de validar el Acuerdo impugnado, limitar la efectividad plena de los votos por falta de escrutinio y de mantener al Pueblo en la penumbra de un proceso democrático al limitarle el acceso al resultado parcial del evento electoral celebrado el pasado domingo, 9 de agosto de 2020, perpetuando de esta forma la falta de confiabilidad en el proceso electoral.


                              Mildred G. Pabón Charneco
                                   Jueza Asociada